IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BLACK WARRIOR RIVERKEEPER, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-267-WKW |
| | ) | [WO] |
| ALABAMA DEPARTMENT OF TRANSPORTATION, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |
| _____ | | |
| BLACK WARRIOR RIVERKEEPER, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-794-WKW |
| | ) | |
| UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is Plaintiff's motion for preliminary injunction. (Doc. # 134.) In the second of these consolidated cases, Black Warrior moves to enjoin the issuance of a 404(b) permit by the U.S. Corps of Engineers to the Alabama Department of Transportation (ALDOT) for the discharge of dredge materials in the waters of the United States in connection with the construction of a 1.86-mile

portion of the Northern Beltway around Birmingham, Alabama. After careful review of the record, full consideration of the arguments, and a hearing on preliminary injunction, the court finds that the motion is due to be denied.

## I. BACKGROUND

**A.**   **Facts**

The Northern Beltline Project is a 50.1-mile stretch of proposed interstate highway bypassing Birmingham, Alabama, by connecting I-459 in Bessemer with I-59 in Trussville.  This project is estimated to take decades to complete with cost estimations currently set at $5.4 billion.  Plaintiff Black Warrior Riverkeeper, Inc. filed the first lawsuit in April 2011, asking the court to enjoin construction until Defendants Federal Highway Administration (FHWA), Mark Bartlett in his official capacity as Division Administrator of FHWA, Alabama Department of Transportation (ALDOT), and John Cooper in his official capacity as director of ALDOT took a "hard look" at the project's environmental effects.

Pursuant to the National Environmental Policy Act, 42 U.S.C. §§ 4321–47 (NEPA), ALDOT and the FHWA completed an Environmental Impact Statement (EIS) in 1997.  Reevaluations of the EIS were performed in 2006 and 2012. Defendants decided that the project was to begin by connecting State Route (SR) 79 and SR 75.  The Army Corps of Engineers (Corps), as a cooperating agency, focused its efforts during the Clean Water Act (CWA) permitting process on site-

specific considerations, while relying on the extensive analysis of impacts contained in the 1997 Final Environmental Impact Statement (FEIS) and the 2012 FEIS Reevaluation prepared by FHWA.  Plaintiff takes issue with the failure of Defendants to prepare an additional EIS during the process under section 404 of the CWA, to reevaluate impacts of, and alternatives to, the entire 50.1-mile project.

In late 2013, ALDOT received its 404 permit from the Corps.  Construction is scheduled to begin in early 2014 to connect SR 79 and SR 75.  The full 50.1-mile project may take as long as 30 years to complete.

**B.**     **Procedural Issue and Overview of the Merits Arguments**

Relevant for purposes of the preliminary injunction motion, the first-filed case seeks to require a supplemental EIS prior to further advancement of the entire 50.1-mile, $5.4 billion project, and the second-filed case objects to the 404(b) permit and is the one in which this injunctive motion resides.   A threshold procedural issue concerns which case framework governs the motion for preliminary injunction.  Is it the first-filed case involving the entire project, or is it the second-filed case in which the motion was filed?  Clearly, the correct answer is the latter.

The reason there is a "which case" question is that Plaintiff argues from a "whole project" perspective to stop the 404 permit. This permit is the kickoff to a much larger match, essentially the first shovel in the ground for the entire project.

Plaintiff's position is that no 404 permit should issue until the entire project has been reevaluated with an SEIS.  At bottom, Plaintiff does not complain so much about the 1.86-mile section.  Plaintiff is concerned about the cumulative environmental effects of the whole project and takes the position that nothing moves, beginning with the 404 permit for the first section of the highway, until a formal study is completed.  Thus, Plaintiff says the injunctive merits before the court are adoptive of the whole project.

Defendants advocate limiting the present merits analysis to just the 404 permit and the 1.86-mile section at issue. They point to the evidentiary record's 17 bankers boxes, a 1997 EIS, a 2006 reevaluation, and a 2012 reevaluation to say enough environmental analysis and accommodations have been done to begin the project.  No less than eight federal and state agencies have either signed off on the 404 permit for this initial section or not opposed the project, though questions remain regarding many other areas of the proposed beltway.  And if that is the scope, Defendants say, then Plaintiff loses because it has failed to individualize its complaint to this 1.86-mile section and particular 404 permit.

Plaintiff circumvents Defendants' position with a segmentation argument: Defendants have improperly segmented the project to avoid the requirements of NEPA and the CWA.  As the issues are framed, the first substantive question to be answered is the segmentation one.  If Defendants have segmented improperly the

4

project, there may be some likelihood of success on the merits of the attack on the permit, though the substantiability of that likelihood of success is not immediately apparent. If the project has not been segmented improperly, however, there is little likelihood of success on the permit argument alone, and the motion must fail. Because the segmentation argument implicates issues in both cases, and of necessity the CWA and NEPA, some analysis of the whole project is required.

## II. DISCUSSION

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008) (citations omitted). Such a remedy requires a "clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The moving party must show that it has a substantial likelihood of success on the merits, that it is likely to suffer irreparable injury unless the injunction is issued, that the balance of equities tips in its favor, and that an injunction is in the public interest. *Id.* at 20; *see also Grizzle v. Kemp*, 634 F.3d 1314, 1320 (11th Cir. 2011). Each of these four factors must be established independently. *See, e.g., Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (stating that "[a] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." (citing *McDonald's Corp. v. Robertson*, 147 F.3d

1301, 1306 (11th Cir. 1998)).  Thus, if Plaintiff is unable to establish any one of the factors, the motion for preliminary injunction must fail.

A.    **Plaintiff has not demonstrated a substantial likelihood of success on the merits.**

Plaintiff's substantial likelihood of success on the merits of its NEPA and CWA claims is evaluated under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–06.  Under the APA, the standard of review is whether the agency's action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *Id.* at § 706(2)(A).  This standard is exceedingly deferential, and the court is "not authorized to substitute [its] judgment for the agency's as long as [the agency's] conclusions are rational."  *Miccosukee Tribe of Indians of Fla. v. United States*, 566 F.3d 1257, 1264–65 (11th Cir. 2009) (internal quotation marks and citation omitted).

NEPA standards require that an agency take a "hard look" at the potential environmental impact of the proposed action before it makes a decision. *Robertson v. Methow Valley Citizen's Council*, 490 U.S. 332, 350 (1989).  The inquiry must be "searching and careful," and a court may not substitute its own substantive judgment for that of the agency.  *City of Alexandria, Va. v. FHWA*, 756 F.2d 1014, 1017 (4th Cir. 1985); *see also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976).  Plaintiff does not have a substantial likelihood of success on the

merits if it cannot show that the Section 404 permit improperly segments the Northern Beltline Project.

### 1. *NEPA 404 Permit Regulations*

The court first addresses Plaintiff's segmentation argument.  NEPA prohibits the "segmentation" of a project when it is done to mask the overall significance of the project's impacts, particularly its cumulative impacts.  40 C.F.R. § 1508.27(B)(7).  To fully evaluate whether a project has been improperly segmented for purposes of evading a thorough NEPA analysis, FHWA regulations require that the project "connect logical termini," "have independent utility," and not "restrict considerations of alternatives for other reasonably foreseeable transportation improvements."  23 C.F.R. § 771.111(f); *see also Preserve Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 916 F. Supp. 1557, 1566 (N.D. Ga. 1995), *aff'd,* 87 F.3d 1242 (11th Cir. 1996).

Because the Northern Beltline is part of the freeway system included in the Appalachian Development Highway Program authorized by Congress, federal funding will be made available over time (perhaps 30 or more years) to advance the construction of the project.  After approving the 2006 and 2012 reevaluations, FHWA approved phased construction of the Northern Beltline, beginning with the SR 79/75 portion.  NEPA allows the responsible agency administrative discretion in determining how to break up a large project into manageable phases.  *Kleppe v.*

*Sierra Club*, 427 U.S. 390, 414 (1976) (holding that one comprehensive impact statement covering all related projects was not necessary before proceeding to approve specific pending applications); *see also Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1059 (7th Cir. 2013) ("There is a difference between 'segmentation' in its perjorative sense and – what is within administrative discretion – breaking a complex investigation into manageable bits." (citations omitted)); *Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1069 (9th Cir. 1995) ("While we cannot allow an agency to segregate its actions in order to support a contention of minimal environmental impact, we also cannot force an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once.   To do so risks further paralysis of agency decisionmaking." (citations omitted)).

In *Save Barton Creek Association v. FHWA*, 950 F.2d 1129, 1141 (5th Cir. 1992), the Fifth Circuit determined that the challenged segments of the Austin Outer Loop met requirements that each phase of the project have independent utility, connect with logical termini, and not foreclose the opportunity to consider alternatives.  The court reasoned:

> The Austin Outer Loop is more closely analogous to the 3-A system of interstate and primary highways in the City of Baltimore which was the subject of litigation in *Movement Against Destruction v. Volpe*, 361 F. Supp. 1360 (D. Md. 1973) (*per curiam*), *aff'd per curiam*, 500 F.2d 29 (4th Cir. 1974).  There, the plaintiffs challenged the FHWA's failure to prepare an EIS prior to its approval of the system plan for

> interconnected and interdependent highways.  The court recognized that each component of the 3-A system served different functions and provided a useful facility even if the others were not constructed.  It held that there was "no 'major [F]ederal action' which treated the 3-A system as a unit, and, therefore, under the plain language of the NEPA no EIS [was] required for the '3-A system' as a whole."  *Id*. at 1383.  *See also Association Concerned About Tomorrow, Inc. v. Dole*, 610 F. Supp. 1101 (N.D. Tex. 1985) (finding that the segmentation of Loop 9 around Dallas County into segments or "legs" was an appropriate decision for the purposes of planning and development, including NEPA analysis; the legs of [the] Loop were not proposed for contemporaneous construction and had significant independent utility).

*Id.* at 1141 n.17.  In consideration of the substantial record before the court, this case fits squarely in the segmentation analysis of *Save Barton Creek*.[1]

The appropriate question is whether the SR 79/75 project serves a significant purpose if the other portions are not built.  *See Coalition on Sensible Transp. Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) (holding that the highway and interchange projects serve necessary purposes in the absence of I-270 expansion and are sufficiently independent); *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 299 (D.C. Cir. 1987) (*per curiam*) (recognizing substantial independent utility in a four-mile section of a mass transit project originally planned as 18.6 miles); *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 440–41 (5th Cir. 1981) (holding that urban highway projects, although related to the overall

---

[1]  There is one very significant difference in this case and *Save Barton Creek*:  Here, an EIS and two reevaluations over a seventeen-year period have been completed, considered, and accounted for in agency planning.  *Save Barton Creek* was decided in large part on the failure to prove that the segment at issue in Austin constituted "major federal action" under NEPA.  But the segmentation discussion of *Save Barton Creek* is instructive.

transportation plan, contributed individually to improving traffic conditions). Plaintiff argues that the traffic counts do not warrant the increase to a six-lane highway. Defendants correctly respond that the regulations only require independent utility, not maximum utility. The evidence establishes that the SR 79/75 segment increases the utility of the existing roadway network by providing access between well-traveled highways. Further, the SR 79/75 segment will relieve traffic on arterial and city streets. Whether four or six lanes are appropriate is a discretionary planning function of Defendants that the court will not disturb on this record.

Defendants have made a reasonable and supportable finding regarding utility. Plaintiff has failed to provide substantial evidence sufficient for this court to substitute its judgment for that of the agencies charged with making those administrative decisions regarding utility.

This project also satisfies the logical termini requirement because the termini are located at nodes of commercial and traffic activity. However, even if the court disagreed, it is not for the court to determine what is the most logical termini, only that the termini chosen by the agency are logical and that the agency did not act arbitrarily and capriciously in choosing the project termini. The court finds, with the benefit of the record, that this requirement is met.

The facts further show a reasonable conclusion by Defendants that proceeding with construction does not dictate that any other segment of the overall project must be built, and thus, it does not foreclose other alternatives for the rest of the Northern Beltline Project as a whole. Plaintiff alleges that the end points of SR 79/75 limit the reasonable alternatives for the end points of the segments that are proposed to connect to the 1.86-mile portion, thus limiting the eastern portion of the overall Beltline Project. Plaintiff has failed in its burden to establish that the end points of the first segment limit or prevent other routing options in the final design scheme for the other segments. Except for connecting to the end of this 1.86-mile stretch (3.71% of total mileage of the project), the remaining 48.24 miles are unconstrained as to locus as will be determined by future planning. No doubt, over the course of thirty years and with periodic reevaluations, sections of the project will migrate here and there. The adjoining sections may never be built and are not required in order for SR 79/75 to be functional. Ultimately, the SR 79/75 section will not foreclose other alternatives.

Accordingly, the SR 79/75 project satisfies NEPA regulations because it has independent utility, logical termini, and does not foreclose other alternatives for the overall project. Moreover, requiring the Corps to prepare an EIS for each 404 permit would likely result in the project never being started at all and would be

useless and redundant. *Price Road Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997).

### 2.   *EIS Analysis*

Plaintiff's second argument implicating the whole project is that the Corps avoided preparation of an EIS that would have "examined a broader spectrum of alternatives to the Northern Beltline. . . ." (Doc. # 135 at 27.) The question here is whether the Corps was required under NEPA to conduct a site-specific wetlands delineation in an additional EIS for the entire 50.1-mile Northern Beltline Project before issuing a 404 permit for a 1.86-mile section. Defendants contend it was not, and the court agrees.

NEPA regulations dictate that the separation of highway projects for purposes of impact analysis is improper when that separation is done in an effort to avoid compliance with federal law and avoid preparing an EIS. *See Preserve Endangered Areas of Cobb's History v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1247 (11th Cir. 1996). However, in *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1215 (11th Cir. 2002), the Eleventh Circuit upheld the Corps' decision to prepare four separate Environmental Assessments (EAs) and use the tiering method, which allows an agency to build onto FHWA's EIS for a highway construction project. "NEPA plainly is not intended to require duplication of work

by state and federal agencies." *Ohio Valley Envtl. Coal. v. Aracoma Coal. Co.*, 556 F.3d 177, 196 (4th Cir. 2009).

Defendants contend that the 2006 and 2012 reevaluations of the 1997 EIS adequately satisfy the requirements for the 404 permitting process of the site-specific 1.86-mile project. Defendants do not dispute that more studies will likely be necessary for the western portion of the Northern Beltline Project, but contend that more study is not necessary based on the findings of the 2006 and 2012 reevaluations for the eastern portion of the project, which includes the current 1.86-mile portion at issue.

In *Kleppe*, the United States Supreme Court explained that

> [e]ven had the Court of Appeals determined that a regional impact statement was due at that moment, it still would have erred in enjoining approval of the four mining plans unless it had made a finding that the impact statement covering them inadequately analyzed the environmental impacts of, and the alternatives to, their approval. So long as the statement covering them was adequate, there would have been no reason to enjoin their approval pending preparation of a broader regional statement; that broader statement, when prepared, simply would have taken into consideration the regional environmental effects of the four mining plans once they were in operation, in determining the permissibility of further coal-related operations in the region.

427 U.S. at 407 n.16. There is no persuasive argument here, nor is there a clear showing that would support a finding of inadequacy of the EIS as twice reevaluated.

NEPA does not require a comprehensive impact statement on all proposed actions in the entire Beltline Project before approving *any* of the segmented projects. *Id.* at 414 n.26. The 2012 reevaluation of the EIS covers the entire Northern Beltline Project, which is sufficient to conclude that there was no effort by the Corps to avoid analyzing the impacts of the Northern Beltline Project under NEPA. It included a comprehensive analysis of direct, indirect, and cumulative impacts pursuant to the Council on Environmental Quality guidelines. *See* 40 C.F.R. § 1501, *et seq.* The result was that there were no significant changes occurring to the project's design or the affected environment for the eastern portion, and a finding that an SEIS was not needed for this part of the overall project. FHWA did note in the 2012 reevaluation that there will be realignments for the western portion of the Beltline Project that would require additional studies to determine if an SEIS is needed before any construction is authorized for that portion. The Corps adopted the findings of the FHWA's additional studies, as permitted by NEPA. *See* 40 C.F.R. §§ 1501.5, 1501.6, 1506.3(c); *LaFlamme v. F.E.R.C.*, 945 F.2d 1124, 1130 (9th Cir. 1991) (holding that "it was not unreasonable for the Forest Service as a cooperating agency to decline to prepare independently an EA or an EIS" because FERC was the lead agency in reviewing the license application). This "tiering" method allows the Corps to prevent

redundant analysis and focus on what has not already been considered.  *Sierra Club*, 295 F.3d at 1214; *see also* 40 C.F.R. § 1508.28(b).

For the foregoing reasons, Plaintiff has not demonstrated that Defendants improperly segmented the SR 79/75 project in an effort to avoid preparing an SEIS.  Accordingly, Plaintiff has not shown a substantial likelihood of success on its claim that Defendants violated NEPA during the 404 permitting process, and issuance of a preliminary injunction is not appropriate.  Though further analysis is unnecessary, the court will discuss the remaining factors.

**B.**     **Plaintiff has not established that it will suffer irreparable harm.**

When seeking a preliminary injunction, a plaintiff must not only show that it will suffer irreparable harm, but it must also show that the alleged harm is not speculative but is both actual and imminent.  *Winter*, 555 U.S. at 21–22.  A mere "possibility" of harm is not enough to justify the issuance of such an extraordinary remedy.  *Id.*; *see also Grizzle*, 634 F.3d at 1320.  Plaintiff fails to establish any actual and imminent irreparable harm from the 1.86-mile proposed project which it is seeking to enjoin.

The majority of Plaintiff's argument focuses on the harms associated with the entire Northern Beltline project, with very little specific analysis of the actual activity permitted by the Corps for this segment.  Plaintiff supports its claim of irreparable harm to the environment by arguing that it should be presumed when an

agency fails to comply with NEPA, citing *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002).  (Doc. # 135 at 29.)  Specifically, Plaintiff alleges the permitted 404 activity represents "significant and permanent degradation of the watersheds of Self Creek, Gurley Creek, and surrounding streams, all of which are part of the sensitive headwaters that feed the Locust Fork of the Black Warrior River."  (Doc. # 135 at 30–31.)  However, Plaintiff does not rely on the initial phase of this construction project for which the 404 permit has been issued, but on the proposed fully completed project for which this permit is not issued.  Plaintiff also discusses impacts to the Turkey Creek Watershed, but the SR 79/75 project is not located in the Turkey Creek Watershed.

Even if Plaintiff's claimed irreparable harm were imminent, the Corps has included in the 404 permit required mitigation and minimization measures by ALDOT to minimize the impacts to streams and wetlands.  Because the unavoidable impacts to some streams and wetlands will be mitigated as a condition of the Corps' 404 permit, the environmental impacts do not reach the threshold of "significant."  *C.A.R.E. Now, Inc. v. FAA*, 844 F.2d 1569, 1575 (11th Cir. 1988).  Moreover, Plaintiff's arguments that the alleged impacts resulting from completion of later phases of the entire Northern Beltline Project are sufficiently "actual" or "imminent" to justify the issuance of an injunction at this stage are belied by the facts.  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1260 (10th Cir.

2003).   Much of the project is subject to additional changes in the decades of planning and preparation to come.   In *Greater Yellowstone*, the court noted that establishing the imminence of injury is critical to support the interim relief that a preliminary injunction provides.   *Id.*  "If the plaintiffs alleged that the eagles would be harmed only by the use of the completed project, and not by its construction, this would be insufficient to justify a preliminary injunction in advance of the trial court's decision on the merits."   *Id.*  Similarly, because Plaintiff only cites possible harms to the environment and not any actual, imminent, and irreparable harm that will result from the issuance of the 404 permit for this segment, a preliminary injunction is not warranted.

**C.**     **Plaintiff has not established that the balance of harms weighs in its favor or that a preliminary injunction is in the public interest.**

As the Court held in *Winter*, to succeed on a motion for preliminary injunction, a plaintiff must show that a preliminary injunction is favored by a balancing of the equities.   555 U.S. at 24.   Courts are to have particular regard for the public consequences of such an extraordinary remedy.   *Id.*  However, even a likely NEPA violation does not automatically call for injunctive relief especially if the balance of harms points the other way.   In certain circumstances the court may withhold injunctive relief when it would harm the public interest, even if doing so

would cause irreparable injury to the movant.  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982); *Yakus v. United States*, 321 U.S. 414, 440 (1944).

Plaintiff's balance of harm arguments are unpersuasive.  Plaintiff argues that the "harm to the environment may be presumed when an agency fails to comply with NEPA." *Davis*, 302 F.3d at 1115.  However, Plaintiff has failed to prove that Defendants have not complied with NEPA.  Plaintiff also cites the harm that will result from the degradation of the water resources in the Black Warrior River Basin, but this is a "whole project" argument already rejected.  And ALDOT's mitigation plan for this section, which was a condition of the 404 permit, will help avoid, minimize, and mitigate potential environmental impacts.  Plaintiff cites the harm from the commitment of agency resources and the formation of contractual obligations, but this argument assumes that the public interest is best served by not developing the Beltline Project.  Not so; the public also has an interest in development that will promote job growth and economic stability, and Plaintiff does not establish a factual weight of harm to override the public interest in development.

Though not controlling, consideration must be given to the fact that substantial funds have already been expended to begin construction on the 1.86-mile project, including preparation for preliminary engineering, right-of-way acquisition, and utility relocation work.  Delaying construction would have

significant financial impacts on Defendants and the public treasury, especially if the bid process has to be repeated.   Finally, the Corps provided substantial opportunities for public participation during the permitting process and adequately addressed concerns presented by the public.   Ultimately, the public's need for adequate transportation infrastructure outweighs Plaintiff's desire to prevent any change to this 1.86-mile area of the Black Warrior River environment.

## III.  CONCLUSION

For the foregoing reasons, Plaintiff has failed to establish, by a clear showing of substantial evidence, *Winter*, 555 U.S. at 24, the four elements necessary to support a preliminary injunction.   Accordingly, it is ORDERED that Plaintiff's motion for a preliminary injunction (Doc. # 134) is DENIED.

DONE this 17th day of January, 2014.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE