IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| BLACK WARRIOR RIVERKEEPER, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:11-CV-267-WKW (WO) |
| ALABAMA DEPARTMENT OF TRANSPORTATION, *et al.*, | ) ) ) | |
| Defendants. | ) | |
| _____ | | |
| BLACK WARRIOR RIVERKEEPER, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CASE NO. 2:13-CV-794-WKW (WO) |
| UNITED STATES ARMY CORPS OF ENGINEERS, *et al.*, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Mere administrative difficulty does not interpose such flexibility into the requirements of NEPA as to undercut the duty of compliance "to the fullest extent possible." But if this requirement is not rubber, neither is it iron. The statute must be construed in the light of reason if it is not to demand what is, fairly speaking, not meaningfully possible, given the obvious, that the resources of energy and research – and time – available to meet the Nation's needs are not infinite.

*Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972) (quoting 42

U.S.C. § 4332; footnote omitted).

In these consolidated cases, Plaintiff Black Warrior Riverkeeper, Inc., seeks declaratory and injunctive relief to require Defendants to perform a comprehensive supplemental environmental impact statement ("SEIS") for the Northern Beltline Project, a proposed six-lane controlled-access highway north of Birmingham, Alabama.   Before the court are Plaintiff's and Defendants' cross-motions for summary judgment. (Docs. # 163, 165, 167.)  The parties have fully briefed the motions and have submitted evidence in support of their opposing positions. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendants' motions are due to be granted and Plaintiff's motion is due to be denied.

## I. DEFINITIONS

This case involves numerous federal agencies, statutes, and regulations pertinent to environmental issues.  The multiplicity of acronyms and terms of art can be confusing. For clarity, the relevant ones are defined as follows:

- **AOI**: Area of influence.  The geographic area within which the project's indirect and cumulative environmental effects are expected to occur.  (USACOE000629; USACOE000677.)

- **ALDOT**: Alabama Department of Transportation.

- **APA**: Administrative Procedure Act, 5 U.S.C. §§ 701-06.

- **AR**: Documents from the administrative record submitted by FHWA are designated with this prefix.

- **CEQ**: Council on Environmental Quality.  NEPA established CEQ as a research and advisory body in the Executive Office of the President of the United States. 42 U.S.C. §§ 4342-44. CEQ issues general regulations for implementing NEPA; each federal agency then issues its own implementing regulations not inconsistent with CEQ regulations.  42 U.S.C. § 4332(B); 40 C.F.R. § 1500.1(a); 40 C.F.R. § 1500.2; 40 C.F.R. § 1500.3; 40 C.F.R. § 1500.6; *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 354 (1989).

- **COE**: Army Corps of Engineers.

- **CWA**: Clean Water Act, 33 U.S.C. § 1251 *et seq.*

- **Cumulative impact**: a major federal action's "impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Sometimes also referred to as "cumulative effect."[1]

- **Direct impact**: an effect of a major federal action that is "caused by the action and occur[s] at the same time and place." 40 C.F.R. § 1508.8(a). Also referred to as a "direct effect." *Id.*

- **Eastern section**: the section of the Northern Beltline that joins I-65 with the eastern terminus of the Beltline at I-59 in Trussville.

- **EA**: Environmental assessment, which is a concise public document that "(1) [b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement [('EIS')] or a finding of no significant impact [('FONSI'),] (2) [a]ids an agency's compliance with the Act when no [EIS] is necessary[, and] (3) [f]acilitate[s] preparation of a statement when one is necessary." 40 C.F.R. § 1508.9(a).

- **EIS**: Environmental impact statement, which is the detailed written statement required by section 102(2)(C) of NEPA, 42 U.S.C. § 4332, discussing the environmental impacts of, and proposed alternatives to, a major federal action. 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11. An EIS can be a draft environmental impact statement, a final environmental impact statement ("FEIS"), or a supplemental environmental impact statement ("SEIS). 40 C.F.R. § 1502.9.

- **The EIS Action:** The action Plaintiff filed in April 2011 against the Highway Defendants. In the EIS action, Plaintiff challenges the approval of the 2012 Re-evaluation.

- **FEIS**: Final environmental impact statement. Drafting environmental impact statements involves a number of steps, including circulation of drafts, making

---

[1] As used in the CEQ regulations, "effects" and "impacts" are synonymous. 40 C.F.R. § 1508.8.

revisions, responding to public comments, and so forth.  The final product of this process is the FEIS.  40 C.F.R. § 1502.9 (b).  The fact that the FEIS is a called a "final" environmental impact statement does not mean that additional environmental impact statements will not be required in the event that new information comes to light or changes occur that are relevant to the environmental impacts of the project.  *See* "SEIS," *infra*.

- **FHWA**: Federal Highway Administration.

- **FONSI**: Finding of no significant impact, which is "a document by a Federal agency briefly presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an [EIS] therefore will not be prepared. It shall include the [EA] or a summary of it and shall note any other environmental documents related to it."  40 C.F.R. § 1508.13.

- **Highway Defendants:** Collectively, FHWA, Mark Bartlett in his official capacity as Division Administrator of FHWA, ALDOT, and John Cooper in his official capacity as director of ALDOT.  The Highway Defendants are the defendants in the lead case, Case No. 2:11-CV-267-WKW-WC, in which Plaintiff challenges the sufficiency of a re-evaluation of the SEIS for the Northern Beltline.

- **Indirect impact:** an effect of a major federal action that is "caused by the action and [is] later in time or farther removed in distance, but [is] still reasonably foreseeable. Indirect [impacts] may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  40 C.F.R. § 1508.8(b).  Sometimes also referred to as an "indirect effect." *Id*.

- **NEPA**: National Environmental Policy Act, 42 U.S.C. §§ 4321-47.  NEPA requires federal agencies to prepare an EIS before undertaking major federal action that will significantly affect the quality of the human environment.  42 U.S.C. § 4332.

- **ROD**: Record of Decision.  When an agency is required to prepare an EIS, the agency is not allowed to make a decision on a proposed action until certain time periods have expired after the publication of the EIS.  40 C.F.R. § 1506.10.  At the time the agency makes the decision, it prepares a concise public ROD, which states what the decision is, identifies all alternatives considered, and discusses the means adopted to avoid or minimize the environmental harm from the decision. 40 C.F.R. § 1505.2.

- **2012 Re-evaluation:** Refers to a Re-evaluation that was completed in 2012 to

review the continuing validity of the FEIS and ROD for the Northern Beltline Project.  FHWA regulations require a written evaluation of a FEIS "before further approvals may be granted" when, as in this case, major steps to advance the project have not occurred within three years after completion of the FEIS.  23 C.F.R. § 771.129(b).  The purpose of the re-evaluation is to determine whether a SEIS is needed for the project.  *See S. Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 661 (3d Cir. 1999).

- **§ 404 permit**:  a permit issued by COE pursuant to § 404 of the CWA. In the absence of  § 404 permit, the discharge of pollutants, including dredged or fill material, into the waters of the United States is prohibited.  33 U.S.C. § 1311(a); 33 U.S.C. § 1344.

- **The § 404 permit action:** The action Plaintiff filed in 2013 against COE, COE's district commander, ALDOT, and ALDOT's director.  In the § 404 permit action, Plaintiff challenges a § 404 permit issued for a 1.86-mile section of the beltline joining SR 75 and SR 79.  The 1.86-mile section is located wholly within the eastern section of the Beltline.

- **SEIS**: Supplemental environmental impact statement.  A SEIS is a supplement to a FEIS.  Supplementation is required when "the agency makes substantial changes in the proposed action that are relevant to environmental concerns[,] or" when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); 23 C.F.R. § 771.130(a).  *See also* 23 C.F.R. § 771.130(a) (requiring supplementation "whenever [FHWA] determines that: (1) [c]hanges to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or (2) [n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.").  The duty to consider the necessity of a supplement is a continuing duty so long as major federal action remains to occur.  42 U.S.C. § 4331(b); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

- **SR**: State route.

- **Tiering**: "Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared."  40 C.F.R. § 1508.28. "Agencies are encouraged to tier their environmental impact statements to

eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20.

- **USACOE**: Documents from the administrative record submitted by COE are designated with this prefix.

- **Western section**: refers to the section of the Northern Beltline that joins I-65 with the western terminus of the Beltline at I-459/59/20 in Bessemer.

## II. FACTS AND PROCEDURAL HISTORY

### A.    The EIS Action

The Northern Beltline Project is a 52-mile[2] stretch of proposed interstate highway bypassing Birmingham, Alabama.   The Beltline will have its western terminus at Interstate 459/20/59 in Bessemer and its eastern terminus at Interstate 59 in Trussville. The estimated cost is $5.4 billion in year-of-expenditure dollars, with an estimated completion date of 2048. (AR 16782.)[3]    Defendants are just beginning a 1.86-mile section of the highway between State Route ("SR") 75 and SR 79 near Palmerdale, Alabama, which will be the first construction phase of the Beltline.

Pursuant to NEPA, FHWA and ALDOT completed a Final Environmental Impact Statement for the Northern Beltline in 1997 and issued a ROD in 1999. (AR 01199; AR 2005.)

In 2006, FWHA approved a re-evaluation of a 3.4-mile portion of the project prior

---

[2] In the administrative record, the Northern Beltline is alternately described as being 50.1 miles long and 52 miles long.  The discrepancy is due to whether ramps are included in the measurement.  (USACOE004804.)

[3] FHWA and COE both submitted voluminous administrative records.  Citations to the administrative record supplied by FHWA are designated with an "AR" before the page number. Citations to the administrative record supplied by COE are designated with "USACOE" before the page number.

to ALDOT taking steps to obtain right-of-way for that portion of the highway.  (AR

05538.)  In the 2006 Re-Evaluation, FHWA stated:

> As indicated in the project description, this reevaluation
> covers only that portion of the beltline project from west of
> S.R. 79 to east of S.R. 75 near Palmerdale . . . , a distance of
> approximately 3.4[ ]miles. Design studies have been
> advanced on this section of the project to the point of FHWA
> authorization of design contracts and right-of-way
> acquisition. The balance of the Northern Beltline project will
> be reevaluated as design work progresses. Although an
> assessment of the indirect and cumulative impacts (ICI) is
> being performed for the entire project, including this section,
> no project authorizations outside of the S.R. 79/S.R. 75
> section will be approved by ALDOT or the FHWA until the
> ICI is completed.

(AR 05540.)

In April 2011, Plaintiff Black Warrior Riverkeeper, Inc., filed suit against the

Highway Defendants.  Plaintiff contended that the Highway Defendants failed to comply

with NEPA's requirement to take a "hard look" at the Northern Beltline's environmental

effects.

In 2012, the U.S. Department of Transportation, FHWA, and ALDOT completed

the 2012 Re-evaluation of the entire Northern Beltline Project "to assess any new

information or changes that have occurred in the design or scope of the project and/or the

affected environment and evaluate their effect on the validity of the [FEIS]."

(USACOE000511-512.)  On March 29, 2012, FHWA approved the 2012 Re-evaluation

subject to certain limitations, including the following:

> Changes and adjustments occurring in the western section of
> the project between I-459/59/20 and I-65 include a number of
> alignment shifts that were not covered by the 1997 FEIS. The

Reevaluation included information on the initial reviews of the alignment shifts and found no new significant impacts were readily identifiable. In accordance with Section 771.130(c) of Title 23 of the Code of Federal Regulations, FHWA has determined that additional environmental studies are needed to fully evaluate the potential impacts associated with the modified alignment. *Based on the findings of the additional environmental studies, FHWA will determine if a Supplemental Environmental Impact Statement is needed.* Therefore, the Alabama Department of Transportation (ALDOT) may not proceed at this time with any activities in the western portions of the project until the additional environmental studies are completed.

*Changes in the eastern area of the project between I-65 and I-59 will not result in any new significant environmental impacts.*

*Based on the above determinations, ALDOT may proceed with [Northern Beltline] project activities on the eastern section of the project, between I-65 and I-59.*

(USACOE000511-513 (emphasis added).)

After the issuance of the 2012 Re-evaluation, Plaintiff filed an amended complaint (Doc. # 82) against the Highway Defendants seeking declaratory relief and an injunction against construction of any portion of the Northern Beltline Project until Defendants perform a comprehensive SEIS for the entire Northern Beltline project.

**B.    The § 404 Permit Action**

On August 8, 2011, ALDOT sent COE a preconstruction notification letter seeking concurrence with ALDOT's determination that a pre-existing nationwide permit[4]

_____

[4] "Nationwide permits (NWPs) are a type of general permit issued by the Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts. . . .  An activity is authorized under an NWP only if that activity and the permittee satisfy all of the NWP's terms and conditions. Activities that do not qualify for

covered the first construction project of the eastern section of the Northern Beltline, a 3.4-mile section from west of SR 79 to east of SR 75.   (USACOE000001-3). Construction would impact wetlands and streams through discharges "associated with filling activities for roadway construction (including stream relocation and channelization), culvert installation and extension, fill associated with detention ponds, culvert for a temporary access road to access an archaeological site, and rip rap installation." (USACOE004805.)  COE determined that, because the nationwide permit did not allow for stream relocation or channelization, the project would have to be reviewed under the individual permitting process.  (USACOE004807.)

Prior to October 12, 2011, ALDOT submitted information to review the project under the individual permitting process.  (USACOE004807.)  However, in November 2011, ALDOT requested that the project be withdrawn from further processing to allow time for additional wildlife studies and the completion of the 2012 Re-evaluation. (USACOE004808.)  On May 31, 2012, after FHWA approved the 2012 Re-evaluation, ALDOT requested that COE reopen the § 404 permit application file for the 3.4-mile project.  (USACOE004808.)  Because there had been no changes to the project during the time the file was closed, COE proceeded to evaluate the original project as it had been submitted in 2011.  (USACOE004808.)

On June 13, 2013, COE, ALDOT, and FHWA representatives met to discuss minimization of the project's impacts, particularly impacts related to the portions of the

---

authorization under an NWP still may be authorized by an individual or regional general permit." 33 C.F.R. § 330.1(b)-(c).

project east of SR 75 and west of SR 79.  (USACOE004808.)   After this discussion, ALDOT agreed to remove those portions of the project so the project would have logical termini at SR 75 and SR 79.  (USACOE004808-09.)   As revised, the proposed project was a six-lane, 1.86-mile limited-access divided highway connecting SR 75 and SR 79 in Palmerdale, Alabama.   (USACOE004804;  USACOE004806;  USACOE004852-53.) COE recognized that the 1.86-mile project was intended to eventually be incorporated into the 52-mile Beltline.  (USACOE004804.)

During the permitting process, COE noted for the record that "[o]ther segments of the [Northern Beltline] project may not happen for 10-20 years down the road. Or they may not happen at all. It all depends on funding. The Corps cannot issue a 20-year permit, which is one of the reasons just a portion of the project is being considered at this time."  (USACOE000171.)  COE, as a cooperating agency, focused its efforts during the § 404 permitting process on site-specific considerations for the 1.86-mile project, while relying on the extensive analysis of impacts contained in the 1997 Final Environmental Impact Statement ("FEIS") and the 2012 FEIS Re-evaluation prepared by FHWA.

On September 30, 2013, COE approved a discharge permit for the 1.86-mile connector, thus allowing construction to begin on the first section of the Northern Beltline.  (USACOE004955.)   On October 25, 2013, Plaintiff filed suit against COE, COE's Mobile District Commander, Jon J. Chytka, ALDOT, and ALDOT Director John R. Cooper.  Plaintiff sought declaratory and injunctive relief rescinding the § 404 permit and requiring that a SEIS be prepared to reevaluate the environmental impacts of, and alternatives to, the entire 50.1-mile Northern Beltline project.

Plaintiff's § 404 permit action has been consolidated with Plaintiff's SEIS action. Both are APA cases that involve judicial review of administrative actions related to the Northern Beltline, and both cases involve Plaintiff's contention that a comprehensive SEIS is required for the entire Northern Beltline.

## III.   STANDARD OF REVIEW

### A.   Standard of Review Applicable to Summary Judgment Cross-Motions

To succeed on summary judgment, the movant must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view the evidence and the inferences from that evidence in the light most favorable to the nonmovant. *Jean–Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This responsibility includes identifying the portions of the record illustrating the absence of a genuine dispute of material fact. *Id*. Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee's note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact."). If the movant meets its burden, the burden shifts to

the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

Cross-motions for summary judgment "must be considered separately," and "each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004); *see also Bricklayers, Masons & Plasterers Int'l Union of Am., Local Union No. 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)[5] ("Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed."). In some cases, "[c]ross motions for summary judgment may be probative of the nonexistence of a factual dispute." *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983). However, the existence of cross motions for summary judgment "'do[es] not automatically empower the court to dispense with the determination whether questions of material fact exist.'" *Ga. State Conference of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (quoting *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983)). This is so

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

because "each party moving for summary judgment may do so on different legal theories dependent on different constellations of material facts. Indeed, cross-motions for summary judgment may demonstrate a genuine dispute as to material facts as often as not." *Bricklayers*, 512 F.2d at 1023.

"'[W]hen both parties proceed on the same legal theory and rely on the same material facts[,] the court is signaled that the case is ripe for summary judgment." *Shook*, 713 F.2d at 665.  Even then, however, "[a] court may discover questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist. . . . . Thus, before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute." *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984) (adopting order of district judge on summary judgment).

**B.      APA Standard of Review Applicable to Challenges to Administrative Actions under CWA and NEPA**

In the SEIS action, Plaintiff alleges that the Highway Defendants violated NEPA and its implementing regulations.  In the § 404 action, Plaintiff alleges that COE and ALDOT violated NEPA, the CWA, and regulations implementing both of those statutes.

"NEPA declares a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).  To ensure that federal agencies "use all practicable means, consistent with other essential considerations of national policy" to comply with that commitment, 42 U.S.C. §

4331(b), NEPA imposes "action-forcing" procedures that require federal agencies (1) to take a hard look at the environmental impact of major federal actions and (2) to inform the public regarding the environmental decisionmaking process. *Id.* at 348-50; *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *see also* 40 C.F.R. § 1500.1(a) (describing the policy and function of NEPA). "Although these procedures are almost certain to affect the agency's substantive decision, . . . NEPA itself does not mandate particular results, but simply prescribes the necessary process. . . . If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350. Thus, NEPA does not prohibit federal projects that are highly destructive of the environment; "NEPA merely prohibits uninformed – rather than unwise – agency action." *Id.* at 351; *see also Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1361-62 (11th Cir. 2008) ("NEPA is procedural, setting forth no substantive limits on agency decision-making. . . . In this case, it would not violate NEPA if the EIS noted that granting the permits would result in the permanent, irreversible destruction of the entire Florida Everglades, but the [federal agency] decided that economic benefits outweighed that negative environmental impact. That capricious decision might run afoul of a duty imposed by a different statute, but it would not violate any duty imposed by NEPA.").

The Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*, at issue in the § 404 permit action, was enacted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The CWA prohibits the discharge

of pollutants, including dredged or fill material, into the waters of the United States without a permit issued by COE pursuant to § 404 of the CWA.  33 U.S.C. § 1311(a); 33 U.S.C. § 1344.   All § 404 discharge permits must meet the § 404(b)(1) Guidelines codified at 40 C.F.R. § 230, as well as other applicable regulations. 33 U.S.C. § 1344(b)(1); 33 C.F.R. § 320.4; 33 C.F.R. § 323.1; 33 C.F.R. § 325.1(a); 33 C.F.R. Pt. 325, App. B.

Because neither NEPA nor the CWA creates a private right of action challenging discretionary agency actions, plaintiffs challenging an agency action on the basis of these statutes must do so under Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06. *Van Antwerp*, 526 F.3d at 1356; *Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1249 (11th Cir. 1996).  Pursuant to the APA, the reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), or "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

In reviewing actions brought pursuant to the APA, "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."  5 U.S.C. § 706.  However, the standard for determining whether an agency action is arbitrary and capricious "is exceedingly deferential."  *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996); *see N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538 (11th Cir. 1990) ("Along the

15

standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal.").   The deference that the "arbitrary and capricious" standard affords to the agency applies "not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue."   *Van Antwerp*, 526 F.3d at 1361.   "[E]ven in the context of summary judgment, an agency action is entitled to great deference."   *Pres. Endangered Areas*, 87 F.3d at 1246.

The APA requires that, at the administrative stage of the proceedings, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)).   The focal point at the judicial stage of review of an administrative agency's action is the administrative record. *Pres. Endangered Areas*, 87 F.3d at 1246.   The reviewing court looks to the entire administrative record that was before the agency at the time of its decision to determine (1) whether the agency's decision was based on a consideration of the relevant factors and (2) whether the agency "committed a clear error of judgment that lacks a rational connection between the facts found and the choice made."   *Legal Envtl. Assistance Found., Inc. v. U.S. E.P.A.*, 276 F.3d 1253, 1265 (11th Cir. 2001) (citation and internal quotation marks omitted); *see also Or. Nat. Res. Council*, 490 U.S. at 378; *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Sierra Club v. U.S. Army Corps of Eng's*, 295 F.3d

1209, 1216 (11th Cir. 2002) (holding that an agency's decision is "arbitrary and capricious under 'hard look' review if it suffers from one of the following: (1) the decision does not rely on the factors that Congress intended the agency to consider; (2) the agency failed entirely to consider an important aspect of the problem; (3) the agency offers an explanation which runs counter to the evidence; or (4) the decision is so implausible that it cannot be the result of differing viewpoints or the result of agency expertise."); *N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d 1533, 1538-39 (11th Cir. 1990).

To determine whether the agency's decision manifests a "clear error of judgment," the court must determine only whether the agency's decision was "reasonably supported by the information before it. This does not require that all of the data support the agency's decision. It is enough that the [agency] considered all relevant factors and that there is credible evidence in the record to support its action." *Envtl. Coal. of Broward Cnty., Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987). The court will not uphold the agency's action by supplying a reasoned basis for the agency's action that the agency has not invoked, but the court will uphold an agency decision of less than ideal clarity if the agency's path may be reasonably discerned from the record. *Motor Vehicle Mfrs.*, 463 U.S. at 43. The reviewing court's inquiry must be "searching and careful," but the court may not substitute its judgment for that of the agency concerning the wisdom or prudence of the proposed action, and the court must defer to the agency's technical expertise. *Or. Nat. Res. Council*, 490 U.S. at 378; *City Of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1352 (11th Cir. 2005); *Fund for Animals*, 85 F.3d at 542; *N. Buckhead Civic Ass'n*, 903 F.2d at

1538-39.  The deference afforded to agency's determinations is particularly appropriate in cases such as this one that involve complex environmental statutes.  *Envtl. Coal.*, 831 F.2d at 986.

Before proceeding further, a word about the parties' relative burdens in this APA case is required.  On summary judgment, Plaintiff raises a plethora of objections to the agency decisions at issue – often in the most conclusory way possible – and then argues that the administrative agencies failed to articulate a satisfactory reason why those objections are without merit.  Plaintiff's shotgun approach is inappropriate because, in effect, Plaintiff is attempting to reverse the burden of proof.[6]  At this stage of review, the burden is on Plaintiff to demonstrate that the agencies acted arbitrarily and capriciously.

The agency's obligation at the *administrative* phase of proceedings to "articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs.*, 463 U.S. at 43, should not be confused with the parties' relative burdens during the *judicial* phase of the proceedings.  At the *judicial* stage of review, "'[a]dministrative action . . . comes before the courts clothed with a presumption of regularity,'" and *Plaintiff* bears the "difficult" and "heavy" burden to demonstrate that the agency decisions were arbitrary, capricious, or otherwise not in accordance with the law.  *Sierra Club v. U.S. Army Corps of Eng'rs*,

---

[6] *See, e.g.,* Doc. # 164 at 40-41 (Plaintiff's initial brief, arguing that Defendants were required to issue a SEIS because "changes have occurred in the Northern Beltline's environment" including the fact that "[b]usiness and residential relocation impacts in the corridor have increased twofold since the 1997 EIS"); Doc. # 170 at 5 (Plaintiff's reply brief, arguing that "Defendants have attempted to shift NEPA's requirements onto Plaintiff by arguing that Plaintiff has not shown the increased number of relocations is significant").  Contrary to Plaintiff's argument, Plaintiff indeed has the burden of to show that the Highway Defendants' finding of no significance was arbitrary and capricious.

295 F.3d at 1222-23 (quoting *Nicholson v. Brown*, 599 F.2d 639, 649 (5th Cir. 1979));
*see also Legal Envtl. Assistance Found., Inc. v. U.S. E.P.A.*, 276 F.3d 1253, 1265 (11th
Cir. 2001) ("In reviewing the reasonableness of an agency's decision-making process
under the arbitrary and capricious standard of the [APA], we are mindful that a party
seeking to have a court declare an agency action to be arbitrary and capricious carries a
heavy burden indeed." (citation and internal quotation marks omitted)); *Tex. Comm. on
Nat. Res. v. Marsh*, 736 F.2d 262, 270 (5th Cir. 1984), *on reh'g*, 741 F.2d 823 (5th Cir.
1984) ("[T]he district court required the Corps to prove that its selection of alternative
water-supply sources was reasonable. This approach turns the review process on its head:
it is the party seeking to invalidate an EIS, not the agency, which has the burden of proof
on this issue." (emphasis in original)).  "Absent evidence to the contrary, [the court will]
presume that an agency has acted in accordance with its regulations." *Sierra Club v. U.S.
Army Corps of Eng'rs*, 295 F.3d at 1223.

## IV. DISCUSSION:  OVERVIEW

Section V. addresses the motions for summary judgment in the EIS action.  In the
EIS action, Plaintiff presents two claims for relief.  Section V.A. and V.B. identify the
final agency actions that are subject to review in the EIS action.  No final agency decision
has been made as to the necessity of a SEIS for the western section; that decision will be
made after more detailed designs and additional environmental studies.   FHWA's
decision that no SEIS is needed for the eastern portion of the Beltline is a final agency
action that is ripe for review, as is its decision that it may reach a conclusion about the
necessity of a SEIS for the eastern section while its decision regarding the western

section is still pending.

Section V.C. explains that Defendants are entitled to summary judgment on Count I of Plaintiff's complaint, in which Plaintiff alleges that the Highway Defendants improperly divided ("segmented") the Beltline into the eastern and western sections to avoid conducting a comprehensive SEIS for the Northern Beltline Project.  Section V.D. explains that Plaintiff's remaining claims are due to be dismissed because, by failing to direct its arguments toward the Highway Defendants' decision not to issue an SEIS for the *eastern* section, Plaintiff has failed to carry its burden to demonstrate that the final agency action at issue was arbitrary or capricious.

However, in an abundance of caution, and as an alternative basis for granting summary judgment in favor of the Highway Defendants, Section V.E. addresses Plaintiff's allegations in both Counts I and II that the Highway Defendants acted arbitrarily and capriciously and failed to take a hard look at all relevant factors in deciding whether a SEIS is needed.

Section VI. explains why the motions for summary judgment are due to be granted in the § 404 action.

## V. ANALYSIS:  THE EIS ACTION

**A.    The Arbitrary and Capricious Standard of Review Governs Plaintiff's Claims**

In Count I of its complaint in the EIS action, Plaintiff contends that the failure to create a SEIS for the entire Northern Beltline constitutes an "agency action unlawfully withheld or unreasonably delayed" within the meaning of 5 U.S.C. § 706(1).  "Failures to act are sometimes remediable under the APA, but not always."  *Norton v. S. Utah*

20

*Wilderness Alliance*, 542 U.S. 55, 61 (2004) ("*SUWA*").  The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702; *see also* 5 U.S.C.A. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review.").  The APA defines "agency action" to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, *or failure to act*."  5 U.S.C. § 551(13) (emphasis added).  The APA provides relief for a failure to act in 5 U.S.C. § 706(1): "The reviewing court shall . . . compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706 (1).

To be subject to judicial review under § 706(1) of the APA, an agency's failure to act must be the failure to take a discrete agency action, and the agency action must be one that is "unlawfully withheld or unreasonably delayed."   5 U.S.C. § 706 (1); *SUWA*, 542 U.S. at 61-63.  "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is *required to take*."  *SUWA*, 542 U.S. at 64 (emphasis in original).  Further, "§ 706(1) empowers a court only to compel an agency 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing how it shall act.'"  *Id.* (quoting Attorney General's Manual on the Administrative Procedure Act 108 (1947)).  Thus, the court can compel the Highway Defendants to issue a single SEIS for the entire Northern Beltline only if issuing a single SEIS for the entire Northern Beltline is a discrete, non-discretionary agency action that the Highway Defendants failed to take despite being legally required to do so.

21

The issuance of a SEIS is not a ministerial or nondiscretionary act.  Rather, whether to issue a SEIS is, of necessity, a decision that "requires a high level of expertise" that is committed to "the informed discretion of the responsible federal agencies." *Or. Nat. Res. Council*, 490 U.S. at 373; *see* 23 C.F.R. § 771.130 (providing that "[a]n EIS shall be supplemented whenever the Administration determines" certain circumstances exist).  Presumably, Plaintiff recognizes this fact, because, on summary judgment, Plaintiff correctly proposes that the operable standard of review is the "arbitrary and capricious" standard applicable to final agency *action* under § 706(2), not to *inaction* under § 706(1).  Section 706(1) does not provide relief for arbitrary and capricious conduct.  (Doc. # 164 at 33.)  *See Georgia v. Army Corps of Eng'rs*, 302 F.3d 1242, 1249 n.4 (11th Cir. 2002) (noting that different standards govern review under § 706(1) and 706(2)).

FHWA has decided that further study is needed before it can determine whether a SEIS is necessary for the western section.  FHWA has also determined that changes in the eastern section do not require issuance of a SEIS.  These decisions are committed to the discretion of the agency.  *See* 23 C.F.R. § 771.130(a) (providing that an EIS "shall be supplemented whenever the Administration determines" that changes, new information, or new circumstances result in significant environmental impacts that were not evaluated in the EIS); 23 C.F.R. § 771.130(b) ("Where the Administration is uncertain of the significance of the new impacts, the applicant will develop appropriate environmental studies or, if the Administration deems appropriate, an EA to assess the impacts of the changes, new information, or new circumstances.").

Plaintiff does not argue that FHWA's decision to *delay* a determination regarding the necessity of a SEIS due to the need for further study of changes in the western section is an "unreasonable delay" pursuant to § 706(1).  Rather, Plaintiff contends that, upon consideration of the 2012 Re-evaluation and all of the presently available information about the impacts of the project, FHWA should have instead reached a decision that changes in both the eastern and western sections of the Beltline have significant impacts that require that a SEIS be conducted for the entire Beltline.  Plaintiff contends that FHWA's failure to reach Plaintiff's preferred decision is an "agency action unlawfully withheld or unreasonably delayed" under § 706(1).  (Doc. # 86.)

In other words, by characterizing the failure to conclude that a SEIS is necessary for the entire Beltline as a "failure-to-act" claim, Plaintiff attempts to substitute its preferred outcome for the decision that the FHWA reached.  Section 706(1) is not a back door through which a plaintiff may, by artful pleading, invite a court to substitute its judgment for that of the agency or to compel the agency to deploy its lawful discretion in a way preferred by the plaintiff.  *See SUWA*, 542 U.S. at 65 ("[W]hen an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power [under § 706(1)] to specify what the action must be.").[7]  *Cf. Motor Vehicle Mfrs. Ass'n of U.S.,*

---

[7] *See also* Charles Alan Wright & Charles H. Koch, Jr., 33 Fed. Prac. & Proc. Judicial Review § 8387 (1st ed.) (footnotes omitted):

> An obvious countermove to [the holding of *SUWA* that § 706(1) reaches only failure to take "discrete" action] might be for a petitioner to request more specific relief.  For instance . . . rather than seeking a generalized order requiring an agency to implement

*Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard [for actions brought pursuant to § 706(2)] is narrow and a court is not to substitute its judgment for that of the agency.").

Therefore, the Highway Defendants' failure to issue a single SEIS for the entire Northern Beltline is not justiciable as a failure-to-act claim under § 706(1).  *See SUWA* 542 U.S. at  65 ("[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take.").  Rather, as Plaintiff implicitly acknowledges on summary judgment by challenging the decision as "arbitrary and capricious," both claims in Plaintiff's complaint are subject to review, if at all, under § 706(2).  *See Or. Nat. Res. Council*, 490 U.S. at 375-76 (holding that an agency's decision not to supplement a FEIS "is controlled by the 'arbitrary and capricious' standard of § 706(2)(A)").

## B.     The Final Agency Action at Issue in This Case

"If [a] claim attacks an agency's action, instead of its failure to act, and the statute allegedly violated does not provide a private right of action, then the 'agency action' must also be a 'final agency action.'"  *Fanin v. U.S. Dep't of Veterans Affairs*, 572 F.3d 868, 877 (11th Cir. 2009).  "[T]he finality requirement is concerned with whether the

---

a broad statutory duty, [a plaintiff] could instead seek an order requiring the agency to implement that broad statutory duty in some particular way - *e.g.*, by adopting a rule that [the plaintiff] has kindly drafted for the agency's consideration. . . .  The Court [in *SUWA*] blocked this avenue, too, however, by emphasizing that courts must not use their remedial authority to usurp agency discretion. Determining how, precisely, to implement a broad statutory duty is up to the expert agency charged with the task, not the courts.

initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury." *Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 193 (1985), *superseded by statute on other grounds*, 47 U.S.C. § 332(c)(7)(B)(v). "The core question [in the finality determination] is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992). Thus, "[t]o be considered 'final,' an agency's action: (1) 'must mark the consummation of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature;' and (2) 'must be one by which rights or obligations have been determined, or from which legal consequences will flow.'" *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1280 (11th Cir. 2007) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)). "By contrast, 'the Supreme Court has defined a nonfinal agency order as one that "does not itself adversely affect complainant but only affects his rights adversely on the contingency of future administrative action."'" *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236-37 (11th Cir. 2003) (quoting *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir. 1999) (quoting in turn *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939)). "[F]ederal jurisdiction is . . . lacking when the administrative action in question is not 'final' within the meaning of 5 U.S.C. § 704." *Id.* at 1236.

In Count I, Plaintiff contends that, because of the cumulative effect of project changes, new information, and new circumstances throughout both the eastern and western sections of the Northern Beltline, a comprehensive SEIS must be issued for the entire project. Also in Count I, Plaintiff contends that the Highway Defendants failed to

comply with NEPA by dividing the Northern Beltline into two segments to avoid preparation of a SEIS for the Northern Beltline.  In Count II, Plaintiff alleges that, in the 2012 Re-evaluation, the Highway Defendants failed to comply with NEPA procedures by failing to consider all of the direct, indirect, and cumulative impacts of the Northern Beltline project.  In other words, Plaintiff is not merely seeking review of the validity of FHWA's conclusion that no SEIS is needed for the eastern section and that construction may proceed that eastern section.  Rather, Plaintiff seeks a judgment requiring FHWA and ALDOT to complete a SEIS for the entire project.

The Highway Defendants have not yet made a decision as to the necessity or scope of any SEIS that may be issued, if at all, for the western section of the Beltline; that decision will be made after FHWA and ALDOT create more detailed designs of the project and complete their studies of the environmental impacts of the western section.[8] Therefore, FHWA's reservation of further consideration of the necessity of a SEIS in the western section is not a final agency action because it "only affects [Plaintiff's] rights adversely on the contingency of future administrative action." *Nat'l Parks*, 324 F.3d at 1236-37.  Moreover, because the NEPA-imposed duty to take a hard look at the environmental consequences of major federal action is procedural in nature, a claim alleging failure to satisfy that duty is ripe for review "at the time the failure takes place.'"

---

[8] In theory, under certain circumstances, it is possible that development of a SEIS to address issues of limited scope, such as changes in location or design variations for a limited portion of the project, may require a reassessment of the entire action or of more than a limited portion of the entire action.  23 C.F.R. § 771.130(f).  In this case, there is no indication that the Highway Defendants anticipate issuing a SEIS for the entire Northern Beltline after they complete their studies of the western section.

*Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1174 (11th Cir. 2006) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998)).  It is simply not possible to predict whether the Highway Defendants will fail to take a hard look at whether a SEIS should be issued for the western section because that decision has yet to be made pending further study and review. The substance of and reasons for whatever decision will be made are unknown, and there is no way to meaningfully subject the issue to judicial review at this time.  Because "[w]e have no idea whether or when" a SEIS will be issued for the western section, "the issue is not fit for adjudication." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal citation and quotation marks omitted).  For these reasons, the Highway Defendants have not taken a final agency action as to the necessity of a SEIS for the western section, and the issue is not ripe for review.  *See id.* at 300 ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted)).

However, a determination *has* been made that any SEIS that may be issued will not include a comprehensive evaluation of the eastern section of the beltline. (USCOE000523 ("For the project sections between I-65 and I-59 . . . significant changes in impacts or in the affected environment have not been identified.  Therefore, no additional analysis of the project between I-65 and I-59 is required and a supplemental EIS is not warranted under the applicable NEPA regulations.").)  Further, based on the decision that no SEIS is required for the eastern section of the Beltline, FHWA has authorized ALDOT to proceed with construction of the eastern section of the Northern Beltline.  (USACOE000511-513.)

27

Accordingly, FHWA's decision that no SEIS is needed for the eastern portion of the Beltline is ripe for review, as is its decision that it may reach a conclusion about the necessity of a SEIS for the eastern section while reserving a decision regarding the western section pending further development and review. *Ouachita*, 463 F.3d at 1174 ("[A] person . . . who is injured by a failure to comply with the NEPA procedure may complain of that failure at the time the failure takes place. As we see it, that is the end of the proper ripeness analysis in a NEPA suit."); *see* 5 U.S.C. § 551(13) (defining "agency action" to include "the whole *or a part* of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act" (emphasis added)); *Bennett*, 520 U.S. 154, 177 (1997) (holding that an agency action is final for purposes of review if it marks the consummation of the agency's decisionmaking process and is a decision from which legal consequences will flow).

## C.      Segmentation of the Eastern and Western Sections of the Beltline

Count I challenges FHWA's decision that it may reach a conclusion about the necessity of a SEIS for the eastern section while reserving consideration of the necessity of a SEIS for the western section pending further design development and environmental studies. Plaintiff contends that Defendants "improperly divided the Northern Beltline into two segments to avoid preparation of a SEIS for the entire Northern Beltline." (Doc. # 82 ¶ 86.)   However, on summary judgment, Plaintiff has put forth only very scant arguments to support its position that the Highway Defendants engaged in improper segmentation by finding that no SEIS was required for the *eastern section* of the Beltline

while reserving consideration of the western section for further study.[9]

In its summary judgment reply brief, Plaintiff cites 23 C.F.R. § 771.130(f)(3) in support of its argument that the Highway Defendants improperly determined "that further study would only be required for half of the Northern Beltline."  (Doc. # 170 at 3.)  23 C.F.R. § 771.130(f) provides:

> (f) In some cases, a supplemental EIS may be required to address issues of limited scope, such as the extent of proposed mitigation or the evaluation of location or design variations for a limited portion of the overall project. Where this is the case, the preparation of a supplemental EIS shall not necessarily:
>
> > (1)    Prevent the granting of new approvals;
> >
> > (2)    Require the withdrawal of previous approvals; or
> >
> > (3)    Require the suspension of project activities[] for any activity not directly affected by the supplement.  *If the changes in question are of such magnitude to require a reassessment of the entire action, or more than a limited portion of the overall action, the Administration shall suspend any activities which would have an adverse environmental impact or limit the choice of reasonable alternatives, until the supplemental EIS is completed.*

23 C.F.R. § 771.130(f) (emphasis added).

By its terms, 23 C.F.R. § 771.130(f)(3) does not place any limitation on an

_____

[9] In its summary judgment briefs, Plaintiff's argument regarding the propriety of segmentation almost exclusively consists of argument that COE improperly issued the § 404 permit for the 1.86 mile section of highway that is located wholly within the eastern section. That argument is addressed in Sections VI.A and VI.C. of this memorandum opinion.

agency's decision whether to *complete a SEIS* for some portion of the project smaller than the entire Beltline; in fact, § 771.130(f) specifically contemplates that "[i]n some cases, a [SEIS] may be required to address issues of limited scope, such as . . . evaluation of . . . design variations for a limited portion of the overall project." *Id.* Rather, 23 C.F.R. § 771.130(f)(3) requires that, under certain circumstances while the completion of a limited SEIS is pending, construction of a segment of a project that is not the subject of that limited SEIS must be suspended. However, *constructing* or *moving forward with project activities* for a "segment" of a project is not the kind of "segmentation" that Plaintiff challenges in its complaint as a procedural misstep in the NEPA process, *i.e.*, the act of breaking a complex project into smaller sections for purposes of environmental analysis to avoid issuing a SEIS or to reduce the scope of a SEIS. (Doc. # 82 ¶ 86.) *See Defenders of Wildlife v. U.S. Dep't of Navy*, 733 F.3d 1106, 1116 (11th Cir. 2013) (defining the "anti-segmentation" principle as the "fundamental NEPA principle . . . that connected actions be analyzed together in one EIS"). *Cf. Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1059 (7th Cir. 2013) ("There is a difference between "segmentation" in its pejorative sense, and—what is within administrative discretion—breaking a complex investigation into manageable bits."). Plaintiff did not allege a violation of § 771.130(f)(3) in its amended complaint, and summary judgment is due to be granted for that reason. *Cf. Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d 1203, 1216 (11th Cir. 2012) ("[Plaintiff's] argument on appeal—that the decision to utilize phasing must be examined further in an SEIS—is substantially different than that alleged in its Complaint, and we will not consider a claim not detailed

in the plaintiff's pleadings.").

Moreover, assuming without deciding that any SEIS that may or may not be prepared sometime in the future constitutes a "supplemental EIS . . . to address issues of limited scope" regarding "changes . . . of such magnitude [as] to require reassessment of the entire action or more than a limited portion of the overall action" as contemplated by § 771.130(f)(3), the preparation of that SEIS would only require the suspension of construction in the eastern section that "would have an adverse environmental impact or limit the choice of reasonable alternatives, until the supplemental EIS is completed."  23 C.F.R. § 771.130(f)(3).  Plaintiff argues in its reply brief that the Highway Defendants have violated 23 C.F.R. § 771.130(f)(3) because construction of a relatively short segment of the highway between SR 79 and SR 75 located entirely within the eastern section would limit the choice of reasonable alternatives by "effectively locking in" the route of the entire Beltline.  (Doc. # 170 at 3).  However, Plaintiff has not provided any legal authority or evidence to support a finding that all (or any) project activities specific to construction of the eastern section would lock in the route for the *western* section[10] of

_____

[10] Elsewhere in its summary judgment filings, Plaintiff does provide a record cite to support its position that construction of a portion of the eastern section effectively locks in the route of the entire *eastern* section of the Beltline. (Doc. # 164 at 48-49.)  The court has reviewed that evidence, and it does not support Plaintiff's position.  Plaintiff cites USACOE00496-99, a December 13, 2011 letter in which the EPA, writing to a district engineer for COE, opined that construction of a 3.4 mile section located within eastern section of the Beltline "that precedes comprehensive evaluation could force the interstate toward a more environmentally damaging alternative, restricting consideration for other reasonably foreseeable transportation improvements. . . . The project must be considered in totality to accurately address cumulative and indirect effects as required by 40 CFR Parts 1508.7 and 1508.8; subsections cannot be considered in isolation. Proceeding towards permitting any subsection before such analysis is complete would prejudge the outcome of environmental reviews and could commit resources toward a project that may not proceed or a design that may not be part of the ultimately preferred

the Beltline.  On the contrary, the route in the western section is not yet finalized, despite the initiation of construction in the eastern section.   Accordingly, Plaintiff has not demonstrated that the Highway Defendants violated § 771.130(f).

In contrast to § 771.130(f)(3), the regulations prohibiting segmentation of the kind that Plaintiff challenges in its complaint do not prohibit *construction* of a project in segments of whatever length, utility, or termini.   40 C.F.R. § 1508.25 requires that "[c]onnected actions . . . should be *discussed in the same impact statement*." (Emphasis added.)   40 C.F.R. § 1508.27(B)(7) prohibits *avoiding a finding of significance* by breaking an action down into small component parts in the course of evaluating the environmental impacts of the action.  23 C.F.R. § 771.111(f) prohibits *issuing an EIS (or SEIS) or finding of no significant impact* for a section of a project that does not meet certain standards.    Thus, "segmentation" of the kind that Plaintiff seeks to challenge in its complaint involves the act of improperly breaking a complex project into smaller sections *for purposes of environmental analysis*.  NEPA prohibits the "segmentation" of a project when it is done to mask the overall significance of the project's environmental impacts, particularly its cumulative impacts. 40 C.F.R. § 1508.27(B)(7) ("Significance cannot be avoided by terming an action temporary or by breaking it down into small

alternative." USACOE00497.  However, the necessary "comprehensive evaluation" to which the district engineer referred was not a *SEIS* for the entire beltline, but the forthcoming 2012 Re-evaluation of the FEIS in its totality, which was subsequently completed in March 2012. USACOE00496, -97, -99). In November 2011, COE placed ALDOT's permit on hold to allow for completion of the 2012 Re-evaluation, and COE's file was not reopened until June, 2012. (USACOE004808.)  COE subsequently granted the permit for the project after it was reduced to a 1.86-mile section with termini at SR 75 and SR 79. Thus, COE did not issue a § 404 permit prior to the completion of the comprehensive review that was in progress at the time the EPA expressed its concern about "[p]roceeding towards permitting any subsection before such analysis is complete."

component parts."). *Cf. Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir. Unit B 1981) ("As a general rule under NEPA, segmentation of highway projects is improper *for purposes of preparing environmental impact statements.* . . . However, the rule against segmentation is not required to be applied in every situation." (emphasis added)).

FHWA regulations, based on CEQ guidelines, set forth the standard for segmentation in the context of a highway project:

> In order to ensure meaningful evaluation of alternatives and to avoid commitments to transportation improvements before they are fully evaluated, *the action evaluated in each EIS or finding of no significant impact* (FONSI) shall (1) connect logical termini and be of sufficient length to address environmental matters on a broad scope; (2) have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and (3) not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f) (emphasis added). *Cf.* 40 C.F.R. § 1508.25 (setting forth the range of actions that must be covered in an individual EIS).

Defendants argue that they did not improperly segment the Beltline in finding that changes in the eastern section of the Beltline did not require a SEIS. (Doc. # 166 at 16-17; Doc. # 168 at 21-22). For the reasons stated in Defendants' briefs, *id.*, and for the reasons stated in this Opinion, Plaintiff has not carried its burden to demonstrate that the Highway Defendants violated NEPA by improperly segmenting the eastern and western sections of the Northern Beltline. Specifically, Plaintiff has not made any legal or

evidentiary showing that the eastern[11] section (which comprises approximately 1/3 of the 52-mile Northern Beltline Project and has endpoints that connect two major interstate highways, I-65 and I-59) fails to connect logical termini, is of insufficient length to address environmental matters on a broad scope, has no independent utility or independent significance, would unusable or an unreasonable expenditure even if no additional transportation improvements in the area are made, or restricts consideration of alternatives for other reasonably foreseeable transportation improvements.  23 C.F.R. § 771.111; *see Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1223 (11th Cir. 2002) ("Administrative action ... comes before the courts clothed with a presumption of regularity." (citation and internal quotation marks omitted)); *Tex. Comm. on Nat. Res. v. Marsh*, 736 F.2d 262, 270 (5th Cir. 1984), *on reh'g*, 741 F.2d 823 (5th Cir. 1984) (holding that a party challenging the agency decision had the burden of proving that a SEIS should have issued).

---

[11] Because no determination has yet been made as to the necessity of a SEIS for the western section or for the project as a whole, it is not possible to predict whether any SEIS that may or may not be completed in the future will contain an evaluation of the western section only, or of some smaller section(s) of the project.  Thus, it is not possible to evaluate whether the action evaluated in such a SEIS would connect logical termini, have independent utility or independent significance, or restrict alternatives for other reasonably foreseeable transportation improvements.  Accordingly, to the extent that Plaintiff contends that the Highway Defendants have improperly segmented the *western* section, that issue is not ripe for review.  *See* § 23 C.F.R. § 771.111(f) (providing that "the action evaluated in each EIS" must meet certain segmentation requirements); *Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all. . . . Under these circumstances, where we have no idea whether or when [a certain agency action will take place], the issue is not fit for adjudication." (internal citation and quotation marks omitted)); *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach*, 727 F.3d 1349, 1356 (11th Cir. 2013) (holding that ripeness is a justiciability doctrine designed to prevent the courts from prematurely entangling themselves in abstract disagreements over administrative policy and to shield agencies from judicial interaction until an administrative decision has been formalized and its effects felt in a concrete way).

Accordingly, the Highway Defendants are entitled to summary judgment on Plaintiff's segmentation claim in Count I of the complaint in the EIS action.

## D.     Ripeness and Plaintiff's Remaining Claims

As foreshadowed in Section V.B, a jurisdictional problem limits consideration of Plaintiff's remaining contentions that the Highway Defendants failed to satisfy the "hard look" requirements of NEPA in deciding not to issue a SEIS.  Plaintiff's claims arise in context of the final agency action at issue, *i.e.*, FHWA's conditional approval of the 2012 Re-evaluation while reserving a determination about the necessity of a SEIS pending further study of alignment changes in the western section of the Beltline, but allowing construction to proceed in the eastern section on grounds that changes in the eastern section did not warrant a SEIS.

The Highway Defendants determined that, because the western section was in the early stages of design, it was not possible to fully evaluate a number of direct, indirect, and cumulative impacts relevant to the western section[12] (including a number of impacts

---

[12] (*See, e.g.*, USACOE000513; USACOE000515; USACOE000517-18 (additional study of cultural resources will be conducted); USACOE000520 (additional noise study needed pending availability of more detailed design); USACOE000522 (additional threatened and endangered species studies to be conducted); USACOE000523; USACOE000558 (additional environmental studies will be needed as design progresses); USACOE000558; USACOE000571; USACOE000595 (further accommodations to be made for pedestrian, bicycle, and greenway projects); USACOE000602-05 (further archeological and historic structure surveys to be conducted); USACOE000609 (additional information to be developed regarding mineral resources); USACOE000610-12 (further testing of possible hazardous materials sites will be conducted as needed pursuant to design development); USACOE000612-15 (ozone conformity to be addressed and particulate emission to be studied); USACOE000625 (wetland and stream studies to be updated); USACOE000627 (additional threatened and endangered species studies to be conducted); USACOE000670; USACOE000691 (additional consideration of cumulative and indirect effects may be needed for project sections where alignment shifts occur as design progresses); USACOE000713-14; USACOE000716.)

Plaintiff contends were not adequately considered in the Re-evaluation) and that further study and consideration of the necessity of a SEIS will be required prior to advancing the western section of the project.  Thus, although the Highway Defendants did consider those factors on the basis of limited information available (*see* USCOE000515), it is not possible at this time to know the extent to which those factors will ultimately be considered or the extent to which a SEIS (if any) will be prepared for the western portion of the project (or for some portion(s) of the western section).  Accordingly, as explained more fully in Section V.B., the portion of the agency decision reserving further consideration of the factors relevant to the western section and postponing a decision as to the necessity of a SEIS for that section is not a final agency decision and is not ripe for review.  *Ouachita*, 463 F.3d at 1175 ("Because of the rather special nature of the injury (that is, the failure to follow NEPA [by failing to take a hard look at the environmental consequences of an agency action]), the issue is ripe *at the time the agency fails to comply*." (emphasis added)); *see also Texas*, 523 U.S. at 300  (holding that an issue is not ripe if "we have no idea whether or when" the issue will arise).

Plaintiff does not directly challenge the Highway Defendants' decision that further study of changes in alignment in the western section is needed before they can determine whether a SEIS must be prepared for the western section.  Instead, Plaintiff challenges the decision not to "prepare a comprehensive Supplemental Environmental Impact Statement for the Northern Beltline project," and insists that the eastern and western sections must be evaluated in a single, comprehensive SEIS.  The court has already determined in Section V.C. that the Highway Defendants are entitled to summary

judgment in their favor with respect to their decision to independently evaluate the need for a SEIS for the eastern and western sections.

Thus, the only remaining "hard look" issues that are ripe for review are whether the Highway Defendants considered the relevant environmental factors and reached a rational decision free of clear error in determining that, "*[f]or the [eastern section]* . . . significant changes in impacts or in the affected environment have not been identified. Therefore, *no additional analysis of the [eastern section] is required* and a supplemental EIS is not warranted under the applicable NEPA regulations."   (USCOE000523 (emphasis added).)

Plaintiff has not raised or argued the issues that are ripe for review *as to the eastern section*, and for that reason the Highway Defendants are entitled to summary judgment on all of the remaining claims in Plaintiff's complaint against them.   *See Citizens for Smart Growth.*, 669 F.3d at 1211 ("A challenging party has the burden of showing by a preponderance of the evidence that the agency did not comply with NEPA's procedures."); *Legal Envtl. Assistance Found., Inc.*, *v. U.S. E.P.A.*, 276 F.3d 1253, 1265 (11th Cir. 2001) ("In reviewing the reasonableness of an agency's decision-making process under the arbitrary and capricious standard of the Administrative Procedure Act (APA), *see* 5 U.S.C. § 706(2)(A), we are mindful that a party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed." (citation and internal quotation marks omitted)); *Druid Hills*, 772 F.2d at 709 n.9 ("The plaintiffs had the burden of showing by a preponderance of the evidence that the defendants failed to adhere to the requirements of NEPA.").

Nevertheless, in an abundance of caution and as an alternative basis for granting summary judgment in favor of the Highway Defendants, the court will proceed to evaluate Plaintiff's remaining claims against the Highway Defendants.

### E.     Plaintiff's Argument that the Highway Defendants Failed to Take a "Hard Look" at the Relevant Environmental Factors

The completion of the 1997 FEIS did not put an end to the Highway Defendants' duties to consider the environmental consequences of the project.  The duty to consider the necessity of a supplement is a continuing duty so long as major federal action remains to occur.  *Or. Nat. Res. Council*, 490 U.S. at 374.  Further, when, as here, major steps to advance the project have not occurred within three years after completion of the FEIS, the agency must complete a written evaluation ("re-evaluation") of the FEIS before further approvals may be granted.  23 C.F.R. § 771.129(b).

However, a re-evaluation is not an EIS or SEIS.[13]   The purpose of the re-evaluation is to determine whether a SEIS is needed for the project. *See S. Trenton Residents*, 176 F.3d at 661.   "[A] federal agency need not perform the detailed environmental analysis of an EIS before it can determine that no EIS need be prepared. Such a requirement would eliminate the threshold requirements of the regulations in

---

[13] "Where FHWA is uncertain of the significance of new impacts, the applicant will develop appropriate environmental studies or, if the Administration deems appropriate, an EA to assess the impacts of the changes, new information, or new circumstances. If, based upon the studies, the Administration determines that a supplemental EIS is not necessary, the Administration shall so indicate in the project file." 23 C.F.R. § 771.130(c); *see also* 40 C.F.R. § 1501.3(b); 40 C.F.R. § 1508.9(a)(1).  In this case, the Re-evaluation is not an EA, but is based on studies developed by ALDOT.  *See* 40 C.F.R. § 1508.10 (defining "environmental documents"); 40 C.F.R. § 1508.11 (defining "environmental impact statement").  Plaintiff does not argue that the Re-evaluation should have included an EA to analyze whether a SEIS was needed to address changed circumstances or new information, including the indirect and cumulative effects analysis.

favor of a full EIS or SEIS in every case. This is clearly not the law." *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 209 (1st Cir. 1999).

Further, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Or. Nat. Res. Council*, 490 U.S. at 373. "The new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned." *Sierra Club v. Froehlke*, 816 F.2d 205, 210 (5th Cir. 1987) (emphasis in original). This is so because requiring supplementation with every project change or every new piece of information—regardless of its environmental significance—would "'task agencies with a sisyphean feat of forever starting over in their environmental evaluations, regardless of the usefulness of such efforts.'" *Florida Keys Citz. Coal., Inc*., 374 F. Supp.2d 116, 1145 (S.D. Fla. 2005) (quoting *Price Road Neighborhood Ass'n, Inc. v. United States Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997)).

Regulations implementing NEPA require a SEIS when changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS, or when new information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.  23 C.F.R. § 771.130(a); 40 C.F.R. § 1502.9(c); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215-16 (11th Cir. 2002).  The standard for whether an impact is "significant" for purposes of determining whether a

SEIS is needed "is essentially the same" as the standard for whether an impact is "significant" for purposes of determining whether an EIS is needed.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d at 1215-16. With respect to determining whether to issue a SEIS, the standard merely "focuses the inquiry on a different body of information," *i.e.*, those environmental impacts that result from the new information or the change in the project design or circumstance and that were not considered in the original EIS, "to evaluate the 'significance' of the environmental impact."  *Id.*; *Nat'l Wildlife Fed'n v. Marsh*, 721 F.2d 767, 782 (11th Cir. 1983) ("'[T]he legal standard of the need for a supplemental EIS . . . is whether the post-[original EIS] changes in the [project] will have a 'significant' impact on the environment that has not previously been covered by the [original] EIS.' If a 'significant' impact on the environment will result, either 'in qualitative or quantitative terms,' from subsequent project changes, an SEIS is required." (quoting *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. Unit A July 1981) (all but first alteration in original)); *see also Or. Nat. Res. Council*, 490 U.S. at 374 ("Application of the 'rule of reason' thus turns on the value of the new information to the still pending decisionmaking process. In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.").

"Significant," at that term is used in NEPA, is defined by "considerations of both

context and intensity."  40 C.F.R. § 1508.27.  "Context" consideration "means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. . . . . Both short- and long-term effects are relevant."  40 C.F.R. § 1508.27(a).  "Intensity . . . refers to the severity of an impact" and requires considerations of a number of factors, including "[i]mpacts that may be both beneficial and adverse," "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial," "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks," and "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts."  40 C.F.R. § 1508.27(b).

NEPA requires that, "regardless of [the agency's] eventual assessment of the significance" of the environmental impacts resulting from new circumstances, the agency has a duty to take a hard look at the evidence.  *Or. Nat. Res. Council*, 490 U.S. at 385.  A challenge to an agency's decision whether to supplement an EIS "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise" that requires substantial deference; accordingly, "as long as the agency's decision not to supplement the [EIS] was not 'arbitrary or capricious,' it should not be set aside" by a reviewing court.  *Or. Nat. Res. Council*, 490 U.S. at 376-77.  "[I]n making the factual inquiry concerning whether an agency decision was 'arbitrary or capricious,' the

reviewing court 'must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' This inquiry must 'be searching and careful,' but 'the ultimate standard of review is a narrow one.'" *Id*. at 378 (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)).  Thus, in reviewing whether the Highway Defendants complied with the procedural requirements of NEPA in determining whether to supplement the FEIS, the court must first consider the administrative record to determine whether the agencies took a hard look at the environmental consequences of new information and changes to the project, and then determine whether the agency reached a decision free of clear error.

**E.1.    Plaintiff's Claim that the Highway Defendants Failed to Take a Hard Look at "All" Direct, Indirect, and Cumulative Impacts of the Northern Beltline**

In Count II, Plaintiff alleges that Defendants violated NEPA in the 2012 Re-evaluation by failing to take a "hard look" at all direct, indirect, and cumulative impacts of the entire Northern Beltline Project.  (Doc. # 82 at ¶¶ 88-91; Doc. # 164 at 41-43.) Plaintiff has cited no authority to support the conclusion that a *re-evaluation* requires a *de novo* consideration of all of the direct, indirect, and cumulative environmental impacts of the entire project or that a re-evaluation must include a *de novo* consideration of whether the 1997 FEIS was sufficient at the time it was approved.  In fact, at this late date, the statute of limitations precludes this court's review of the validity of the FEIS at the time it was approved.  28 U.S.C. § 2401.

The focus of a re-evaluation is not on *all of the potential environmental impacts of*

*the entire project*, but on whether environmental impacts *resulting from changes in the project, new information, or new circumstances* are significant environmental impacts that were not evaluated in the EIS.  23 C.F.R. § 771.130(a); 40 C.F.R. § 1502.9(c); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215-16, 1221 (11th Cir. 2002); *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509-10 (9th Cir. 1997); *Froehlke*, 816 F.2d at 209-10 (holding that, in determining whether a SEIS is required, "the test is whether the new information so alters the project's character that a new 'hard-look' at the environmental consequences is necessary" (emphasis omitted)); *S. Trenton Residents*, 176 F.3d at 661 ("The Supreme Court has set forth a three-part test to guide our review of an agency's decision that a [SEIS] is unnecessary: (1) whether any major federal action remains to occur; (2) whether any substantial changes have occurred or new information has come to light; and (3) whether *these changes* were significant enough to require preparation of a Supplemental Environmental Impact Statement despite the defendant agency's conclusion to the contrary." (citing *Or. Nat. Res. Council*, 490 U.S. at at 374) (emphasis added)).

Accordingly, the Highway Defendants are entitled to summary judgment on Plaintiff's claim that they violated NEPA by failing to take a hard look at "all" of the direct, indirect, and cumulative impacts of the entire Northern Beltline.

**E.2.** **Plaintiff's Claim that the Highway Defendants Failed to Take a Hard Look at Certain Specific Direct, Indirect, and Cumulative Impacts of the Northern Beltline**

In Counts I and II, Plaintiff also contends that the Highway Defendants violated the "hard look" procedural requirements of NEPA by failing to adequately consider

certain specific direct impacts caused by changes in design and circumstances and all indirect effects and cumulative impacts[14] of the project.  (Doc. # 82 at ¶¶ 85, 90.)  The court now turns to the merits of that argument.

Rather than making an argument that the Highway Defendants failed to take a hard look at whether a SEIS was needed *for the eastern section*, Plaintiff has lumped into one heap all of the direct, indirect, and cumulative environmental impacts throughout the entire Beltline that the Highway Defendants allegedly failed to consider, regardless of whether those impacts pertain specifically to the eastern section. Because the only final agency action ripe for review is whether the Highway Defendants violated NEPA by determining that no SEIS was needed for the *eastern section¸* Plaintiff's approach creates practical difficulties for the court as it digs through that heap.  As noted in Section V.D., Defendants are entitled to summary judgment on Plaintiff's "hard look" claims because (1) the Highway Defendants are entitled to summary judgment in their favor regarding their decision to determine the necessity of a SEIS for the eastern section while reserving the decision as to the western section for further study and (2) Plaintiff has completely failed to make any argument that *the decision not to issue a SEIS for the eastern section* resulted from failure to consider the relevant factors or a clear error of judgment. However, in an abundance of caution, the court will attempt to sort through the mixed stack of individual impacts that Plaintiff contends were either not considered at all or

---

[14] To the extent that Plaintiff contends that the 1997 FEIS failed to include consideration of all of the indirect effects and cumulative impacts of the entire Northern Beltline project, Plaintiff's claims are barred by the APA's 6 year statute of limitations.  28 U.S.C. § 2401. Plaintiff acknowledges this fact and is not challenging the validity of the 1997 FEIS for failure to include an indirect and cumulative effects analysis.  (Doc. # 170 at 2.)

were subject to a faulty determination that no significant impact existed.

At the outset of this discussion, it should be noted that the relief Plaintiff seeks is not a limited SEIS to address one or more of these particular issues, but a "comprehensive" SEIS that examines all of the direct, indirect, and cumulative effects of the entire Northern Beltline.  (Doc.# 82 at 15-17).  Even if one or more of particular issues did require a SEIS, that would not automatically mean that a SEIS must be created to cover every direct, indirect, or cumulative effect of an entire project or to function as an updated replacement for the entire FEIS.  *See* 23 C.F.R. § 771.130(f) ("In some cases, a supplemental EIS may be required to address issues of limited scope, such as the extent of proposed mitigation or the evaluation of location or design variations for a limited portion of the overall project.").  Thus, to support the comprehensive relief it seeks,[15] Plaintiff must demonstrate not only that a SEIS is required, but also that the new information and changes in the environment and project design individually or cumulatively require that the scope of that SEIS must encompass all the environmental impacts of the entire 52-mile Northern Beltline.  Plaintiff has not done so.

**E.2.i.  Added Lanes.**

Plaintiff argues that the 2012 Re-evaluation failed to examine the direct impacts[16] of the addition of new lanes to the Beltline.  (Doc. # 82 ¶ 73.)  This particular design

---

[15] Plaintiff also requested "such other relief as the [c]ourt deems just and proper." (Doc. # 82 at 17.)  To the extent that this could theoretically be construed as a request for an injunction requiring a less than "comprehensive" SEIS for anything other than the entire Beltline, Plaintiff's arguments on summary judgment do not support such relief.

[16] Direct impacts "are caused by an action and occur at the same time and place."  40 C.F.R. § 1508.8(a).

change is relevant to the Eastern Section.  The Re-evaluation states:

> Since the approval of the 1997 FEIS and 1999 ROD, the typical section of the project has changed. A four-lane typical section was shown in the 1997 FEIS. As currently designed, the roadway would include a six lane section - three, 12-foot travel lanes in each direction with a 26-foot median and 14-foot outside shoulders (with 12 feet being paved). However, the roadway would be graded for an eight lane section and will ultimately consists of four, 12-foot travel lanes in each direction with a 26-foot median and 12-foot outside shoulders (with 10 feet being paved). This change in the typical section does not, however, increase the footprint of the roadway due to the decrease in the median width from what was shown in the 1997 FEIS and 1999 ROD. Refer to Figures 3a and 3b for each of the typical sections discussed above.

(USACOE000549.)

Plaintiff argues that "there is nothing in the record that substantiates Defendants' claims that there will be zero increase in project footprint throughout [the Beltline's] 52-mile length."  (Doc. # 170 p. 4).  However, basic arithmetic, as well as the figures representing typical sections that were referenced in the Re-evaluation, support the conclusion that typical sections of the former four-lane design do not have a larger footprint than the typical footprint of the updated design.  (1997 FEIS 01250, 01252; 2012 Re-evaluation, USACOE000549, USACOE000552-53).  *Envtl. Coal. of Broward Cnty., Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987) ("It is enough that the [agency] considered all relevant factors and that there is credible evidence in the record to support its action.").

Plaintiff also argues that "there is nothing in the record that substantiates Defendants' claims that . . . a decrease in the median width will have zero impact on

waterways and other resources." (Doc. # 170 p. 4). However, in the 2012 Re-Evaluation, Defendants did not claim that the design change to eight lanes would have "zero impact on waterways and other resources." The standard for whether a SEIS is required is not whether a design change will have "zero" environmental impact or whether impacts from the design change would be identical to those considered in the FEIS. The Highway Defendants are not obligated to produce hydrologic studies to demonstrate that the additional lanes of highway will result in "zero" impacts or impacts that are "identical" to those considered in the FEIS. Instead, the applicable standard requires the Highway Defendants to take a hard look at the relevant factors and determine whether the change in design will result in "significant" impact that was not already considered in the FEIS. *Or. Nat. Res. Council*, 490 U.S. at 373-74; *Froehlke*, 816 F.2d at 210 ("[N]ot every new circumstance, however small, requires filing a SEIS; the new circumstance must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned.").

Contrary to Plaintiff's contentions, the Re-evaluation *did* take into consideration whether increased stormwater runoff from paving the width of the road and clearing vegetation for the right-of-way will result in significant environmental impacts to waterways that were not already considered in the 1997 FEIS. (USACOE000608.) ALDOT and FHWA considered numerous impacts due to the updated road design. (*E.g.*, USACOE000549 ("Table 3 provides a summarization/comparison of the direct project impacts to all resources as reported in the FEIS and to any changes in impacts resulting from the design changes discussed in Section 5.0.").) While acknowledging that impact

to water quality is dependent in part on the amount of land that will be converted to a paved surface (USACOE000608), the Re-evaluation concludes that there would not be any "substantial" long-term adverse impacts to water quality. (USACOE000607 ("Quality and quantity of storm water runoff would be altered by the proposed project. The potential impacts on surface water quality would occur in two ways 1) direct effects from construction, and 2) effects from long-term operation of the roadway;" USACOE000606-09 (discussing long-term water quality impacts of the project due to paving the roadway and removing vegetation).) Based on various design, permitting, and monitoring requirements for minimizing the impacts of the project on water quality, including stormwater management plans that "will minimize impacts from changes in the quantity and quality of runoff during the long-term operation of the roadway," the Re-evaluation concludes that "impacts to water quality as a result of the proposed project remain unchanged from what was presented in the FEIS and ROD." (USACOE000608-09.)

Thus, the Highway Defendants did take a hard look at the environmental impacts due to paving the road surface, and they articulated a satisfactory explanation for their conclusion that establishes a rational connection between the facts found and the choice made and is not clearly erroneous. Accordingly, the decision not to issue a SEIS on the basis of the added lanes was not arbitrary and capricious.

### E.2.ii. Alignment Shifts

Plaintiff argues that changes in the proposed route of the Beltline are significant changes that require issuance of a SEIS. The Highway Defendants considered the

48

environmental impacts of alignment shifts in the eastern section and determined that those changes did not necessitate a SEIS.  (USACOE000558-63.)  As explained in the Re-evaluation, the routing changes were either slight and located within the original study area of the FEIS, or were made for the express purpose of reducing environmental impacts, or had been subjected to studies that indicated that no significant impacts would result from the shift and that the shifts would reduce impacts to open water.  *Id.*  Plaintiff does not offer any argument as to why those findings are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), or as to why these routing changes necessitate their requested relief, *i.e.*, a comprehensive SEIS evaluating all impacts of the entire Northern Beltline project.  The Highway Defendants met the "hard look" requirements of examining the relevant data and articulating an explanation for their decision regarding alignment shifts in the eastern section that is not clearly erroneous.

Plaintiff also argues that changes in the proposed route of the Beltline in the western section are significant changes that require issuance of a SEIS.  (Doc. # 164 at 28.)  As the Highway Defendants stated in the Re-evaluation, however, the design of the western section is in its early stages, the precise alignment of the western section has not been finalized, and further studies will be necessary before determining which (if any, or all) portions of the western section will require a SEIS.  (USACOE000558.)  Plaintiff appears to agree with the conclusion that further consideration of the impacts of the design changes in the western section is necessary.  Further, in approving the 2012 Re-Evaluation, FHWA specifically provided that "ALDOT may not proceed at this time with

49

any activities in the western portions of the project" until additional studies were completed to evaluate the impacts of the alignment shifts in the western portion and to determine if a SEIS is needed as a result of those alignment shifts.  (USACOE000513.)

Accordingly, Plaintiff has not met its burden to show that the Highway Defendants failed to examine the relevant data or that the decision to engage in further study is the product of clear error, and Plaintiff's argument that alignment shifts in the western section require a SEIS is not ripe for review.

### E.2.iii.  Worsening Water Quality In Area Streams

Plaintiff argues that, since the issuance of the FEIS, numerous streams in the Black Warrior and Cahaba River basins have experienced worsening water quality. Plaintiff does not provide any analysis regarding which of these streams would be affected by construction of the eastern section; thus, to an unknown extent, this argument pertains to the matter of the necessity of a SEIS for the western section, an issue that has not been the subject of a final agency action and is not ripe for review.

Plaintiff argues that, because worsening water quality is a significant "change in the Northern Beltline's environment," the fact of worsening water quality necessitates a SEIS for the entire project.  (Doc. # 164 at 28-29.)  Not every change in the environment, however momentous, requires issuance of a SEIS.  "[T]he key to whether a Supplemental Environmental Impact Statement is necessary is not whether the area has undergone significant change, but whether the proposed roadwork will have a significant impact on the environment in a manner not previously evaluated and considered."  *S. Trenton Residents*, 176 F.3d at 663; *see also* 23 C.F.R. § 771.130(a)(2); 40 C.F.R. §

1502.9(c)(ii).  The Highway Defendants considered the fact of worsening water quality and the extent to which worsening water quality and the project had any bearing on one another, and, to the extent that reasonably available information allowed,[17] the Highway Defendants concluded that "appreciable differences in water quality are not anticipated with and without the construction of the project with implementation" of various mitigation measures.  (USACOE000695; *see also* USACOE000520-21; USACOE000606-09; USACOE000654-63; USACOE000668-69; USACOE000680; USCOE000690-91, USCOE000695; USACOE000700-10.)  Plaintiff does not present any argument to show that the Highway Defendants' conclusion in this regard was arbitrary or capricious.  Accordingly, Plaintiff has not met its burden to show that the Highway Defendants failed to take a hard look at effects of the project as it relates to worsening water quality in streams.[18]

_____

[17] As the design of the Beltline is revised, more detailed information about the direct impacts to water quality will be available. The Highway Defendants will continue to develop mitigation measures and to work with COE to determine the direct impacts of the project on water quality throughout the process.  (*See* USACOE000608; USACOE000691; *see also* USACOE004844 (in response to suggestion that COE and ALDOT work together to make certain determinations regarding the potential indirect effects of the entire Beltline, explaining that "ALDOT has a general idea of the footprint for the remainder of the Beltline, but final engineering is not complete and on the ground waters of the US determinations have not been conducted. This is because the funding is not available to get this far along in the planning stages. They have a general idea of the direct impacts, but until they get to the stage where they have the funding for in-depth studies, this type of project planning cannot be conducted at this time. The Corps will work with ALDOT when the appropriate time comes.").

[18] Additional arguments raised by Plaintiff regarding indirect and cumulative effects relating to water quality are discussed in Section V.E.2.x.  In addition, Section V.E.2.i. addresses Plaintiff's argument that a comprehensive SEIS is necessary to consider the water quality impacts of increased stormwater runoff from paving the width of the road and clearing vegetation for the right-of-way.

**E.2.iv.  Newly Listed Endangered Species and Indirect and Cumulative Impacts to Endangered Species**

Plaintiff argues that, since 1997, at least eight species in the vicinity of the Beltline have been newly listed as endangered under the Federal Endangered Species Act.  In addition, Plaintiff argues that federally-protected critical habitat has been designated in Jefferson County for the vermillion darter and several freshwater mussels.  (Doc. # 164 at 39; USACOE000521.)  Plaintiff argues that the identification of additional endangered species constitutes new information or a significant change in the Northern Beltline's environment that necessitates issuing a SEIS for the entire project.  (Doc. # 164 at 28-29.)

Not all of the federally protected species at issue are necessarily located in the area of the project affected by the eastern section, but Plaintiff supplies no analysis regarding which of these endangered species it believes would be affected by construction of the eastern section; thus, to an unknown extent, Plaintiff's argument pertains to matters reserved for further study and the necessity of a SEIS for the western section, an issue that is not ripe for review.  Further, Plaintiff has failed to establish (or even argue) that the entire Northern Beltline must be analyzed as a whole to properly address the impact of the Beltline on any particular endangered species.

Not every piece of new information or change in circumstances that is "relevant to environmental concerns" requires issuance of a SEIS.   The existence of newly identified endangered species is a "significant new circumstance[]" that requires issuance of a SEIS *only if* it "has a bearing on the [project] or its impacts" and "would result in significant environmental impacts not evaluated in the EIS."  23 C.F.R. § 771.130(a)(2); 40 C.F.R. §

1502.9(c)(ii); Environmental Impact and Related Procedures, 52 FR 32646-01 (noting that § 772.130(a) "is intended to distinguish, for example, between new information that may be very important or interesting, and thus, significant in one context, such as to the scientific community" and information that "should not be considered 'significant' so as to trigger preparation of a supplemental EIS because the information does not result in a significant change in the anticipated environmental impacts of the proposed action").

In the Re-evaluation, the Highway Defendants considered the direct, indirect, and cumulative impacts of the project in light of the newly listed threatened and endangered species. (USACOE000521-22; USACOE00625-27; USACOE000630; USACOE000654-55; USACOE000663; USACOE000671; USACOE000682-83; USACOE000690-95; USACOE000710-11; USACOE000712-13; USACOE716). Based on data and studies available at the time of the Re-evaluation, the Highway Defendants concluded that the project would not have a significant impact on federally protected species. (USACOE000521-22; USACOE000627-28.) The Highway Defendants also committed to conducting further surveys of endangered species "once more detailed design is available" for the western portion and also for the portions of the project in the eastern section outside the area between SR 79 and SR 75, which had recently been subjected to an updated survey. (USACOE000522; USACOE000627-28; USACOE000712-13; USACOE000716; USACOE001107.)

In coordinating with the Highway Defendants for the Re-evaluation, the United States Fish and Wildlife Service ("USFWS") stated that it remained "extremely concerned that the listed species in the area could, *depending on the exact route selected*,

experience substantial adverse impacts as a result of the direct and indirect effects" of the project.[19]  (USACOE001108 (emphasis added).)  However, in reliance on the Highway Defendants' agreement that additional studies would be performed on the remaining sections of the highway as more detailed designs became available, "[f]or purposes of the EIS and construction of the initial segment between SR-75 and 79," USFWS concurred with the finding that "this project is not likely to adversely affect listed species." (USACOE001107; *see also* USACOE000521-22; USACOE000627-28.)

Rather than taking specific issue with the factors and data that the Highway Defendants considered or the conclusion they reached with respect to the indirect and cumulative effects of the project on threatened and endangered species, Plaintiff merely contends that those effects "should be analyzed," and they were.

Plaintiff points out that, in the Re-evaluation, the Highway Defendants stated that "the proposed project is anticipated to induce growth and affect land use and land use patterns, although to what degree is uncertain due to current sewer and financial problems being experienced by Jefferson County . . . . This growth, coupled with past development and transportation projects is anticipated to have some cumulative effects on water quality, threatened and endangered species, and critical habitat." (USACOE000523.)

---

[19] In its summary judgment brief, Plaintiff argues that USFWS has "repeatedly raised concerns about the project's indirect and cumulative impacts." (Doc. # 164 at 41.)  In support of this statement, Plaintiff cites a March 9, 2011 letter from USFWS to FHWA expressing concern that, "Since the completion of the Projects initial [FEIS] in 1997 there has been one re-evaluation study completed for a single segment in 2006. Given the length of time since the original EIS and a re-evaluation coupled with the ongoing planning process for the entire multi-segment Project the Service would like to request that a supplemental EIS and an indirect and Cumulative Impacts Analysis be prepared to assist in our environmental review and comment for this Project."  (AR 9918-19.)  The March 9, 2011 letter is of limited relevance because it was sent prior to the completion of the 2012 Re-evaluation.  (USACOE001108.)

However, the potential for "some effects" is not the same thing as evidence of "significant environmental effects." As UFWS stated, the significance of the Beltline's effects on endangered species will depend on the exact route selected; however, the exact route has not yet been selected, and additional endangered species studies will be conducted as more detailed designs for the exact route of the Beltline became available. The Highway Defendants made their finding of significance (with which USFWS concurred) on the basis of the studies that were reasonably available, and those studies do not demonstrate that the Northern Beltline will have a significant environmental effect on threatened and endangered species. Plaintiff has not addressed any specific error in the Highway Defendants' analysis.

Accordingly, to the extent that issues related to federally protected species are ripe for review, Plaintiff has not met its burden to show that the Highway Defendants failed to take a hard look or acted arbitrarily or capriciously in deciding whether the existence of newly listed endangered species necessitated a SEIS, or whether the indirect and cumulative effects of the project would have a significant effect on threatened and endangered species.

## E.2.v. Floodplains

Since the issuance of the FEIS, the number of floodplains mapped by the Federal Emergency Management Agency ("FEMA") that will be crossed or encroached upon by the Northern Beltline has increased from 14 in 1997 to 54 in 2012 due to alignment changes in the western section and due to the development of conceptual interchange configurations, tie-ins, and side road relocations along the entire Beltline.

(USACOE000518.)   Plaintiff does not provide any analysis regarding which of the additional floodplains would be crossed or encroached upon by design changes in the eastern section; thus, to an unknown extent, this issue pertains to the matter of the necessity of a SEIS for the western section, an issue that is not ripe for review.

The Highway Defendants considered the significance of the direct, indirect, and cumulative impacts of the project with respect to the additional floodplain crossings and encroachments.   (USACOE000518;     USACOE000571-72;     USACOE000593; USACOE000605-06;     USACOE000653;     USACOE000667-68;     USACOE000680; USACOE000691; USACOE712-13).   Plaintiff does not take issue with the factors and data that the Highway Defendants considered or the conclusions they reached with respect to the significance of the increased number of floodplain crossings and encroachments.   Plaintiff merely contends that the fact that the project will cross additional floodplains is a significant change in the project's design that necessitates the issuance of a SEIS.  (Doc. # 164 at 39.)

Again, not every change in the project requires the issuance of a SEIS.  Changes require a SEIS if they are "substantial changes in the proposed action that are relevant to environmental concerns" and if those changes would result in significant environmental impacts that were not anticipated in the FEIS.  23 C.F.R. § 771.130(a)(1); 40 C.F.R. § 1502.9(c)(a).   The Highway  Defendants noted that the additional crossings and encroachments "have increased from 14 to 54 due to alignment changes on the western portion of the project . . . and the development of conceptual interchange configurations, tie-ins, and side road relocations along the entire corridor (compared to the [conceptual]

centerline [design] that was analyzed for the FEIS." (USACOE000518; USACOE000605.) Specifically, the Northern Beltline Project currently contemplates 50 floodplain crossings and 4 encroachments. (USACOE000654.) The Highway Defendants also noted that "the project would be designed in such a way that it would have no significant encroachment on any floodplain areas." (USACOE000605.) The Highway Defendants explained that the increase in the number of floodplain crossings and encroachments implicated in the project "is expected as design progresses from the conceptual centerline alignment evaluated in the 1997 FEIS." (USACOE000606.) Accordingly, the Highway Defendants concluded that "no significant changes to anticipated impacts on FEMA mapped floodplains have occurred." *Id.*; *see Froehlke*, 816 F.2d at 210 (holding that, to require issuance of a SEIS, a new circumstance must present a *seriously different* picture of the environmental impact of the proposed project *from what was previously envisioned*." (emphasis in original)).

Accordingly, Plaintiff has not met its burden to show that the Highway Defendants failed to take a hard look at whether a SEIS was needed to address the increased number of floodplain crossings.

### E.2.vi.  Change in Available Federal Funding

NEPA requires that an EIS must include "a detailed statement" on "alternatives to the proposed action."  42 U.S.C. § 4332(C)(iii).  However, "as should be obvious even upon a moment's reflection, the term 'alternatives' is not self-defining. To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility."  *Vt. Yankee Nuclear Power*

*Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978). "Common sense also teaches us that the 'detailed statement of alternatives' cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved." *Id*. Thus, "[c]onsideration need only be given to reasonable alternatives." *Druid Hills*, 772 F.2d at 713. Plaintiff bears the burden of establishing that the Highway Defendants failed to comply with NEPA's requirement that alternatives be considered. *Id.*, at 709 & n.9.

Plaintiff argues that, in 2012, Congress passed a new transportation bill that took effect on October 1, 2012 (after the 2012 Re-evaluation was approved) and that "greatly expanded the number and types of transportation projects that can be funded." (Doc. # 164 at 39.) According to Plaintiff, "[t]his sea change in federal transportation funding greatly expands the range of practicable alternatives that would satisfy the Northern Beltline's stated purposes of enhancing cross-regional accessibility and stimulating economic development." *Id*. However, as the Federal Defendants point out (Doc. # 168 at 41), Plaintiff did not raise this claim in its amended complaint, and summary judgment is due to be granted for that reason.

Further, Plaintiff does not identify any particular alternatives that might have been

considered *in the 2012 Re-evaluation*[20] but were not. *Cf. Upper W. Fork Watershed Assoc. v. Corps of Eng'rs, U.S. Army*, 414 F. Supp. 908, 920 (N.D.W. Va. 1976), *aff'd sub nom. Upper W. Fork River Watershed Ass'n v. Corps of Eng'rs, U.S. Army*, 556 F.2d 576 (4th Cir. 1977) ("The Corps, in undertaking the authorship of the EIS, had the burden of meeting NEPA standards. But this does not mean that Plaintiff, in charging that the discussion of alternatives is inadequate, may rest upon the naked conclusion that a 'watershed project' should have been listed in the EIS as an alternative.").

Moreover, assuming without deciding that the availability of other regional transportation projects can qualify as a "significant new circumstance[] . . . relevant to environmental concerns," Plaintiff has not demonstrated that other available regional transportation projects "ha[ve] a bearing on the [project] or its impacts," 23 C.F.R. § 771.130(a)(2); 40 C.F.R. § 1502.9(c)(ii). Viewed another way, Plaintiff has failed to demonstrate that the Highway Defendants had a duty to take a hard look at transportation alternatives (1) for which funding was not available at the time the Re-evaluation was completed and (2) that are not specifically identified by Plaintiff in a way that would permit the court or the relevant agencies to determine what they are. In fact, the Highway Defendants have no such duty. *See Vt. Yankee*, 435 U.S. at 551 ("'There is reason for concluding that NEPA was not meant to require detailed discussion of the environmental

---

[20] Elsewhere in its summary judgment brief (Doc. # 164 at 54), in addressing COE's consideration of the § 404 permit for the section of road between SR 79 and SR 75, Plaintiff cites comments made by the Southern Environmental Law Center in July 2012 and April 2013 (after the Re-evaluation was completed) stating that alternatives for the project would include extending Corridor X, the interstate connecting Birmingham and Memphis, Tennessee, farther into Birmingham, and pursuing 35 other transportation projects. (USACOE0002497; USACOE003940-58.) That argument is addressed in Section VI.B.2.

effects of "alternatives" put forward in comments when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities, in view of basic changes required in statutes and policies of other agencies—making them available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed.'" (quoting *Nat. Res. Defense Council v. Morton*, 458 F.2d 827, 837-838 (1972)).

Accordingly, the Highway Defendants are entitled to summary judgment on this issue.

### E.2.vii.  Increased Business and Residential Relocations

Plaintiff argues that business and residential relocation impacts across the Northern Beltline have increased almost twofold since the 1997 EIS.  (Doc. # 164 at 39-40.)  Plaintiff does not provide any analysis regarding which of these relocations would be affected by construction of the eastern section as opposed to the western section, which is still in early design stages; thus, to an unknown extent, this argument pertains to the necessity of a SEIS for the western section, an issue that is not ripe for review.

Plaintiff argues that the increase in relocations is a significant change in circumstance that necessitates issuing a SEIS for the entire project.  (Doc. # 164 at 28-29; Doc. # 170 at 4-5.)   However, not every changed circumstance requires issuance of a SEIS. The additional relocations are doubtless important to the people and communities they affect and thus may be "significant" in that context, but they are not "significant" in the context of determining whether a SEIS is necessary unless they "'result in a significant change in the anticipated environmental impacts of the proposed action.'" *S.*

*Trenton Residents.*, 176 F.3d at 664 (quoting 52 F.R. 32646, 32656 (1987)); *see also* 23 C.F.R. § 771.130(a)(2); 40 C.F.R. § 1502.9(c)(ii).

In the 1997 FEIS, the Highway Defendants noted that, "since the project consists of constructing a new roadway through or near developed areas, relocation impacts are unavoidable." (AR01294.) At that time, the Highway Defendants found that the preferred alternative route for the Northern Beltline would "potentially impact 279 residences, 13 businesses," and one non-profit, and stated that "[t]hese numbers will likely decrease as efforts to reduce locations will be made during the design phase of the project." (AR0124.) However, the Highway Defendants also noted that "[t]he number of relocations required by each alternative is an estimate, as the exact alignment for the road is not yet determined. . . . The actual number of relocations will likely change as the alignment is adjusted to minimize impacts. This will be determined during the location phase of the project." (AR01321.)

In 2010, the Highway Defendants undertook updated relocation studies confirming that, since the FEIS, the number of relocations had increased from a total of 293 to a total of 520 (485 residences, 35 businesses, and 0 nonprofits). (USACOE000586.) In the 2012 Re-evaluation, the Highway Defendants considered the direct, indirect, and cumulative impacts of those relocations. (USACOE000515-16; USACOE000569; USACOE000575-76; USACOE000586-88; USACOE000663-64; USACOE678; USACOE000741-42; USACOE001983-1990.) The Highway Defendants examined the causes of the increased number of relocations and found that those relocations were the result of more detailed design and new, scattered residential and commercial construction. (USACOE586.) The

Highway Defendants noted that, because of the alignment changes that had occurred since the 1997 FEIS, the number of relocations did not increase as much as it would have if the alignment had remained the same as was contemplated in the 1997 FEIS. (USACOE586.)  The Highway Defendants also noted that adequate replacement housing and funding for relocations was available for all relocations.  (USACOE586.)  Further, the Highway Defendants found that the relocations would not disproportionately affect minority and low income populations.  (USACOE588.)

Accordingly, and as demonstrated in FHWA's summary judgment brief (Doc. # 168 at 40), the Highway Defendants did not violate NEPA by failing to take a hard look at whether the additional relocation of 206 residences and 10 businesses over the course of building the 52-mile Beltline represented a significant new circumstance that warranted issuance of a SEIS.  Moreover, Plaintiff has not carried its burden to demonstrate that the additional relocations require the comprehensive relief it requests: a SEIS addressing all direct, indirect, and cumulative environmental impacts of the entire Northern Beltline.  *See* 40 C.F.R. § 1508.27(a) (noting significance of an action depends on its context and intensity).

### E.2.viii.  Increased Cost Estimate of Constructing Beltline

In the 1997 FEIS, the Highway Defendants found that the preferred alternative route for the Beltline had "the lowest right-of-way costs ($90.80 million) and the lowest cost per mile ($12.91 million). . . . Total cost was not a significant factor in recommending a preferred alternative because overall, the difference in total costs among the alternatives is relatively minor." (AR 1203.)   As of March 28, 2011, the project was

expected to have a total cost of $5.4 billion in year-of-expenditure dollars, with an estimated completion date of 2048.  (AR16782.)  The Re-evaluation disclosed updated cost estimates for the project (USACOE000719-33) and, where the cost of the Beltline was considered, the Re-evaluation did not rely on the cost estimates in the 1997 FEIS. (*See* USACOE001209-1249.)  However, Plaintiff argues that the post-1997 increase in the estimated cost[21] of the total project is itself a significant change in circumstance necessitating a comprehensive SEIS for the entire Beltline.

An increase in the estimated total project cost is not, without more, a "significant" change "relevant to environmental concerns" that requires a SEIS.  The necessity of a supplement "turns on the value of the new information to the still pending decisionmaking process."  *Or. Nat. Res. Council*, 490 U.S. at 374.  Only if the increased cost will cause the remaining federal action to "'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared."  *Or. Nat. Res. Council*, 490 U.S. at 374 (quoting 42 U.S.C. § 4332(c)); *see also* 23 C.F.R. § 771.130(a)(2); 40 C.F.R. § 1502.9(c)(ii).  Project cost may be relevant to environmental concerns and the quality of the human environment insofar as the cost of the project is a factor in (1) the evaluation of the relative environmental and economic costs and benefits of the project and in (2) the selection of project alternatives.  40 C.F.R. § 1502.23; *Sand*, 692 F.2d at 1011-12.

---

[21] Plaintiff does not make any effort to explain the exact amount of actual increase in cost between the 1997 estimate (which may or may not be in 1997 dollars) and the current estimate, which is in year-of-expenditure dollars. For purposes of this opinion, the court assumes, as do the parties, that the estimated cost of construction has increased.

The decision to proceed with a project in light of relative costs and benefits of the project is among the "fundamental policy questions appropriately resolved in Congress and in the state legislatures [that] are *not* subject to reexamination in the federal courts under the guise of judicial review of agency action." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978);  *S. Louisiana Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir. 1980) (holding that "determination of economic benefits and costs that are tangential to environmental consequences are within th[e] wide area of agency discretion" in policymaking decisions).  "Over time, . . . economic realities do change. But once Congress has authorized a project, it is not for the courts to review its economic justification." *Id*. at 1014-15. "NEPA . . . permits, at most, a narrowly focused, indirect review of the economic assumptions underlying" an agency's consideration of a project. *Id*.  When the economic realities of a project change significantly over time, a court may evaluate the economic justification for a project only if the plaintiff demonstrates that the economic considerations of the project have become so grossly distorted as to impair fair consideration of the environmental factors against which the economic considerations have been weighed.  *Id*. at 1011-12, 1015.  Plaintiff has made no such showing in this case.

Plaintiff also has failed to show that the increase in total project cost necessitates a SEIS to reevaluate project alternatives.  In the 1997 FEIS, the agencies concluded that the total cost of each alternative was not a significant factor in choosing one alternative over another, because the total cost of each alternative was roughly equal. (AR 1203.) Plaintiff submits no evidence and no argument that the *relative* costs of each alternative

evaluated in the FEIS have changed significantly or are now so different as to require reconsideration of the alternatives.  Moreover, the updated cost estimates for the current Beltline alignment could only be meaningful for evaluating alternatives if Defendants are obligated to perpetually and at every stage of environmental review create updated designs and cost estimates for the previously rejected alternative routes for the entire Northern Beltline in order to re-compare all of the alternatives.  Not even this Plaintiff argues that Defendants carry such a heavy burden at every stage of the environmental review process.  Accordingly, Plaintiff has not met its burden to show the increased cost of the project is relevant to environmental concerns or that the cost increase would result in significant environmental impacts not already evaluated in the FEIS.

**E.2.ix.  Jefferson County Financial and Sewer Issues**

Plaintiff argues that the Highway Defendants failed to take a hard look at the fact that, in 2011, Jefferson County, Alabama declared bankruptcy largely as a result of rampant fraud and public corruption that left an insurmountable debt for sewer-related work.  Specifically, Plaintiff argues that the Highway Defendants failed to consider whether the indirect effects of Jefferson County's ability to construct sewer infrastructure would limit the project's potential to create economic growth.  (Doc. # 164 at 40.)  In the Re-evaluation, the Highway Defendants noted that Jefferson County's sewer and financial problems would, to an unforseeable extent, affect the speed and timing of the project's indirect and cumulative impacts on economic growth, land use, and

development patterns.[22]  After acknowledging and disclosing the uncertainties associated with Jefferson County's sewer and financial problems, the Highway Defendants proceeded to consider the project's environmental impacts. (*See* USACOE000664 ("While other factors influence the development of an area (e.g. favorable economic conditions, zoning and other land use controls, water and sewer availability, and amenities), the link between transportation improvements and development is strong. Induced growth is expected to occur as a result of the proposed project; therefore, its effects on the surrounding environment should be [and were] analyzed.").

NEPA's requirement that the Highway Defendants describe the anticipated environmental effects of Northern Beltline Project "is subject to a rule of reason;" the agencies are not required to "foresee the unforseeable." *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973); *see also* 42 U.S.C. § 4332(B) (requiring that, "to the fullest extent possible," federal agencies must supply a detailed environmental impact  statement that complies with NEPA); 40 C.F.R. § 1508.7

---

[22] (USACOE000523 ("As stated in the FEIS, the proposed project is anticipated to induce growth and affect land use and land use patterns; although to what degree is uncertain, due to current sewer and financial problems being experienced by Jefferson County."); USACOE000651 ("Noted differences between the 2009 and 2011 [expert panel survey on land use and development] results" included "Jefferson County's current sewer and financial issues which could limit growth severely."); USACOE000664; USACOE000700 ("[A]ll development (regardless of the project) would be influenced by Jefferson County's current sewer and financial issues. . . . Based on discussion with the Expert Panel, development would occur even if the project were not constructed; however, the project will speed the pace of development to some degree. To what degree this will be influenced by Jefferson County's current sewer and financial problems cannot be readily determined as the outcome of the issues is not reasonably foreseeable."); USACOE000715; USACOE001893; ("Some [of the surveyed experts] were concerned that the current sewer situation in Jefferson County may negatively affect the ability to service the area with sewer service but at the same time many indicated local city governments may initiate the service if needed.")).

("Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and *reasonably foreseeable* future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." (emphasis added)); 40 C.F.R. § 1508.8 ("Indirect effects . . . are caused by the action and are later in time or farther removed in distance, *but are still reasonably foreseeable.*" (emphasis added)); *Sierra Club v. Morton*, 510 F.2d 813, 818-19 (5th Cir. 1975) ("In determining whether an agency has complied with [NEPA] we are governed by the rule of reason, *i.e.,* we must recognize on the one hand that the Act mandates that no agency limit its environmental activity by the use of an artificial framework and on the other that the act does not intend to impose an impossible standard on the agency." (footnotes and internal quotation marks omitted)).

Plaintiff has not made any argument or showing that Jefferson County's financial and sewer difficulties would affect the project's environmental impacts in some foreseeable way that could reasonably have been more accurately forecast and considered in the Re-evaluation or the 1997 FEIS.  Accordingly, Plaintiff has not demonstrated that the Highway Defendants failed to take a hard look at the issue.

### E.2.x.  Indirect and Cumulative Impacts

The 1997 FEIS did not include an analysis of the indirect[23] and cumulative[24]

---

[23] In contrast to direct impacts, "indirect [impacts] . . . are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  40 C.F.R. § 1508.8(b).

effects of the Northern Beltline.  NEPA requires that an EIS must include an analysis of the indirect and cumulative effects of a project and that public review and comment procedures be followed before a decision is made.  *See* 40 C.F.R. § 1502.16; 40 C.F.R. § 1508.27(b)(7); *see also Froehlke*, 816 F.2d at 212 ("As a general matter, we do not condone post hoc review of, or rationalizations for, decisions already made. We recognize and assign great importance to NEPA's review and comment procedures for obtaining and incorporating opposing viewpoints into the final EIS, and thus into the heart of the decision process.").[25]

This case is in an unusual posture because the statute of limitations has run on any argument that the 1997 FEIS was deficient for failure to comply with NEPA's requirement to include an indirect and cumulative effects analysis.  28 U.S.C. § 2401. Recognizing this fact (Doc. # 170 at 2), Plaintiff does not expressly argue that the 1997 FEIS should be supplemented because it is inadequate.  However, Plaintiff does argue that an SEIS is necessary because all indirect and cumulative impacts of the Northern Beltline "should be analyzed" and "should be considered."  (Doc. # 170 at 42-43.)  To the

---

[24] "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."  40 C.F.R. § 1508.7.

[25] The Re-evaluation is not an EIS, EA, or other NEPA document.  40 C.F.R. § 1508.11 (defining "environmental impact statement"); 40 C.F.R. § 1508.10 (defining "environmental documents").  Plaintiff does not argue that the Highway Defendants should have conducted an EA to analyze whether a SEIS was needed to address changed circumstances or new information, including the indirect and cumulative effects analysis.  See 23 C.F.R. § 771.130(c); 40 C.F.R. § 1501.3(b); 40 C.F.R. § 1508.9(a)(1).

extent that Plaintiff is suggesting that failure to include indirect and cumulative effects analysis in the FEIS *automatically* requires an SEIS, that argument is barred by the statute of limitations.  To the extent that Plaintiff is suggesting generally that the *2012 Re-evaluation* is deficient because indirect and cumulative effects "should be considered," that argument misses the mark because the Highway Defendants *did* consider the indirect and cumulative impacts for the Northern Beltline.  (*See* USCOE000522-23, USCOE000567 ("The indirect effects and cumulative impacts (ICI) analysis for this project required additional evaluation, which is included in Sections 6.4-6.8."), USCOE000628-716.)

Plaintiff also argues that all of the indirect and cumulative impacts of the entire Northern Beltline project must be considered "new information" because those impacts were not considered in the 1997 FEIS and, therefore, the Highway Defendants were obligated to consider whether the indirect and cumulative impacts of the project would have significant environmental effects that require issuance of a SEIS.  The Highway Defendants do not dispute that the Re-evaluation required an analysis of all indirect and cumulative effects of the entire Northern Beltline to determine whether to issue a SEIS, and they did analyze those effects in the Re-evaluation.[26]  Accordingly, the court will review whether the Highway Defendants acted arbitrarily or capriciously in deciding whether the indirect and cumulative effects of the project necessitate a SEIS.

---

[26] Therefore, it is not necessary to consider whether, in light of the statute of limitations, the Highway Defendants were required to consider only "*new* information or circumstances" that arose after the FEIS was issued, 23 C.F.R. § 771.130(a) (emphasis added), or whether they were also required to also consider whether information and circumstances that existed at the time of the 1997 FEIS and 1999 ROD required a SEIS.

Plaintiff takes issue with the Highway Defendants' indirect and cumulative effects analysis by arguing the Highway Defendants failed to consider a number of specific indirect and cumulative impacts of the project and that the Highway Defendants used deficient water quality models in their analysis.  (Doc. # 164 at 42.)   Specifically, Plaintiff argues that "indirect impacts that should be analyzed include, but are not limited to" the following: increased impervious surfaces in the Black Warrior and Cahaba River watersheds from secondary construction, impacts to sewage treatment[27] and water supplies, the costs to local governments of maintaining the Northern Beltline and constructing accessory infrastructure, and indirect effects of the project on sewage treatment and drinking water supplies.  (Doc. # 164 at 42.)   Plaintiff also argues that the Re-evaluation "fails to evaluate the indirect and cumulative effects on endangered species."   Further, Plaintiff argues that "the cumulative impacts of the project" must be evaluated in conjunction with the reasonably foreseeable impacts of the completed Corridor X, another highway project in the Birmingham area which will ultimately be Interstate 22, a limited-access interstate highway running from Birmingham to Memphis, Tennessee.  (*See* USACOE000908.)  (Doc. # 164 at 41-43.)

Plaintiff's argument that the 2012 Re-evaluation failed to adequately consider indirect and cumulative impacts of the Northern Beltline suffers from several terminal problems.   First, the jurisdictional problem persists with respect to the indirect and

---

[27] Plaintiff does not provide any explanation of what significant environmental "impact to sewage treatment facilities" the project may pose that was not considered in the FEIS or the Re-evaluation.  Therefore, the court will not consider this argument.

cumulative effects of the western section.  (*See* USACOE000691 ("For the cumulative effects analysis, the area of direct impact is defined as the ROW of the current alignment. . . . [A]lignment shifts may occur, particularly on those areas where preliminary design is in the early stages.  For project sections where alignment shifts occur, additional consideration of indirect impacts and cumulative effects may be needed prior to advancing those sections of the project."); *see also* USACOE000558; USACOE000567).  No determination has been made as to whether a SEIS will be required for the western section, and the court has already determined in Section V.C. that the Highway Defendants did not violate NEPA by choosing to reserve consideration of the necessity of a SEIS for that section.

Therefore, the only final agency decision that is currently subject to review is the decision that no SEIS is required for the eastern section, but Plaintiff does not specifically challenge that decision; instead, it directs its arguments at the entire Beltline as a whole, regardless of which sections have or have not been subject to a final agency decision at this time.  Accordingly, Plaintiff's argument that a SEIS is required to evaluate all of the indirect and cumulative effects of the entire Beltline implicates issues that were not the subject of a final agency action and are not ripe for review.  Therefore, Plaintiff has not met its burden to demonstrate noncompliance with NEPA, and the Highway Defendants are entitled to summary judgment on this issue.

Further, Plaintiff utterly fails to acknowledge that the 2012 Re-evaluation *did* consider the indirect and cumulative impacts of increased impervious surfaces in the

Black Warrior and Cahaba River watersheds from secondary construction.[28]  (Doc. # 170 at 42-43.)  For example:

- USACOE000661 (identifying indirect ecological effects of the project, including "increased runoff from the additional impervious surface that would result from development");

- USACOE000663 ("Indirect effects could also occur to the area's water quality including the impaired streams. These impacts include degradation to the area's water quality due to increased runoff from the additional impervious surface that would result from development. With this anticipated increase in impervious surface, there is potential for future impacts to water quality. Due to the sensitivity of the overall aquatic habitat and the protected status of the species known to

---

[28] For example, Plaintiff argues that, "[w]hile the 2012 Re-evaluation acknowledges that there could be future increases in stormwater runoff levels and non-point source pollution due to induced development, it completely fails to analyze the extent of these impacts."  (Doc. # 164 at 42.)  This is but one of many examples of Plaintiff misstating the evidence. Alleging "complete" failure to do a thing is too easy from a proof perspective, and can be a tactic that encourages a fact-finder to be lazy.  With each allegation that the agencies "completely failed" to consider a certain issue, a conscientious court must closely examine the administrative record (which in this case is both highly technical and exceedingly voluminous) to verify whether Plaintiff's statement regarding the *absence* of any administrative consideration of a particular subject is in fact supported by the record.  Defendants' briefs have been useful in aiding the court in this endeavor, but the court is ultimately responsible for reviewing the entire administrative record to verify whether the facts regarding what the agency did or did not consider are as the parties represent them to be.  *See Or. Nat. Res. Council*, 490 U.S. at 378 ("[I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance-or lack of significance-of the new information."); *Sierra Club v. U.S. Army Corps of Engineers*, 295 F.3d 1209, 1216 (11th Cir. 2002) (holding that the court's "duty is to ensure that the agency took a 'hard look' at the environmental consequences of the proposed action" is a duty that "requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record"); *see also Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004) (holding that cross-motions for summary judgment "must be considered separately," and "each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law"); *Griffis v. Delta Family-Care Disability*, 723 F.2d 822, 824 (11th Cir. 1984) (adopting order of district judge on summary judgment) ("A court may discover questions of material fact even though both parties, in support of cross-motions for summary judgment, have asserted that no such questions exist. . . . . Thus, before the court can consider the legal issues raised by the parties on cross-motions for summary judgment, it must have no doubt as to the relevant facts that are beyond dispute.").

occur, all of the indirect effects identified have the potential to affect water quality, habitat and protected aquatic species and will be studied in further detail (see Section 6.5.6).");

- USACOE000668-69 ("Future increases in storm water runoff levels and NPS pollution could occur due to induced development. . . . Water quality modeling was undertaken in order to determine the proposed project's potential cumulative impact on water quality (refer to Section 6.6.6 and Appendix N for detailed information). . . . When comparing the difference between the change from the baseline (existing) of the build and no build (2035) scenarios, the results show the pollutant loads for total suspended solids (TSS) (sedimentation) decrease within the AOI [*i.e.*, the area of the project's environmental influence] while the loads for nitrogen (TN) and phosphorous (TP) increase. Results of the model show that TN and TP loads would increase even if the proposed project is not constructed. The change in the TN and TP load increase between the 2035 build and 2035 no build scenarios is generally less than two percent, and for most cases is 0.5 percent or less. It should be noted that the water quality model is not able to take into account the beneficial effects of BMPs, so these numbers represent a conservative estimate of what increases in TN and TP loads would be. . . . Appreciable differences in water quality are not anticipated with and without the construction of the project with implementation of Jefferson County's Storm Water Management program, ALDOT's monitoring program and ADEM's erosion control guidelines for construction sites.");

- USACOE000680 ("Future increases in storm water runoff levels and NPS pollution would occur due to induced development. The network of future roadways and subdivision streets, in conjunction with the proposed project, would contribute to increased runoff as impermeable surface area increases. The density and type of development within the AOI would contribute to the overall changes in runoff. . . . [W]ater quality will be carried forward for consideration of cumulative effects. Cumulative impacts to streams will also be discussed in this section.");

- USACOE682 ("[W]etlands will be carried forward for consideration of cumulative effects. Streams will not be assessed here but will be discussed with respect to water quality and federally protected species/critical habitat in their respective sections.");

- USACOE000700-701 ("Cumulative effects to water quality and streams would include direct and indirect effects discussed in Section 6.5.6 as well as the effects caused by the projects listed in Section 6.5.5. It should be noted that the effects to water quality and streams caused by the projects listed in Section 6.6.5 would occur even if the proposed project were not constructed as it is anticipated these

transportation improvements will be constructed even if the proposed project is not.  The most common cause and effect issue is increased quantity and quality of runoff, increased sedimentation, and direct impacts to streams that resulted from past development and linear transportation projects, that will result from the proposed action and that is anticipated to occur due to future development and transportation projects.");

- USACOE000701-02 ("Water quality modeling was undertaken in order to determine what the proposed project's potential cumulative impact on water quality might be. . . . After consultation with ALDOT, the Pollutant Load (PLOAD) model was chosen as the preferred modeling platform for this project. PLOAD . . . estimates [non-point source] pollution at watershed and sub-watershed levels. . . . For this study, nitrogen (IN), phosphorus (TP) and sedimentation (TSS) were estimated using the PLOAD model, which is considered to be a screening-level tool to assess large geographic units for initiating permitting and impact discussion and is part of the BASINS (Better Assessment Science Integrating point & Non-point Sources) modeling system promulgated through the USEPA.  PLOAD does not calculate in-stream effects, nor was there any attempt to estimate the effects of [best management practices] on the pollutant loading figures . . . . Within the PLOAD [water quality] model, the Simple Method was used to calculate the pollutant loads for the Baseline scenario and the five Build scenarios. This method requires input data consisting of watershed area, land use types and areas, pollutant loading rate (Event Mean Concentration), the impervious factor, annual precipitation data, and ratio of storms generating runoff. . . . PLOAD outputs generated for the baseline scenario and the five Build scenarios are shown in Appendix N. These figures and tables include summaries of the total pollutant loads for total suspended solids (TSS), total nitrogen (TN), and total phosphorus (TP) by basin and hydro logic unit. The appendix also contains additional supporting figures. Please note that although located outside the AOI, portions of the Coosa River Basin were included in the PLOAD model.")

- USACOE000710 ("The proposed project is expected to have some cumulative impact to water quality and streams. Results of the water quality modeling show that, generally, the pollutant loads for TSS decrease in each subbasin of the AOI [*i.e.*, areas of impact] by 2035 while the loads for TN and TP increase. However, although the model shows a decrease in TSS, the model does not take into account the in-stream effects of storm water runoff flows. Therefore it is anticipated that with the increased quantity and quality of runoff expected to occur as a direct and indirect result of the project and the increased runoff expected to occur as part of the reasonably foreseeable projects discussed in Section 6.2.5, that in-stream erosion and sedimentation will lead to increased TSS loads within the AOI.").

At the same time that Plaintiff argues that the Highway Defendants failed to

consider the indirect and cumulative impacts of the Northern Beltline on water quality, Plaintiff also contends that the Highway Defendants' chosen water quality model "deliberately ignored the impact of in-stream sediment." (Doc. # 170 at 42.) The record does not support Plaintiff's contention. The Highway Defendants' consideration of the effects of development on water quality included water-quality modeling, and the Highway Defendants explained the basis for its choice of a water-quality model. (USACOE000663, USACOE000668-69; USACOE000700-710; USACOE1955; USACOE1959). The chosen water quality model accounted for total nitrogen, total phosphorus, and total suspended solids (sedimentation) as a result of runoff from variations in projected development and impervious surfaces under different scenarios, including build and no-build scenarios. (USACOE000702). The model projected that total suspended solids would decrease with increased development because urban land uses generate smaller sediment loads from runoff than less-developed areas due to the higher amount of impervious surfaces in urban areas. (USACOE000702, USACOE000710). However, as the Highway Defendants fully acknowledged and explained in the Re-evaluation, the chosen model's projection for total suspended solids underestimated the ultimate effect of development because the model did not account for in-stream erosion caused by intensified stormwater runoff flows due to the increased impervious surfaces typical of urbanized areas. (USACOE000710). The Highway Defendants concluded that, "[t]herefore, it is anticipated that with the increased quantity and quality of runoff expected to occur as a direct and indirect result of the project and the increased runoff expected to occur . . . that in-stream erosion and sedimentation will

75

lead to increased [total suspended solid] loads within the [area of impact.]" (USACOE000710).

Wholly contrary to the record, Plaintiff contends that the 2012 Re-evaluation contains an "admission" that the model "was not designed to analyze stream impacts" and that the Highway Defendants "never used modeling or any other technique to evaluate stream impacts." (Doc. # 170 at 6.)  The Highway Defendants did state that "PLOAD does not calculate in-stream effects," (USACOE000702), but they further clarified that the "in-stream effects" to which they referred were the effects of "TSS loads due to in-stream erosion" caused by the intensification of storm water runoff flows in increasingly urbanized areas.  (USACOE000710.)  The model did calculate for changes to sediment loads due to the effects of urbanization and increased impervious surfaces on "land-based soil erosion." (USACOE000702.)  Thus, the statement in the Re-evaluation that the model failed to calculate for "in-stream effects" does not reasonably suggest a failure to consider or calculate the project's effects on water quality in streams.

On the contrary, the record makes it painfully obvious that the Highway Defendants *did* consider the effects of the project on the quality of water in streams, and it is not clear why Plaintiff argues otherwise.[29]  Perhaps Plaintiff misunderstands the

---

[29]As has happened in a number of other instances in this case, only some of which are noted in this Opinion, Plaintiff's mischaracterization of the record to argue that the Highway Defendants "completely failed" to consider a potentially significant environmental impact required the devotion of a disproportionate amount of judicial time and resources to determining what the record says and what it truly means.  The 2012 Re-evaluation is quite clear about what "in-stream effects" the model did and did not take into calculation, and about how the model's projection of the Beltline's impact on sediment loads in streams should be evaluated in light of the model's acknowledged shortcomings.  (USACOE000702; USACOE000710.)

difference between in-stream erosion and sediment and other pollutants that have been carried into the stream from overland runoff (a difference made clear by the discussion in the Re-evaluation itself), or perhaps Plaintiff was simply careless and imprecise in mixing and matching hydrological terms to make broad statements that are incorrect. Whatever the reason, in Plaintiff's briefs, the Highway Defendants' acknowledgement that they did not model for "TSS loads due to in-stream erosion" (USACOE000710) morphs progressively (and inappropriately) into "evidence" that the Highway Defendants failed to consider the impact of "in-stream sediment" (Doc. # 164 at 42), then "in-stream impacts" (Doc. # 164 at 42; Doc. # 170 at 6), and then all "stream impacts" of the project in general (Doc. # 170 at 6).

Despite the fact that the model did not calculate for TSS due to in-stream erosion, the Highway Defendants did not "ignore" the impacts of in-stream erosion on water quality in streams.  Plaintiff takes issue with the fact that the water quality *model* "ignored" those impacts, but Plaintiff has not explained why it would have been necessary for the Highway Defendants to analyze in-stream erosion by using a different computer model or any model at all.  *See City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1358 (11th Cir. 2005) ("The methodology used to make technical determinations . . . is a matter of agency expertise. Th[e] court's role is simply to ensure that the agency utilized legally adequate procedures in applying its expertise.  We therefore owe particular deference to the [agency's] choice of methodologies.").

Plaintiff also alleges that urbanization, to which the project will contribute, will increase pollution and decrease groundwater recharge, thereby increasing the cost and

decreasing the supply of treating drinking water.  However, as noted, the Highway Defendants did consider the impact of urbanization and pollution on water quality. Plaintiff has not shown that increased cost of treating drinking water or reduction in drinking water supply are relevant to environmental concerns, or that these factors would result in significant *environmental impacts* not already evaluated in the FEIS.  23 C.F.R. § 771.130(a)(2); 40 C.F.R. § 1502.9(c)(ii).

Plaintiff has also similarly failed to demonstrate or even argue that "the cost to Jefferson County and affected local governments of maintaining the Northern Beltline and constructing accessory infrastructure" (Doc. # 164 at 42) is relevant to environmental concerns or would result in significant environmental impacts not already evaluated in the FEIS.  Therefore, Plaintiff has not demonstrated those costs are relevant to whether a SEIS should be issued.  23 C.F.R. § 771.130(a)(2); 40 C.F.R. § 1502.9(c)(ii); *Or. Nat. Res. Council*, 490 U.S. at 374.

Further, there is no basis for Plaintiff's argument that "the Re-evaluation . . . fails to evaluate the indirect and cumulative effects on endangered species."  (Doc. # 164 at 32.)  The 2012 Re-evaluation *did* consider the indirect and cumulative impacts of the project on threatened and endangered species.[30]  (USACOE000521-22; USACOE00625-27;  USACOE000630;  USACOE000654;  USACOE000663;  USACOE000671; USACOE000682-83;  USACOE000690-95;  USACOE000710-11;  USACOE000712-13;

---

[30] This is yet another example of a broad misstatement of negative fact by Plaintiff. Technically, as the Re-evaluation acknowledges, the indirect and cumulative impacts of the project will be studied in more detail as more detailed designs become available for the western section as well as portions of the eastern section.  (USACOE000627.)  However, this does not mean that the Highway Defendants failed to consider the issue.

USACOE716).   As the court has already explained in Section V.E.2.iv., Plaintiff has failed to demonstrate error in the Highway Defendants' assessment of those effects. Plaintiff has also failed to demonstrate error in the decision that no SEIS is required for the eastern section, that further environmental studies will be conducted in the eastern section as more detailed designs become available, or that further environmental studies are needed to analyze the significance of the effects of the western section on threatened and endangered species. The endangered aquatic species at issue do not necessarily live in all the water bodies in all three major watersheds that would potentially be impacted by the Beltline.  (USACOE000625-28; USACOE692-94). However, Plaintiff has made no attempt to demonstrate that the entire Northern Beltline must be analyzed as a whole to properly address the impact of the Beltline (or even just the entire eastern section) on any or all of those endangered species.

Plaintiff argues that "the cumulative impacts of the project" must be evaluated in conjunction with the reasonably foreseeable impacts of the completed Corridor X, particularly with respect to water quality.  (Doc. # 164 at 41-43; USACOE00090.) The Re-evaluation did consider the cumulative effects of the Beltline in conjunction with Corridor X, particularly with respect to development at the connector between the Northern Beltline and Corridor X, but also generally.[31]  Plaintiff has not offered any

---

[31] (See, e.g., USACOE000649, -51 (noting, in identifying trends for use in indirect effects analysis, that "the construction of Corridor X and the proposed BNB will encourage further development towards the traditional rural and suburban areas of the county, most notably within the Gardendale/ Fultondale area where significant residential developments are planned or proposed," that "areas of notable increase [in employment] include the Adamsville/Graysville area and the Mulberry Forks/ North Johns Area, both projected to increase over 100 percent with the completion of Corridor X," and that "[t]hose interviewed [for the expert panel survey

argument or explanation as to why the Highway Defendants were required to perform a

---

regarding land use trends] indicated that the proposed project would spur new development and redevelopment and at a faster rate than would otherwise occur. Interchange locations located north and east of Corridor X are particularly favorable for accelerated development and changes to non-residential development patterns as a result of the proposed project."); USACOE000664 (noting, for purposes of analyzing cumulative impacts of "existing and future land use and the proposed project['s potential impact on land use, development, redevelopment, rate of growth and the potential impacts of any new development on sensitive environmental and community resources (see Section 6.6.6 and Appendix M)" that "the influence of the project is expected to be primarily on residential development, but there could also be an influence on commercial development through land use conversion at . . . the Corridor X interchange," and "that interchange locations north and east of Corridor X are particularly favorable for accelerated development and changes to non-residential development patterns as a result of the proposed project. These changes were generally found to be supported and even anticipated by local government."); USACOE000696-99 (Section 6.6.5: "Identification of Other Reasonably Foreseeable Actions That May Affect Resources," including the interchange at Corridor X); USACOE000700 ("Cumulative effects to water quality and streams would include direct and indirect effects discussed in Section 6.5.6 as well as the effects caused by the projects listed in Section 6.5.5.  It should be noted that the effects to water quality and streams caused by the projects listed in Section 6.6.5 would occur even if the proposed project were not constructed as it is anticipated these transportation improvements will be constructed even if the proposed project is not."); USACOE000710-11 ("Cumulative effects to wetlands would include direct and indirect effects discussed in Section 6.5.6 as well as the effects caused by the projects listed in Section 6.6.5. . . . Cumulative effects to T&E species and critical habitat would include indirect effects discussed in Section 6.5.6, as well as the effects caused by the projects listed in Section 6.6.5. It should be noted that the effects caused by the projects listed in Section 6.6.5 would occur even if the proposed project were not constructed. . . . It is anticipated that with the increased quantity and quality of runoff expected to occur as a direct and indirect result of the project and the increased runoff expected to occur as part of the reasonably foreseeable projects discussed in Sections 6.5.6 and 6.6.5, that in-stream erosion and sedimentation will lead to increased sedimentation (thus resulting in decreased water quality) within the AOI."); *see also*, *e.g.* USACOE000696 ("The Expert Panel, tax maps, and zoning were all used to determine reasonably foreseeable development within the AOI."); USACOE000700 ("The Expert Panel concluded that the proposed project could change development patterns by causing relatively rural areas to convert to more suburban areas. . . . The project's cumulative effect on land use would include direct and indirect effects discussed in Section 6.5.6 as well as the effects caused by the projects listed in Section 6.6.5. In sum, the proposed project's cumulative effect on land use is the conversion of relatively rural and undeveloped land to residential and commercial uses with some potential for industrial. New residential development is already occurring or will occur around . . . Corridor X . . . . Based on discussion with the Expert Panel, development would occur even if the project were not constructed; however, the project will speed the pace of development to some degree. To what degree this will be influenced by Jefferson County's current sewer and financial problems cannot be readily determined as the outcome of the issues is not reasonably foreseeable.").

more detailed or more broadly scoped cumulative effects analysis of the Northern Beltline in conjunction with Corridor X (or, for that matter, the cumulative water quality effects of any or all of the other reasonably foreseeable transportation projects in the three watersheds potentially impacted by the 52-mile Northern Beltline).  *See Fritiofson v. Alexander*, 772 F.2d 1225, 1245 n.15 (5th Cir. 1985), *abrogated on other grounds by Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 677-78 (5th Cir. 1992) ("Obviously, we are not suggesting that at this stage of the process [*i.e.*, determining whether an EIS is necessary,] a full-blown environmental analysis of the impacts of other actions, akin to that which they would receive if they were the subject of NEPA review, is necessary.").  *Cf. Kleppe v. Sierra Club*, 427 U.S. 390, 413-14 (1976) ("[D]etermination of the extent and effect of [cumulative impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies. . . . Even if environmental interrelationships could be shown conclusively to extend across basins and drainage areas, practical considerations of feasibility might well necessitate restricting the scope of comprehensive statements.").

Moreover, the portion of Corridor X that could potentially share water quality impacts with the Northern Beltline is located in the western section of the Beltline.  (*See* USACOE1646.)  *See D'Olive Bay Restoration & Pres. Comm., Inc. v. U.S. Army Corps of Eng'rs*, 513 F. Supp. 2d 1261, 1292-93 (S.D. Ala. 2007) ("A reasonable cumulative impacts analysis is to include . . . other actions – past, present, and reasonably foreseeable proposed – that have had or are expected to have impacts *in the same area*." (emphasis

added)).  At this time, the Highway Defendants have decided that the direct and indirect, and cumulative effects of the western beltline on water quality require further study pending more detailed design of that section, and the court does not have jurisdiction to review that decision.  Corridor X is not located in the eastern section of the Northern Beltline (*see* USACOE1646), and the court has already determined that the Highway Defendants did not improperly segment the Beltline for purposes of determining whether the eastern section requires a SEIS.   Plaintiff has not made any effort to show that Corridor X would have environmental effects in the same area as the eastern section of the Beltline.

Plaintiff has not met its burden to demonstrate that the Highway Defendants failed to take a hard look at indirect and cumulative impacts or acted arbitrarily or capriciously in determining that no SEIS is needed for the eastern section of the Beltline.

## F.    Conclusion

Accordingly, the Highway Defendants are entitled to summary judgment on Plaintiff's complaint against them, and Plaintiff's motion for summary judgment is due to be denied as to that complaint

## VI.  ANALYSIS:  THE § 404 ACTION

Section 404 of the Clean Water Act, 33 U.S.C. § 1344, prohibits the discharge of dredged or fill material into the waters of the United States without a permit from COE. On September 30, 2013, COE issued a § 404 permit to ALDOT for the discharge of dredge and fill material into waters of the United States in conjunction with the construction of a 1.86-mile section of the Northern Beltline near Palmerdale, Alabama.

The 1.86-mile section is located roughly in the center of the eastern section of the Beltline for which FHWA authorized construction after conditionally approving the 2012 Re-evaluation.

COE's decision to issue the permit is subject to the deferential standard of review set forth in the APA, pursuant to which final agency action will be set aside only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1363 (11th Cir. 2008); *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996); *see also Envtl. Coal. of Broward County, Inc. v. Myers*, 831 F.2d 984, 986 (11th Cir. 1987) (holding that deference to agency decisions is "particularly appropriate in the case of complex environmental statutes such as the Clean Water Act").

In evaluating a § 404 permit application, COE must follow the requirements of CWA and NEPA, as well as a number of other environmental statutes and regulations such as the Endangered Species Act (16 U.S.C. § 1531 *et seq*.).  In its complaint in the § 404 action (Doc. # 1 in case No. 2:13-cv-794), Plaintiff challenges the § 404 permit's compliance with CWA and NEPA only.  Plaintiff asserts four claims.  First, Plaintiff alleges that COE and ALDOT "segmented" the Northern Beltline and violated NEPA because the permit application and permit were limited to the section of highway connecting SR 75 and SR 79.  Second, Plaintiff contends that COE's public interest review and analysis of alternatives violate the CWA.  Third, Plaintiff contends that NEPA required COE and ALDOT to create a SEIS for the entire Northern Beltline. Fourth, Plaintiff argues that COE's EA and FONSI violate NEPA because COE's NEPA

analysis improperly "segmented" the Beltline and because COE failed to take a hard look at the relevant environmental factors.

**A.    Count I: Plaintiff's Claim that Application and Issuance of a Permit for the 1.86-Mile Section Violates Rules Against Segmentation**

In Count I, Plaintiff contends that, by ALDOT applying for a permit for less than the entire Beltline, and by COE issuing a permit for the 1.86-mile section, ALDOT and COE improperly segmented the Northern Beltline in violation of NEPA and § 404.  As explained at length, *supra*, "[t]here is a difference between 'segmentation' in its pejorative sense, and—what is within administrative discretion—breaking a complex investigation into manageable bits."  *Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1059 (7th Cir. 2013) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 412–15 (1976)).  While the law does not "allow an agency to segregate its actions in order to support a contention of minimal environmental impact," the law also does not "force an agency to aggregate diverse actions to the point where problems must be tackled from every angle at once. To do so risks further paralysis of agency decisionmaking."  *Nw. Res. Info. Ctr., Inc. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1069 (9th Cir. 1995).  Massive interstate highways are not "built all at once." *Hoosier*, 722 F.3d at 1060.  Commonly, as occurred in this case, the general route of the highway is chosen and an EIS is developed for the project as a whole, while the costly process of determining precise alignment and engineering design of the highway, including the number, location, and design of ancillary structures such as bridges, culverts, and interchanges, is reserved for future development to be done for various

sections of the highway in turn.  *See id*. at 1059-60.

At each stage of the design process, the relevant agencies have a continuing duty to consider whether new information or changes in the environment or project design necessitate additional studies and NEPA documents.  *Or. Nat. Res. Council*, 490 U.S. at 372-73.  In fact, it is often the case that advanced environmental review *cannot* meaningfully occur until the designs for the various sections of the highway progress to a sufficiently detailed point that the necessary data can be obtained for the environmental analysis.  This is especially true with respect to the § 404 permitting process.  Generally, as in this case, COE coordinates with FHWA at the early stages of review when the initial FEIS is produced for the project as a whole.  33 C.F.R. Pt. 325, App. B ¶ 8(c); *see Hoosier*, 722 F.3d at 1059-61.   However, COE usually does not perform a § 404 permit analysis for the entire highway project all at once.  Instead, because "[t]he . . . task of determining the optimal alignment of the highway, and the optimal location and design of ancillary structures, within each section to minimize wetlands damage" is "best . . . performed piecemeal" after the overall route of the highway has been chosen, COE will defer issuance of § 404 permits until designs for the various sections are developed enough to enable COE to "kn[ow] exactly where the new highway and its crossings and any other ancillary structures [are] planned to be."  *Hoosier*, 722 F.3d at 1060.  In this way, COE is better able to determine the highway's effects on wetlands and waters of the United States.  *See id.*

Thus, COE does not generally wait to begin issuing permits until all designs for all sections of a massive interstate highway project have been completed.  Instead, § 404

permits are granted or denied as the analysis of the wetland effects of alternative configurations is completed for each segment.   *Id*.  Otherwise, COE would have to "either . . . devote [many] times the resources to conduct the permit analysis for all . . . sections at once, to the prejudice of its other assignments," or "delay[] the start and completion of construction for years as a smaller staff did first section 1, and then section 2, and so forth but did not grant a permit until it had analyzed all . . . sections." *Id*.

The practical necessity of this approach is especially evident in this case. It would be impossible for ALDOT to apply for, and COE to review, a permit for the entire Northern Beltline at once – not only because of the time, logistics, and volume of information that would be involved in permitting every discharge at every point along the entire 52-mile-long Beltline at once, but also because much of the Beltline has not even reached the point in the design stage where COE could meaningfully review such a permit application.  (USACOE000567; USACOE000625.)   COE explained in the administrative record its reasoning for approaching the § 404 permit process by sections:

- "This project involves the construction of a 3.4 mile [later reduced to 1.86-mile] segment of a larger proposal to construct a 52-mile expressway from 1-59/20 in Bessemer to 1-59 north of Trussville. This initial . . . segment has funds already appropriated. . . .  Other segments of the project may not happen for 10-20 years down the road. Or they may not happen at all. It all depends on funding. The Corps cannot issue a 20-year permit, which is one of the reasons just a portion of the project is being considered at this time." (USACOE000171 (September 20, 2011 Memorandum for Record).)

- "Regarding working with ALDOT on the potential indirect effects for the entire project, if and when the future phases progress (it is reasonable to assume they will), the Corps will work with ALDOT at the time the project is submitted to assess avoidance and minimization of impacts. ALDOT has a general idea of the footprint for the remainder of the Beltline, but final engineering is not complete and on the ground waters of the US determinations have not been conducted. This

is because the funding is not available to get this far along in the planning stages. They have a general idea of the direct impacts, but until they get to the stage where they have the funding for in-depth studies, this type of project planning cannot be conducted at this time. The Corps will work with ALDOT when the appropriate time comes." (USACOE4844.)

In the considerable length of time that it would take for ALDOT to create a detailed design of the entire 52-mile long Beltline, for ALDOT, FHWA, and COE to conduct all of the studies and assessments that will be completed as the design becomes more detailed, and for COE to complete a § 404 permit analysis for the entire project, changes will no doubt occur in the environment and in the project design, and new information and new circumstances will come to light. The inevitable ebb and flow of updated and outdated information over time would require constant monitoring to ensure that the myriad decisions made throughout the entire process remained valid under NEPA, CWA, and other applicable regulatory schemes until the final, massive § 404 permit decision can be made and then (if applicable) run through the gauntlet of judicial review.[32] In other words, Plaintiff's preferred approach would effectively reduce the Northern Beltline Project to nothing more than an intractable administrative mess. That

---

[32] The United States Supreme Court has observed in other contexts:

> Administrative consideration of evidence . . . always creates a gap between the time the record is closed and the time the administrative decision is promulgated [and, we might add, the time the decision is judicially reviewed]. . . . If upon the coming down of the order litigants might demand rehearing as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening.

*Or. Nat. Res. Council*, 490 U.S. at 374 n.19 (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Resources Defense Council, Inc*., 435 U.S. 519, 554-555 (1978)) (alterations in original).

is neither the goal, nor should it be the result, of the regulatory process.  23 U.S.C. §

101(b)(4) ("Congress declares that it is in the national interest to expedite the delivery of

surface transportation projects by substantially reducing the average length of the

environmental review process."); 40 C.F.R. § 1500.1 (c) ("Ultimately, of course, it is not

better documents but better decisions that count.  NEPA's purpose is not to generate

paperwork—even excellent paperwork—but to foster excellent *action*. The NEPA

process is intended to *help* public officials *make decisions* that are based on

understanding of environmental consequences, and *take actions* that protect, restore, and

enhance the environment." (emphasis added).)

Nevertheless, in Count I of its complaint, Plaintiff insists that issuance of a § 404

permit for less than the entire Northern Beltline violates 33 C.F.R. § 325.1(d)(2).  33

C.F.R. § 325.1(d)(2) provides: "All activities which the applicant plans to undertake

which are reasonably related to the same project and for which a [§ 404] permit would be

required should be included in the same permit application. District engineers should

reject, as incomplete, any permit application which fails to comply with this requirement.

For example, a permit application for a marina will include dredging required for access

as well as any fill associated with construction of the marina."  Except to mention 33

C.F.R. § 325.1(d)(2) in a conclusory fashion (Doc. # 164 at 7), Plaintiff does not argue

this point in its summary judgment briefing.[33] Plaintiff's mere citation to § 325.1(d)(2),

---

[33] Closely related to the issue of "how much of the project must be included in the same permit *application*" is the issue of whether COE's EA/§ 404 analysis may be based on a component or phase of a larger project.  William L. Want, *Law of Wetlands Regulation*, § 6.63 (Westlaw 2015) (emphasis added).  In some circumstances, NEPA requires the scope of the

without more, is not sufficient to carry Plaintiff's burden on summary judgment.  *See Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986) (holding that "mere general allegations which do not reveal detailed and precise facts will not prevent the award of summary judgment," and "a party may not rely on his pleadings to avoid [summary] judgment against him." (citations and internal quotation marks omitted)); *see also Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 182 F.3d 888, 892 (Fed. Cir. 1999) ("[A]ssertions made in the pleadings (e.g., complaint or answer), but not made in opposition to a motion for summary judgment, need not be considered by the district court or the appellate court in ruling on the motion for summary judgment."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary

---

activities addressed in the *EA/§ 404 document* to be broader than the scope of the activity presented in the *permit application*.  For example, regulations governing NEPA implementation in COE's EA/404(b)(1)/FONSI analysis provide that, in some situations when COE is called upon to review a permit application for a specific activity that is part of a larger project, COE must address not only the "specific activity" for which the permit is sought, but also "those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. Pt. 325, App. B ¶ 7(b).  The existence of such regulations confirms that the scope of the activity that must be included in the permit application is not necessarily coextensive with the scope of the activities contemplated in COE's *§ 404 or NEPA analysis* of the permit application.  To the extent that Plaintiff argues that *the scope of COE's § 404 analysis* was improperly narrowed to the 1.86-mile section of highway for which the permit was sought, that argument is properly addressed in Section VI.B., which contains the discussion of Plaintiff's challenge to COE's § 404 analysis.  To the extent that Plaintiff relies on 33 C.F.R. Pt. 325, App. B ¶ 7(b) or other regulations to argue that COE's *NEPA analysis* focused too narrowly on the activity for which the permit is sought, those arguments are properly analyzed in Section VI.C., which covers Plaintiff's claim that the *scope of the EA* (rather than the scope of the permit application itself) violated NEPA.

judgment are deemed abandoned.").

Plaintiff also contends that the issuance of a permit for less than the entire Northern Beltline violates 40 C.F.R. § 1508.27(b)(7). (Doc. # 164 at 44). Section 1508.27(b)(7) does not prohibit *permitting* a manageable segment of a project. Rather, § 1508.27(b)(7) provides that, for purposes of NEPA's requirement that an EIS must be prepared for major federal actions that significantly affect the quality of the human environment, 42 U.S.C. § 4332(c), a *finding of significance* (and, by extension, the decision to issue a SEIS) "cannot be avoided by terming an action temporary or by breaking it down into small component parts." 40 C.F.R. § 1508.27(b)(7).

In its summary judgment brief, Plaintiff also argues that the issuance of the permit violates 23 C.F.R. § 771.111(f). (Doc. # 164 at 44). Section 771.111(f) does not require that a COE *permit* must issue for the entire Northern Beltline or not at all. Rather, § 771.111(f) provides that "*the action evaluated in each EIS or finding of no significant impact* (FONSI)" must connect logical termini, be of sufficient length to address environmental matters on a broad scope, and not restrict consideration of alternatives for reasonably foreseeable transportation alternatives. 23 C.F.R. § 771.111(f) (emphasis added).

Thus, 40 C.F.R. § 1508.27(b)(7) and 23 C.F.R. § 771.111(f) prohibit improper segmentation of an agency action in the preparation of (or decision not to prepare) a SEIS or FONSI. To the extent that Plaintiff raises the related argument that COE improperly segmented the 1.84-mile section in order *to avoid issuing a SEIS* for the entire Northern Beltline and *in issuing an EA and FONSI*, those contentions are raised in Counts III and

IV of the complaint in the § 404 action and will be evaluated separately.  (Doc. # 1 in Case No. 12:13-cv-794, ¶¶ 119-131).   However, Defendants are entitled to summary judgment on Count I of the complaint in the § 404 action because 40 C.F.R. § 1508.27(b)(7) and 23 C.F.R. § 771.111(f) do not require that the ALDOT must include the entire Northern Beltline in its permit application, or that COE must *issue or deny a permit*, if at all, for the entire Northern Beltline.

### B.1.   Count II: Plaintiff's Claim that COE Violated § 404 by Impermissibly Narrow Public Interest Review and Alternatives Analysis

Section 404 permits must meet the guidelines (the "§ 404(b)(1) Guidelines," codified at 40 C.F.R. pt. 230) developed by the Administrator of the Environmental Protection Agency ("EPA"), in conjunction with COE. 33 U.S.C. § 1344(b)(1).   In relevant part, the § 404(b)(1) Guidelines specify that COE must ensure that the proposed fill will not cause significant adverse effects on human health or welfare, aquatic life, and aquatic ecosystems. 40 C.F.R. § 230.10(c)(1)-(3).   COE must make a written determination of the effects of a proposed activity "on the physical, chemical, and biological components of the aquatic environment."   40 C.F.R. § 230.11. COE's implementing regulations incorporate the § 404(b)(1) Guidelines. 33 C.F.R. § 320.4(b)(4); 33 C.F.R. § 325.2(a)(6).   Under the applicable regulations, "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a).   Further, a permit generally will not be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact

on the aquatic ecosystem." 40 C.F.R. § 230.10(a).    In Count II, Plaintiff contends that COE violated § 404 by conducting inadequate review of the impacts of the proposed activity on public interest and by failing to adequately consider the existence of other practicable alternatives.

## B.2.    Alternatives Analysis

The prohibition on the permitting of projects "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences," 40 C.F.R. § 230.10(a), is often referred to as the "least environmentally damaging practicable alternative" requirement.  To be "practicable," an alternative must be "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2).

For projects that are not water dependent, the Guidelines establish a presumption that practicable alternatives are available that do not involve wetlands unless clearly demonstrated otherwise. 40 C.F.R. § 230.10(a)(3).[34]  "In addition, where a discharge is proposed for a special aquatic site, all practicable alternatives to the proposed discharge which do not involve a discharge into a special aquatic site are presumed to have less adverse impact on the aquatic ecosystem, unless clearly demonstrated otherwise." *Id.*

---

[34] COE determined that the project is not water dependent. (USACOE004805.)  *See* 40 C.F.R. § 230.10(a)(3) (providing that a project is not water dependent if it "does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose).  In addition, after reviewing the alternative routes of the Beltline, COE, concluded that "there are no practicable alternatives that would not involve a discharge into a special aquatic site."  USACOE004853.

At the administrative stage of review of ALDOT's § 404 permit application, ALDOT had the burden of "clearly demonstrating" to COE that no practicable alternatives exist that avoid discharges to wetlands. 40 C.F.R. § 230.10(a)(3). However, COE must "conduct[] its own independent evaluation [of available alternatives], and its practicable alternative analysis is not susceptible to numerical precision, but instead requires a balancing of the applicant's needs and environmental concerns." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 543 (11th Cir. 1996). Thus, at the stage of *judicial* review, Plaintiff bears the burden of demonstrating that COE acted arbitrarily or capriciously in analyzing the alternatives and granting the permit. *See id*. at 544 ("[I]nsofar as the CWA practicable alternatives analysis is concerned, we hold that the Plaintiffs failed to demonstrate that the Corps acted arbitrarily and capriciously in granting a permit to fill seventy-four acres of wetlands on the Walton Tract."); *see also Alliance For Legal Action v. U.S. Army Corps of Eng'rs*, 314 F. Supp. 2d 534, 543 (M.D.N.C. 2004) ("[T]he court's inquiry is not whether the Corps has clearly demonstrated a lack of practicable alternatives, but whether its decision that [the applicant] had done so was a clear error of judgment.").

In this case, COE requested ALDOT to provide information showing that no less environmentally damaging practicable alternatives to the proposed project were available. (USACOE004846.) ALDOT provided the requested information regarding alternatives to the proposed project. (USACOE003575-82; USACOE003619-26.) COE evaluated the alternative locations for the project and four alternative on-site design plans for the project and found two of them impracticable. (USCOE004847-52). COE also

considered a no-action plan, but noted that the no-action plan would not meet the project purpose.  (USACOE4852).   Of the alternative locations determined to be practicable, COE concluded that ALDOT's preferred location ("Alternative A") for the project was the least environmentally damaging practicable alternative because it would impact fewer acres of wetlands and would have fewer stream crossings than either of the other two practicable alternative locations.  (USACOE4852-53.)   Of the practicable alternative design plans, after discussions with COE, ALDOT agreed that, rather than using its original proposed plan for the project, it would use the plan that would minimize the impacts to aquatic resources and ensure that the project would have logical termini and independent utility by removing portions of the project that would have extended west of SR 79 and east of SR 75.  (USACOE004807-10, -4853.)

In its summary judgment reply brief (Doc. # 170 at 14), Plaintiff argues that a letter in which "the EPA described the negative environmental consequences" of Alternative A is evidence that alternative A is not the least environmentally damaging practicable alternative.  Plaintiff then quotes from a September 8, 1997 letter in which the EPA opined that "Alternative A . . . has the most impacts to natural resources," "will disrupt streams at 14 crossings, will impact over 4050 acres of forested lands located within the [right-of-way], . . . will destroy up to 68 acres of wetlands at 114 different sites," and "will have the greatest impact on wildlife of all the alignments discussed." FHWA 01998.  The EPA preferred Alternative D, which was not a feasible alternative. As explained by COE, "Alternative D was eliminated from further consideration because

it involved the use of land from a Section 4(f) property."[35]   Further, COE provided

information showing that, of the remaining feasible alternatives, Alternative A was "the

least environmentally damaging practicable alternative because it would impact fewer

acres of wetlands and would have fewer stream crossings than either" of the remaining

feasible alternative routes,[36] and Plaintiff has not submitted any evidence demonstrating

otherwise.  (USACOE4853-57.)   *See N. Buckhead Civic Ass'n v. Skinner*, 903 F.2d

1533, 1539 (11th Cir. 1990) ("'When specialists express contrary views, an agency must

have discretion to rely on the reasonable opinions of its own qualified experts even if, as

an original matter, a court might find contrary views more persuasive.'" (quoting *Or. Nat.*

*Res. Council*, 490 U.S. at 378)).

Plaintiff also argues that COE failed to consider numerous other alternatives to

---

[35] Section 4(f) of the Transportation Act provides: "[T]he Secretary [of the FHWA] may approve a transportation program or project . . . requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if— (1) there is no prudent and feasible alternative to using that land; and (2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use."  49 U.S.C. § 303(c).  COE explained that Alternative D was not feasible in light of the requirements of Section 4(f) because other feasible alternatives existed.  (USACOE004849.)

[36] The court recognizes that, for Alternative A, the estimated number of floodplains and wetlands has been revised since 1997 due to more detailed design for that alternative and that the estimated acres of affected wetlands has *decreased* due to a difference in the way impacted streams and wetlands are reported, and those changes were considered in the 2012 Re-evaluation.  (USACOE605-06; USACOE000623-25.)  Further, these numbers may change again in the future because, as more detailed designs are developed, additional wetland and stream surveys will be conducted.  (USACOE000625.)  Plaintiff does not argue that Defendants are obligated to similarly (and perpetually at every stage of environmental review) create equally more detailed designs for the previously rejected alternative routes for the entire Northern Beltline in order to re-compare all of the alternatives, and, in any event, such an argument would have no merit.

building the entire Northern Beltline, such as pursuing other transportation projects instead or extending Corridor x farther into the City of Birmingham. (Doc. # 164 at 41-45.)  However, a "practicable alternative" is one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics *in light of overall project purposes*." 40 C.F.R. § 230.10(a)(2) (emphasis added).  Thus, COE "analyzes practicable alternatives in light of a project's 'overall purpose,' which is more particularized to the applicant's project than is the basic purpose, and reflects the various objectives the applicant is trying to achieve."  *Sierra Club v. Van Antwerp*, 709 F. Supp. 2d 1254, 1264 (S.D. Fla. 2009), *aff'd*, 362 F. App'x 100 (11th Cir. 2010).

In this case, "[t]he overall project purpose, as determined by the Corps, is the construction of a limited access, divided highway linking SR 79 and SR 75 in Jefferson County, Alabama (Figures 2 and 3 - Attachment 1). The project is part of a larger project to construct a 50.01-mile expressway from 1-459/59/20 in Bessemer to 1-59 north of Trussville, to enhance cross-region accessibility."  (USACOE004805.)  COE used "the overall project purpose . . . as a basis for assessing the practicable alternatives for the proposal."  (USACOE004805.)  Plaintiff has not explained how its preferred alternatives (such as pursuing other transportation projects or extending Corridor X farther into the City of Birmingham) further the overall project purpose of building a limited access, divided highway linking SR 75 and SR79 as part of a larger expressway connecting Bessemer and Trussville.  Plaintiff also has not demonstrated that any of its preferred alternatives are "available and capable of being done after taking into consideration cost,

existing technology, and logistics" in light of this overall purpose.[37]

In conjunction with its argument that COE's § 404 alternatives analysis is arbitrary or capricious, Plaintiff offers a conclusory argument that the "public interest review requirements" of § 404 have not been met because COE allegedly relied on "outdated" data, specifically with respect to its analysis of the economic impacts of the Beltline. (Doc. # 164 at 55.)  COE did consider and rely on the alternative comparison in the 1997 FEIS that was used to select the Beltline route.  The outcome of the alternatives analysis was based on the relative costs of each alternative, which were roughly equal. (AR 1203.) Thus, the cost was not a deciding factor in choosing an alternative, and as explained in Section V.E.2.viii., Plaintiff has failed to establish that the updated cost estimate for the current preferred Beltline alignment requires Defendants to re-consider the continuing validity of that alternatives analysis.

---

[37] "For actions subject to NEPA, where the Corps of Engineers is the permitting agency, the analysis of alternatives required for NEPA environmental documents . . . will in most cases provide the information for the evaluation of alternatives under these Guidelines. On occasion, these NEPA documents may address a broader range of alternatives than required to be considered under [the § 404(b)(1) guidelines] or may not have considered the alternatives in sufficient to respond to the requirements of these Guidelines. In the latter case, it may be necessary to supplement these NEPA documents with this additional information."  40 C.F.R. § 230.10(a)(ii)(4); *see also Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1163 (10th Cir. 2002) *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003) ("For actions subject to NEPA, the analysis of alternatives required for the NEPA environmental documents will in most cases provide the information for the evaluation of alternatives under the CWA Guidelines.").  Plaintiff contends that NEPA regulations prohibiting segmentation require that COE's EA include a broader analysis of alternatives than those that would serve the overall purpose of the proposed activity as defined by COE (*i.e.*, overall purpose of the 1.86 mile section). *See* 40 C.F.R. § 1502.14, 33 C.F.R. Pt. 325, App. B ¶ 7(b). Because Plaintiff frames that argument in terms of the proper scope of the EA, and to avoid unnecessarily duplicative analysis, the court will evaluate that argument in conjunction with Counts III and IV of the complaint in the § 404 action.

In its summary judgment reply brief, Plaintiff argues that COE "is charged with studying economics as well as environmental impacts in its [§] 404 public interest review,"[38] and that COE "unequivocally failed to analyze the project's skyrocketing economic costs and respond to direct comments on this point from Plaintiff and others during the permitting process that this change in cost affects the project's purpose and practicable alternatives." (Doc. # 170 at 15.)   However, COE did respond to comments on the issue.  As COE explained those responses, it was not required to include in its a study of the economics of the entire Northern Beltline or a determination as to whether the 1.86-mile project should be pursued in light of the overall cost of the entire Beltline. (USACOE004820; USACOE004828-29 (explaining that the OCHS center report about the costs of the entire Beltline did not affect the alternatives analysis because the alternatives analysis was based on the project's "overall purpose," which was "the construction of a limited access, divided highway linking SR 19 and SR 75 in Jefferson County, Alabama")); *see Sierra Club v. Van Antwerp*, 709 F. Supp. 2d at 1264 (noting that a project's alternatives are analyzed in terms of a project's overall purpose, not its

---

[38] *See* 33 C.F.R. § 320.4(a)(1) ("All factors which may be relevant to the proposal must be considered including the cumulative effects thereof: among those are conservation, economics, aesthetics, general environmental concerns, wetlands, historic properties, fish and wildlife values, flood hazards, floodplain values, land use, navigation, shore erosion and accretion, recreation, water supply and conservation, water quality, energy needs, safety, food and fiber production, mineral needs, considerations of property ownership and, in general, the needs and welfare of the people.").  Plaintiff also cites *Van Abbema v. Fornell*, 807 F.2d 633, 639 (7th Cir. 1986), which held that, "[w]here. . . a proposal's benefits are entirely economic and its costs environmental, the Corps must make at least a minimally reliable effort to establish economic benefit. Obviously, the Corps is not an expert in every business seeking a permit, but, as guardian of the public welfare, it must credibly attempt to appraise economic benefit." Plaintiff has not explained why (contrary to COE's public interest review findings (USACOE004857)), this is a case where the project's benefits are "purely economic," or how COE failed to "make at least a minimally reliable effort to establish economic benefit."

basic purpose); *see also S. Louisiana Envtl. Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir. 1980) (holding that "[d]etermination of economic benefits and costs that are tangential to environmental consequences are within th[e] wide area of agency discretion" in policymaking decisions).  From COE's perspective, cost was considered in the § 404 alternatives analysis solely "to ensure the cost would not be prohibitive or impractical." (USACOE004848.)     Plaintiff has demonstrated neither that COE "unequivocally failed to analyze" the costs, nor that the increased cost estimates for the preferred alternative render that alternative impracticable.   Thus, Plaintiff has not established that COE's alternatives analysis was arbitrary or capricious in light of updated cost estimates of the Beltline.

Plaintiff also argues that COE erred in failing to consider alternatives to building the 1.86-mile section as a two- or four-lane parkway instead of a six- or eight-lane interstate.  (Doc. # 164 at 55.)  However, COE did not fail to comply with a procedural duty to consider the need for the number of lanes requested or whether the requested number of lanes presented the least environmentally damaging practicable alternative. As part of its independent review of this issue, COE specifically requested, and ALDOT provided, documentation justifying "a six-lane Beltline as opposed to the original four-lane design analyzed in the Final Environmental Impact Statement, as well as the need for the six-lane highway for this [1.86-mile] portion of the project."  (USACOE004846-47).  As COE explained in the § 404(b)(1) Guidelines Evaluation:

- "[COE] requested documentation for the need for 6 lanes, as opposed to 4 lanes. ALDOT explained that the Beltline, once completed, will become part of the National System of Interstate and Defense Highways. The FHWA, therefore,

requires ALDOT to design the roadway in accordance with the American Association of State Highway and Transportation Officials '(AASHTO's) 'A Policy on Design Standards-Interstate System.' This policy requires that interstates must be designed with control of access to ensure their safety, permanence and utility, and with flexibility to provide for predicted growth. The policy further sets the design year to be at least twenty years and requires the number of lanes shall be sufficient to accommodate the predicted volumes at an acceptable level of service. The current traffic projections, supplied by the Birmingham Metropolitan Planning Organization (MPO), were analyzed using the 2010 version of Highway Capacity Software for Basic Freeway Segments, Release 6.1. The results indicate that six lanes are needed to achieve level of service "C", which is the minimum acceptable standard. The analysis is located in the project file. The Corps defers to FHWA's decision on the number of lanes required as it is not up to the Corps to make that determination. As discussed, the Corps gave an objective review of the need by requesting the analysis and reviewing the analysis. The Corps ultimately defers to FHWA for this determination." (USACOE004821.)

- "The alternatives analysis and [least environmentally damaging practicable alternative] determination is provided in Section 4 of this document. ALDOT addressed the comment regarding why a 4-lane interstate or a 2-lane or 4-lane parkway could not satisfy the project purpose. . . . This explanation addresses why a 4-lane interstate or 2-or 4-lane parkway could not be used. The Corps required ALDOT to provide the numbers and analysis proving that 6 lanes are needed to provide the appropriate level of service. This was provided in ALDOT's letter to the Corps dated December 19, 2012. FHWA is ultimately the lead agency that determines appropriateness of the need for a 6-lane interstate. It is not within the Corps purview to dispute that FHWA has determined that the need is there." (USACOE004828.)

- "Regarding the comparison of environmental impacts associated with 4 lanes versus 6 lanes, the direct impacts to aquatic resources remain the same regardless of the number of lanes. ALDOT stated that the footprint associated with the road is the same with the 4 lanes as the 6 lanes and ultimately, 8 lanes. The project was planned to conduct all direct impacts to aquatic resources when the project is first constructed, allowing for the expansion to 8 lanes in the future without having to come back and acquire additional right-of-way (ROW) and expand culverts. Conducting all of the impacts upfront minimizes the amount of ground disturbance that would be required if they were to come back at a later date to conduct additional impacts. The current design has six lanes - three, 12-foot lanes in each direction with a 26-foot median and 14-foot outer shoulders. The road would be graded for all eight lanes, which would ultimately consist of four, 12-foot travel lanes in each direction with a 26-foot median and 12-foot outer shoulders. The reason there is not an increase in the footprint of the roadway is because of the

decrease in the median width from what was shown in the 1997 EIS. Figures 3 a and 3b on pages 5-4 and 5-5 of the Re-evaluation depict the typical sections for each design. The concern may be regarding the increase in impervious surfaces and the environmental effect that may have. ALDOT states the additional impervious areas resulting from the additional 2 lanes amount to less than one tenth of one percent of the affected drainage area. It does not appear that the small amount of increase in impervious surfaces would have an adverse effect on the environment." (USACOE004830.)

- "The need for the six lanes is approved by FHWA, as the lead federal agency. It has been shown that regardless of the number of lanes proposed to be paved, ALDOT planned from the beginning to apply for a permit for the entire width that is being proposed now, just with two fewer lanes. So, from the Corps perspective, the direct impacts to aquatic resources would be the same, whether four lanes or six lanes are being paved."  (USACOE004837.)

- "The EIS proposed four lanes with a wide median to accommodate four additional lanes on the inside in the future. The current proposed plan calls for six lanes with a graded area to accommodate two additional lanes on the outside, rather than the inside, when needed in the future. The additional impervious surface for six lanes versus four amounts to less than one tenth of one percent of the affected drainage area. The plan to widen to the outside rather than the inside is now a standard practice by highway departments, according to ALDOT. This method provides a safer construction area for the workers that construct the new lanes as well as the traveling public. ALDOT also stated that constructing the six lanes now versus four would decrease safety concerns for both the traveling public and construction workers. Regardless, ALDOT provided the analysis showing that based on current traffic projections, six lanes are required for the Beltline. The Corps defers to FHWA's determination that six lanes are appropriate for this project." (USACOE004839-40.)

- "ALDOT noted that there is no increased grading associated with the additional two lanes. The project has always been the width that is proposed. It has been their plan from the beginning to grade for the maximum eight lanes (four in each direction); therefore, they would not have to come back in the future to perform additional clearing and grading activities and extend culverts, which would require re- exposing the soil to add the additional lanes. ALDOT says this is standard practice with highway departments, to clear and grade for the maximum number of lanes and not necessarily pave all lanes but leave it grassed and ready to add a lane in the future if needed. This way, they will not have to come back to the Corps to get another permit for additional fill in waters of the U.S." (USACOE004840.)

101

Thus, COE considered and explained why a two- or four-lane interstate "could not be used," (USACOE00428; USACOE004821; USACOE004839-40), and why, from its perspective, a four-lane highway would not necessarily be a less environmentally damaging practicable alternative than the final six-lane design (with the built-in potential for expanding the road to eight lanes) (USACOE004829-30; USACOE004837).  Plaintiff has provided no evidence and no substantive argument to the contrary.  Accordingly, Plaintiff has not demonstrated why, contrary to COE's findings, a 2- or 4-lane highway is either "practicable" or "less environmentally damaging."   There is no clear error in COE's judgment.

Accordingly, Plaintiff has not met its heavy burden to demonstrate that COE's § 404 analysis of alternatives was arbitrary or capricious.  *See Fund for Animals, Inc*, 85 F.3d at 544 (holding that plaintiffs failed to carry their burden to demonstrate that COE's practicable alternatives analysis was arbitrary or capricious).

**B.3.   Public Interest Analysis**

In processing § 404 permits, COE conducts a "public interest review." 33 C.F.R. § 320.4(a). Public interest review requires COE to evaluate "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest," and to balance "the benefits which reasonably may be expected to accrue from the proposal . . . against its reasonably foreseeable detriments." 33 C.F.R. § 320.4(a)(1). Thus, while the "least environmentally damaging practicable alternative" focuses on impacts on the aquatic ecosystem, the public interest review involves broader considerations.  *Id*.  "The decision whether to authorize a proposal, and if so, the

conditions under which it will be allowed to occur, are . . . determined by the outcome of this general balancing process" of the public interest review.  *Id*.

Plaintiff argues that COE's public interest review for the permit was inadequate and skewed because, "[o]n the one hand, the Corps must use data and assumptions associated with the entire 52-mile Beltline to justify the project's overall need and the supposed benefits of the interstate," but, "[o]n the other hand, when it comes to analyzing the Northern Beltline's total direct, indirect, and cumulative environmental impacts to water resources, the Corps adopts the fiction that this 1.86-mile interstate is actually a stand-alone project."  (Doc. # 164 at 53.)  However, Plaintiff has not provided a citation to the record showing that COE's public interest analysis relied on the need for and benefits of the entire Northern Beltline as the justification for the benefits and need for the 1.86-mile section.[39]  In fact, COE found that the project had utility independent of the rest of the Beltline, and therefore, with respect to the direct effects of the project, COE considered the direct impacts of the 1.86-mile segment.  (USACOE004819; USACOE 4857-59.)  For example, COE noted that "[t]he project would provide a more efficient and safe east/west connection between SR 75 and SR 79 and provide increased accessibility for emergency response vehicles" and that "[t]he project would create new jobs and businesses and provide a more efficient east/west connection between SR 75 and SR 79, reducing travel times and allow increased accessibility for emergency response vehicles."  (USACOE4819.)

---

[39] The citation provided by Plaintiff in its brief (Doc. # 164 at 53 n. 43 (citing USACOE 4848-51)) is COE's alternatives analysis.   COE's public interest analysis is located at USACOE004856 – 72.

The language defining the focus of the public interest review limits that focus to "the proposed activity," "the proposed structure or work," and "the particular proposal." 33 C.F.R. § 320.4(a).[40]  Thus, the language of 33 § C.F.R. 320.4(a) makes clear that the public interest review is to be conducted with respect to the proposal for which COE is considering issuing a permit[41] – in this case, the 1.86-mile road between SR 79 and SR 75. (*See* USACOE004804 (defining the "proposed work")); *see also* 33 C.F.R. § 323.2(g) ("The term individual permit means a Department of the Army authorization that is issued following a case-by-case evaluation of a specific project involving the proposed discharge(s) in accordance with the procedures of this part and 33 CFR part 325 and a determination that the proposed discharge is in the public interest pursuant to 33 CFR part 320.").  With respect to that activity, COE did conduct a public interest analysis.

---

[40] COE's NEPA implementation procedures require that, generally, the EA should be combined in the same document as the § 404 public interest analysis, as was done in this case. 33 C.F.R. Pt. 325, App. B ¶ 7.  Arguably, therefore, "the extent of the entire project reviewable by the Corps under its [§ 404] public interest review is essentially the same as the extent of review permitted under the NEPA [EA/FONSI] analysis." *Water Works & Sewer Bd. of the City of Birmingham v. U.S. Dep't of Army, Corps of Eng'rs*, 983 F. Supp. 1052, 1067 (N.D. Ala. 1997) *aff'd without opinion sub nom. Water Works v. U.S. Army Corps Engineers*, 162 F.3d 98 (11th Cir. 1998). In certain circumstances where a § 404 permit is sought for "a specific activity . . . which is merely one component of a larger project," the scope of the EA must "address the impacts of the specific activity requiring a [§ 404] permit and those portions of the entire project over which the district engineer has sufficient control and responsibility to warrant Federal review." 33 C.F.R. Pt. 325, App. B. ¶ 7(b).  In conjunction with its argument that the EA and FONSI violate NEPA, Plaintiff argues that, pursuant to 33 C.F.R. Pt. 325, App. B. ¶ 7(b), the EA and FONSI should have included an analysis of the direct, indirect, and cumulative impacts of the entire Northern Beltline.  Because Plaintiff raises that argument in conjunction with Count IV alleging NEPA violations, but not in conjunction with its § 404 public interest analysis claim, that argument is addressed in Section VI.C. to reduce unnecessarily duplicative analysis and discussion.

[41] Plaintiff's argument that the proposed activity as presented in the permit application should not have been limited to the 1.86-mile highway between SR 75 and SR 79 is discussed in Section VI.A.

(USACOE4856 -72.)  Even if, in its public interest analysis, COE did consider that one of the benefits accruing from the proposed action would be the facilitation of the Northern Beltline project (although Plaintiff does not provide a citation to the record to demonstrate that this was in fact the case), that does not mean that the analysis of the direct effects of the proposed action is impermissibly skewed.  *Cf. Hoosier Envtl. Council v. U.S Army Corps of Eng'rs*, No. 1:11-CV-0202-LJM-DML, 2012 WL 3028014, at *12-13 (S.D. Ind. July 24, 2012), *aff'd*, 722 F.3d 1053 (7th Cir. 2013) (rejecting an argument similar to Plaintiff's).

Moreover, simply because COE determined that "[e]valuation of the [§] 404(b)(1) Guidelines for remaining portions of the 50.01 mile road will be conducted at the time the permit application is submitted for review," (USACOE004853) this does not mean that COE's public interest analysis failed to take into consideration the Northern Beltline's total direct, indirect, and cumulative environmental impacts to water resources.  Although 33 C.F.R. § 320.4(a) focuses the public interest inquiry on the proposed project, 33 C.F.R. § 320.4(a) requires that "[a]ll factors which may be relevant to the proposal must be considered including the cumulative effects thereof."[42]   Consistent with this requirement, COE *expressly considered* the Northern Beltline's indirect and cumulative

---

[42] Similarly, NEPA provides that, to determine whether an action "significantly" affects the quality of the human environment, thereby necessitating the preparation of an EIS, an agency may first prepare an EA, which must take cumulative effects into consideration. 40 C.F.R. § 1501.4(c). NEPA requires that an EA must take into consideration "the environmental impacts of the proposed action," 40 C.F.R. § 1508.9(b), which would include cumulative impacts.  40 C.F.R. § 1508.7.  NEPA's requirements are discussed in Section VI.C. in conjunction with Plaintiff's NEPA claims.

effects in its public interest analysis. COE stated that, "[b]ecause the 50.01 mile [Northern Beltline] is a reasonably foreseeable future action, [COE's] scope for cumulative and [indirect ] effects include[d]" not just the watersheds crossed by the 1.86-mile section, but "all three watersheds that the Beltline would cross: the Upper Black Warrior, Locust Fork, and Cahaba." (USACOE004860.) Therefore, COE considered the indirect and cumulative effects of the 1.86-mile section in conjunction with the environmental effects of entire Beltline. (USACOE4859-72.) With respect to indirect effects, COE "largely defer[red] to the analysis in the FHWA 2012 Re-evaluation" and COE provided a discussion in the EA/§ 404(b)(1)/FONSI document that summarized that analysis. "For the in-depth analysis" of indirect effects, COE referred readers "to Section 6.5 in the 2012 Re-evaluation," which was "located in the project file and included in the administrative record for this project." (USACOE004860.) For cumulative effects, COE also relied on and provided a summary of FHWA's cumulative effects analysis, noting that "[t]he full description of the cumulative effects analysis is located in Section 6.6 of the Re-evaluation." (USACOE004861.) COE also requested and analyzed additional information from ALDOT regarding cumulative effects and independently performed its own additional analysis of certain cumulative effects of the project in conjunction with the effects of the Northern Beltline. (USACOE004827; USACOE004846-47; USACOE4862-72.)

Thus, contrary to Plaintiff's argument, COE did not compromise its public interest analysis by "adopt[ing] the fiction that the 1.86-mile interstate is actually a standalone project" or by ignoring the direct, indirect, and cumulative effects of the Northern

Beltline as a whole.  (Doc. # 164 at 53.)

**B.4.   Count II - Conclusion**

Accordingly, for the reasons stated in this memorandum opinion, and for the reasons more fully expressed in Defendants' briefs, Plaintiff has not carried its burden to show that COE's public interest and alternatives analysis violates § 404 of the CWA, and Defendants are entitled to summary judgment on Count II of Plaintiff's complaint.

**C.      COUNT IV: NEPA**

In Count IV,[43] Plaintiff argues that COE's[44] EA/FONSI document violated NEPA in two ways.  First, Plaintiff claims that COE improperly segmented its analysis of the 1.86-mile section to avoid requiring a SEIS for the Northern Beltline.  Second, Plaintiff claims that COE failed to take a hard look at direct, indirect, and cumulative impacts.

**C.1.   Count IV: COE's EA/FONSI Did Not "Segment" the Beltline In Violation of CEQ or FHWA Regulations**

NEPA prohibits the "segmentation" of a project when it is done to mask the overall significance of the project's impacts, particularly its cumulative impacts. 40

---

[43] The purpose of the EA is to determine whether an EIS is necessary. *See* 33 C.F.R. Pt. 325, App. B ¶ 7 ("The [EA] . . . shall conclude with a FONSI (See 40 CFR 1508.13) or a determination that an EIS is required. . . . In those cases where it is obvious an EIS is required, an EA is not required.").  Thus, the disposition of Count IV of Plaintiff's , which challenges the validity of COE's EA analysis under NEPA, largely controls the disposition of Count III, in which Plaintiff alleges that COE should have concluded that a SEIS was needed for the entire Northern Beltline.  Accordingly, the analysis of Count IV is presented before the analysis of Count III.

[44] Plaintiff asserts in the last paragraph of Count IV that "Defendants" in the § 404 action violated NEPA by creating a deficient EA and FONSI.  Defendants in the § 404 action include not only COE and COE's District Commander, but also ALDOT and ALDOT's Director.  However, all factual allegations in Count IV pertain to the alleged conduct of COE.  Therefore, it does not appear that Count IV is directed at ALDOT or its Director.  Moreover, for the reasons stated in this Section and in Section V., Plaintiff has not demonstrated that ALDOT violated NEPA.

C.F.R. § 1508.27(b)(7). To fully evaluate whether a project has been improperly segmented for purposes of evading a thorough NEPA analysis, FHWA regulations require that the project "connect logical termini," "have independent utility," and not "restrict considerations of alternatives for other reasonably foreseeable transportation improvements." 23 C.F.R. § 771.111(f).

ALDOT originally submitted an application for a 3.6-mile highway that extended beyond SR79 and SR 75, but COE rejected that plan because it did not have logical termini and independent utility. (USACOE004809.) ALDOT then revised its design so that it would connect SR 75 and SR 79. (USACOE004809.) COE concluded that, as revised, the 1.86-mile project connects logical termini and has independent utility even if the remainder of the Beltline is never constructed. (USACOE004808-09; USACOE004819; USACOE004824; USACOE004837; *see* USACOE USACOE004819 ("[R]egulations allow for the consideration of permit applications for projects that are phased as long as they have independent utility. This project begins and ends at two major roads, SR 79 and SR 75, so it has logical termini. This project does not rely on other phases because it joins two roads. It is not a 'road to nowhere.'")).

Plaintiff argues that the 1.86-mile section is "located at the top of the Northern Beltline's arc" and, therefore, "locks in substantial portions of the route, particularly the eastern section." (Doc. # 164 at 49.) Transportation projects have to begin somewhere.[45] The Northern Beltline is roughly half of an ellipsis; Plaintiff does not explain why the

---

[45] To paraphrase G.K. Chesterton on morality, "[highways,] like art, consist[] of drawing a line somewhere."

fact that, on a map, the 1.86-mile section is located roughly at the "top" (northernmost area) of the Beltline gives that section any particular controlling significance compared to any other section of that half-ellipsis.  Of course, either end of the phased construction of any nonterminal section of the Northern Beltline will, in all likelihood, establish two connection points for the Beltline, but this does not mean that phased construction impermissibly "restrict[s] consideration of alternatives for other reasonably foreseeable transportation improvements" by "locking in" the rest of the Beltline's route.  If 23 C.F.R. § 771.111(f)(3) necessarily requires COE's EA/FONSI to encompass the entirety of a larger project every time transportation agencies seek a § 404 permit for a road that has independent utility and logical termini and that also happens to have ends that will eventually connect to other phases of a larger project, then all interstate highways would have to be built and permitted all at once, or COE would be required to perpetually issue comprehensive EAs for the entire interstate project each time a new phase is built – a result that is neither possible nor what the law requires.  *Cf. Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*,[46] 722 F.3d 1053, 1060 (7th Cir. 2013) ("The Tier II analysis required sectioning in order to be manageable. . . . The highway wasn't going to be built all at once. Construction would start at its southernmost point and Clean Water Act

---

[46] *Hoosier* involved a challenge to the scope of COE's § 404 alternatives analysis.  In *Hoosier*, the plaintiffs did not argue that the interstate project was "sectioned in order to prevent consideration of its total environmental harms" in violation of NEPA.  *Hoosier*, 722 F.3d at 1063.  Nevertheless, *Hoosier* is cited here because its discussion of the practicalities of tiering is relevant to the point that COE is not legally required and cannot reasonably be expected to issue an EA/§ 404 document that encompasses all phases of an entire interstate project in every circumstance where a permit is sought for one phase of that project.  *See* 33 C.F.R. Pt. 325, App. B ¶ 7. ("The EA should normally be combined with other required documents (EA/404(b)(1)/SOF/FONSI).")

permits would be granted or denied when the analysis of the wetland effects of alternative configurations was completed for each segment.").

Aside from the fact that the Northern Beltline will eventually connect to the ends of the 1.86-mile section, the record does not support Plaintiff's argument that the construction of the 1.86-mile section will pose any meaningful restriction for considering construction alternatives for the remainder of the Northern Beltline.  COE independently considered ALDOT's analysis of the alternative conceptual alignment routes for the Northern Beltline, and COE's analysis demonstrated that the currently preferred alignment (which includes the 1.86-mile section) presents the least environmentally damaging practical alternative.  (USACOE004847-53.)  Again, the precise alignment of much of the remainder of the Beltline has not yet been determined, and environmental and other public interest factors will be taken into consideration as selection of the precise route and design of the remainder of the Beltline progress.  (*See, e.g*.,USACOE004837;   USACOE004844;   USACOE000517-18;   USACOE000520; USACOE000522;   USACOE000558;   USACOE000595;   USACOE000000609; USACOE000612.)

In ruling on Plaintiff's motion for preliminary injunction, the court previously determined that "the SR 79/75 project satisfies NEPA regulations because it has independent utility, logical termini, and does not foreclose other alternatives for the overall project."  (Doc. # 157 at 11).  Thorough consideration of Plaintiff's and Defendants' summary judgment arguments regarding segmentation of the 1.86-mile section has not provided any basis for the court to alter its previous conclusions on the

110

subject.   Accordingly, for the reasons stated in the January 17, 2014 Memorandum
Opinion and Order (Doc. # 157 at 6-12), for the reasons stated in this memorandum
opinion, and for the reasons stated in Defendants' summary judgment briefs, Plaintiff has
not demonstrated that the EA/FONSI document violated NEPA by improperly
segmenting the 1.86-mile road between SR 75 and SR 79.

### C.2.   Count IV: COE's EA/FONSI Did Not "Segment" the Beltline in Violation of Its Own NEPA Implementation Procedures

On summary judgment, in addition to relying on § 771.111(f)(3) to make a
traditional segmentation argument, Plaintiff also argues that COE's own NEPA
implementation procedures required COE to conduct its EA analysis for the entire
Northern Beltline.   Specifically, Plaintiff cites 33 C.F.R. Pt. 325, App. B ¶ 7(b), which
provides:

> In some situations, a permit applicant may propose to conduct
> a specific activity requiring a [§ 404] permit (*e.g.*,
> construction of a pier in a navigable water of the United
> States) which is merely one component of a larger project
> (*e.g.*, construction of an oil refinery on an upland area). The
> district engineer should establish the scope of the NEPA
> document (*e.g.*, the EA or EIS) to address the impacts of the
> specific activity requiring a [§ 404] permit and those portions
> of the entire project over which the district engineer has
> sufficient control and responsibility to warrant Federal
> review.

Plaintiff also cites 33 C.F.R. Pt. 325, App. B ¶ 7(b)(2) and (3), which provide
guidelines for determining when COE has sufficient "control and responsibility for
portions of the project beyond the limits of Corps jurisdiction" to argue that COE should
have concluded that it was required to conduct a NEPA review of the entire Northern

Beltline.

Plaintiff's argument fails because, as explained in Section VI.B.3, COE *did* consider the indirect and cumulative effects of the 1.86-mile section in conjunction with the environmental effects of entire Beltline.  (USACOE4859-72.)

Moreover, Plaintiff's interpretation of ¶ 7 would prohibit COE from ever limiting its EA analysis of direct effects to one phased construction section of an interstate project whenever the remainder of the interstate project also crosses wetlands and streams, even if the phased section does not otherwise run afoul of rules and regulations that prohibit segmentation.  (Doc. # 164 at 51.)  Although Plaintiff's interpretation of ¶ 7(b) would severely (if not completely) foreclose COE's ability to conduct an EA and issue permits for anything less than an entire interstate project all at once, Plaintiff has not offered any relevant[47] legal authority for its interpretation of ¶ 7(b) other than its own representation of the meaning of the text of the paragraph itself.  Essentially, Plaintiff interprets ¶ 7(b)'s

---

[47] In support of its argument that COE's implementation procedures require it to conduct an EA for the entire Northern Beltline, Plaintiff cites *Swain v. Brinegar*, 542 F.2d 364, 368 (7th Cir. 1976), in which the Seventh Circuit held that an EIS prepared by the Illinois Department of Transportation and reviewed by FHWA violated NEPA because it was confined to a 15-mile segment of a 42-mile freeway that did not have logical termini or independent utility, and that foreclosed other reasonable alternatives.  The portion of *Swain* cited by Plaintiff is not applicable to Plaintiff's argument regarding COE's NEPA implementation procedures because it relies on regulations that are no longer current, because it does not address the proper scope of an EA issued by COE in conjunction with a permit application for one phase of construction of an interstate for which an EIS has already been completed, and because it was decided before the existence of COE's current NEPA implementation procedures upon which Plaintiff relies.  49 FR 1387-01; *see* William L. Want, *Law of Wetlands Regulation*, §§ 6.24-25 (Westlaw 2015) (2015) (noting that COE's NEPA implementation regulations were amended in 1988, and that "the principal aspect of [the amendment] was to limit the scope of review in evaluating permit applications").  Furthermore, *Swain* does *not* prohibit segmentation of a project that has logical termini and independent utility and that does not foreclose other reasonable alternatives.

reference to "the specific activity requiring a § 404 permit" to mean the specific 1.86-mile project for which this permit is sought, and ¶ 7(b)'s reference to "the larger project" and "the entire project" to refer to the entire Northern Beltline. Plaintiff also interprets ¶ 7(b)(2)'s reference to "the limits of Corps jurisdiction" as referring to the geographic boundaries of the 1.86-mile section that is the subject of the permit, and ¶ 7(b)(2)'s reference to "portions of the project beyond the limits of Corps jurisdiction" as referring to any larger project outside of the 1.86-mile section that may one day incorporate that section.

COE addressed the scoping requirements of ¶ 7(B) in the EA, and, on summary judgment, all Defendants presented arguments regarding the applicability of ¶ 7(b). (USACOE004815-16; Doc. # 166 at 11-13, 32; Doc. # 168 at 49-51.)  COE's analysis of ¶ 7(b) is in direct conflict with Plaintiff's interpretation of ¶ 7(b).   In the EA, COE evaluated the requirements of ¶ 7(b) and concluded that the scope of NEPA analysis must encompass not only "the footprint of the regulated activity within the delineated water," *i.e.*, the specific portions of the 1.86-mile project that involve regulated activities that cross or directly affect the waters of the United States, but also "the entire property," *i.e.*, all portions 1.86-mile project.  (USACOE004816.)[48]  Thus, under COE's approach, ¶ 7's

_____

[48] The copy of the EA/FONSI document attached to Plaintiff's  is not a final copy and it differs materially from the final version with respect to the section analyzing the scope of NEPA considerations for the EA.  (Doc. # 1 in case No. 2:13-cv-794 at 14 n.1; Doc. # 1-2 at 13-14; USACOE004815-16.)  COE's NEPA analysis, even those portions that did not change between the draft and the final version, was consistent COE's determination that it was obligated to perform the NEPA analysis not only with respect to the specific discharge and fill activities that required a permit, but also over those portions of the 1.86-mile section that did not cross wetlands and streams.

reference to "portions of the project beyond the Corps' jurisdiction" means those upland "portions" that are part of the specific "project" that is the subject of the permit, but that are not located within the jurisdictional limits of the waters of the United States.

COE's interpretation of ¶ 7(b) is not inconsistent with the language of COE's regulations or the purpose of ¶ 7(b). *See, e.g.,* 33 C.F.R. § 323.2 ("The term waters of the United States and all other terms relating to the geographic scope of jurisdiction are defined at 33 CFR part 328."); 33 C.F.R. § 328.4 ("The limits of jurisdiction in non-tidal waters: (1) In the absence of adjacent wetlands, the jurisdiction extends to the ordinary high water mark, or (2) When adjacent wetlands are present, the jurisdiction extends . . . to the limit of the adjacent wetlands. (3) When the water of the United States consists only of wetlands the jurisdiction extends to the limit of the wetland."); 33 C.F.R. Pt. 325, App. B ¶ 7(b)(2) ("The district engineer is considered to have control and responsibility for portions of the project beyond the limits of Corps jurisdiction where the Federal involvement is sufficient to turn an essentially private action into a Federal action. These are cases where the environmental consequences of the larger project are essentially products of the Corps permit action."); 33 C.F.R. Pt. 325, App. B ¶ 7(b)(1) ("In some situations, a permit applicant may propose to conduct a specific activity requiring a [§ 404] permit (*e.g.*, *construction of a pier in a navigable water* of the United States) which is merely one component of a larger project (*e.g.*, construction of an oil refinery on an *upland area*)." (emphasis added)); 33 C.F.R. Pt. 325, App. B ¶ 7(b)(3) (discussing when NEPA review should be "extended to *the entire project*, *including portions outside waters of the United States*. . . if sufficient Federal control and responsibility over the

entire project is determined to exist" and noting that "[f]or those regulated activities that comprise merely a link in a transportation . . . project, the scope of analysis should address the Federal action, *i.e., the specific activity requiring a [§ 404] permit* and any other portion of the project that is within the control or responsibility of the Corps of Engineers" (emphasis added)); *Environmental Quality, Procedures for Implementing the National Environmental Policy Act* (NEPA), 49 FR 1387-01 (explaining that, where a utility line crosses waters of the United States, the "specific activity" requiring the permit is "the crossing itself," and "the entire project" is the entire length of the utility line); William L. Want, *Law of Wetlands Regulation*, §§ 6:24-25 (Westlaw 2015) (explaining that ¶ 7 was introduced to limit COE's previously very broad scope of review of an entire project of which the regulated dredge or fill site was merely a part).

Further, unlike Plaintiff's preferred interpretation, COE's interpretation avoids the illogical effect of prohibiting tiering[49] with respect to highway projects (which CEQ regulations encourage, *see* 40 C.F.R. § 1502.20) and does not prevent COE from issuing permits for individual, manageable phases of massive highway projects that do not otherwise run afoul of other regulations that prohibit segmentation and overly narrow permit applications.

---

[49] "Tiering refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared."  40 C.F.R. § 1508.28. "Agencies are *encouraged* to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review." 40 C.F.R. § 1502.20 (emphasis added).

Accordingly, the court finds that COE's interpretation of ¶ 7(b) is persuasive, reasonable, not clearly erroneous, and not inconsistent with the regulation.  Moreover, because Plaintiff has not provided any relevant legal authority to support its preferred interpretation, which is contrary to that of COE's interpretation, Plaintiff has not shown that COE acted arbitrarily or capriciously in determining the proper scope of NEPA review.   *See Fla. Wildlife Fed'n v. U.S. Army Corps of Eng'rs*, 401 F. Supp. 2d 1298, 1311-12 (S.D. Fla. 2005)[50] ("The Corps' determination of the appropriate scope of the environmental review process is entitled to deference. *See Or. Nat. Res. Council*, 490 U.S. at 375-76; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989)."); *see also Robertson*, 490 U.S. at 359 (upholding an agency's interpretation of its own regulation as "controlling" where that interpretation was not "plainly erroneous or inconsistent with the regulation"); *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 912 (11th Cir. 2007) ("[C]ourts must give deference to an agency's reasonable interpretation of its own regulations.").

### C.3.   Count IV: Hard Look Analysis

In Count IV, Plaintiff claims that COE's EA/FONSI "fail[ed] to properly examine the direct, indirect, and cumulative project impacts, either by ignoring them altogether or by merely listing them with no analysis."  (Doc. # 1 in case No. 2:13-cv-794 at ¶ 128.) On summary judgment, Plaintiff puts forth several arguments to support its contention

---

[50] In *Florida Wildlife*, the court held that ¶ 7 did not allow COE to confine its EA to the first phase of a project to build a research institute. *Florida Wildlife* is distinguishable on its facts (*see* Doc. # 168 at 55 (distinguishing the case)) and, perhaps for that reason, Plaintiff did not cite *Florida Wildlife* in support of its ¶ 7 argument.

that the EA failed to take a hard look at the project's impacts.

First, Plaintiff argues that COE had an "incomplete picture" of the Northern Beltline's direct, indirect, and cumulative environmental impacts because COE used "improper segmentation" to evaluate the 1.86-mile segment "as a standalone project." (Doc. # 164 at 49-50.) However, Sections VI.C.1 and VI.C.2 explain why COE did not improperly limit its EA/FONSI analysis to the 1.86-mile project.

Second, Plaintiff argues that "much of [COE's] EA is merely a listing of impacts with no analysis whatsoever." (Doc. # 164 at 50.) Plaintiff specifically points to only one particular portion of the EA/FONSI (USACOE004862-68) as allegedly "listing impacts with no analysis whatsoever." (Doc. # 164 at 50 n.99.) The section of the EA that spans the page numbers cited by Plaintiff consists of COE's own independent cumulative effects analysis, which addresses the cumulative effects of the Northern Beltline in combination with other COE-permitted projects in each of the relevant watersheds. The cited portion is concise,[51] but it does provide data and brief explanations

---

[51] So long as an EA/FONSI contains sufficient information and analysis to support COE's decision whether to issue an EIS or a FONSI, brevity and concision in the document are not defects, but a required feature. By law, an EA is a "*concise*" public document that "*briefly* provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1) (emphasis added). It "include[s] *brief* discussions of the need for the proposal, . . . of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1508.9(b) (emphasis added); *see also* 33 C.F.R. § 230.10 ("An EA is a *brief* document which provides sufficient information to the district commander on potential environmental effects of the proposed action and, if appropriate, its alternatives, for determining whether to prepare an EIS or a FONSI . . . . While no special format is required, the EA should include a *brief* discussion of the need for the proposed action, or appropriate alternatives if there are unresolved conflicts concerning alternative uses of available resources, of the environmental impacts of the proposed action and alternatives and a list of the agencies, interested groups and the public consulted. *The document is to be concise* for meaningful review and decision."

supporting COE's conclusions and is not simply a "listing of impacts with no analysis whatsoever." Plaintiff has not explained what "analysis" is lacking from COE's discussion. Accordingly, Plaintiff has not carried its burden to show that COE's independent cumulative effects analysis was arbitrary or capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (holding that an agency is required to consider the relevant data and articulate an explanation of its action that demonstrates a rational connection between the facts found and the choice made, and "ideal clarity" is not required if the basis of the agency's decision can be reasonably discerned); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1223 (11th Cir. 2002) ("Absent evidence to the contrary, we presume that an agency has acted in accordance with its regulations."). *Cf. Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1248 (11th Cir. 1996) ("Although the plaintiffs disagree with the conclusion of the Corps, they can point to nothing that would make the Corps decision arbitrary and capricious.").

Third, Plaintiff argues that COE "bases its FONSI in part on past environmental studies that are "either out of date or themselves lacking in probative analysis." (Doc. # 164 at 50.) The only use of "out of date" information Plaintiff specifically mentions is COE's reliance on the cost projections in the 1997 FEIS. As explained in Section VI.B.2,

---

(emphasis added)). A FONSI is "a document by a Federal agency *briefly* presenting the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." 40 C.F.R. § 1508.13 (emphasis added); *see also* 33 C.F.R. § 230.11 ("The FONSI will be a *brief summary* document as noted in 40 CFR 1508.13." (emphasis added)). COE's NEPA implementation procedures provide that the combined EA/§ 404(b)(1)/FONSI document "normally should not exceed 15 pages," 33 C.F.R. Pt. 325, App. B ¶ 7, although, in this case, the document is 75 pages in length, excluding appendixes.

COE did not act arbitrarily or capriciously in its use of the cost projections in 1997 FEIS.

Fourth, Plaintiff argues that COE cannot rely on the 2012 Re-evaluation because it is a "flawed document."  (Doc. # 170 at 12.)  However, for the reasons stated in Part V., Plaintiff has not demonstrated that the 2012 Re-evaluation is a "flawed document."

Thus, Plaintiff has not shown that COE failed to take a hard look at direct, indirect, and cumulative impacts of the project in issuing the EA/FONSI.

## D.    Count III: COE's Decision Not to Prepare a SEIS For the Entire Northern Beltline

In Count III of the complaint in the § 404 action, Plaintiff alleges that COE violated NEPA by failing to independently determine that a SEIS was necessary for the entire Northern Beltline. [52]  In its summary judgment motion and initial supporting brief, Plaintiff does not discuss this claim against COE.  In its summary judgment response brief, Plaintiff argues that *somebody* should have determined that a SEIS for the whole Northern Beltline was needed, and that COE should have concluded that a comprehensive SEIS was needed for all the same reasons that the Highway Defendants should have come to that conclusion. However, as explained in Section VI.C., Plaintiff failed to demonstrate that NEPA obligated the Highway Defendants to create a comprehensive SEIS for the entire Northern Beltline; therefore, Plaintiff has not demonstrated that, if COE had independently assessed the issue, COE would have been obligated to require a comprehensive SEIS for the entire Northern Beltline.  Therefore,

---

[52] Also in Count III, Plaintiff asserts that COE's decision not to conduct a SEIS for the entire Northern Beltline was the product of improper segmentation.  COE is entitled to summary judgment on that issue because, for the reasons stated in Sections V.1.C.1 and .2, COE did not improperly segment the Beltline.

COE is entitled to summary judgment on Count III.

Alternatively, summary judgment should be granted on Count III for the reasons given by Defendants, who do address Count III in their summary judgment briefs.  (Doc. # 166 at 25-31; Doc. # 168 at 40.)  Defendants argue that COE is entitled to summary judgment on Plaintiff's claim because FHWA, as the lead federal agency on the Northern Beltline Project, was responsible for preparing the FEIS and ensuring its continuing validity, and COE properly deferred to FHWA's determination that no SEIS was needed for the entire Northern Beltline.

In response to Defendants' summary judgment arguments, Plaintiff argues that COE acted arbitrarily and capriciously in two ways when it relied on FHWA's decision not to supplement the EIS for the entire Northern Beltline.  (Doc. # 170 at 12-13.)  First, Plaintiff argues that FHWA's decision not to supplement the EIS was wrong because the FEIS is outdated and because it did not include an analysis of the indirect and cumulative effects of the Beltline. (Doc. # 170 at 12-13.)   *See* 33 C.F.R. § 230.21 ("[COE] will normally adopt another Federal agency's EIS and consider it to be adequate unless [COE] finds substantial doubt as to technical or procedural adequacy or omission of factors important to the Corps decision.").  However, for the reasons stated in Section V., Plaintiff has not shown that FHWA's decision not to supplement the FEIS was arbitrary or capricious.

Second, Plaintiff argues that COE could not have relied on FHWA's conclusion in the 2012 Re-evaluation that no SEIS was needed because because the Re-evaluation itself was a "flawed document" and because, in any event, COE was not a cooperating

120

agency[53] in the preparation of the Re-evaluation.  (Doc. # 170 at 12.)

For the reasons stated in Section V., Plaintiff has not demonstrated that the Re-evaluation was a "flawed document."  Further, Plaintiff does not cite any authority to support its contention that COE was required to serve as a cooperating agency in the preparation of the 2012 Re-evaluation in order to defer to FHWA's decision that no SEIS was needed for the entire Northern Beltline.  It appears that Plaintiff is conflating the issue of whether COE was allowed to defer to FHWA's conclusion about the necessity of a SEIS for the Northern Beltline with Defendants' (separate) argument that COE was allowed to "tier" to the 1997 FEIS.  "Tiering" allows a cooperating agency to adopt an

---

[53] In fact, COE was asked to cooperate on the Re-evaluation, although ALDOT did not coordinate with COE outside of the permitting process.  (USACOE004818.)  Plaintiff does not explain what "cooperation" COE ought to have provided in the 2012 Re-evaluation. Cooperating agencies normally assist lead agencies with information concerning which the cooperating agency has special expertise. 40 C.F.R. § 1501.6(c)(3); *see also* 33 C.F.R. Pt. 325, App. B ¶ 8(c) ("If another agency is the lead agency as set forth by the CEQ regulations . . . , the district engineer will coordinate with that agency as a cooperating agency under 40 CFR 1501.6(b) and 1508.5 to insure that agency's resulting EIS may be adopted by the Corps for purposes of exercising its regulatory authority. As a cooperating agency the Corps will be responsible to the lead agency for providing environmental information which is directly related to the regulatory matter involved and which is required for the preparation of an EIS.").  There is no evidence that the project designs were sufficiently advanced for COE's expertise to be useful in evaluating the necessity of a SEIS for the entire Northern Beltline.  (*See* USACOE4844 ("Regarding working with ALDOT on the potential indirect effects for the entire project, if and when the future phases progress (it is reasonable to assume they will), the Corps will work with ALDOT at the time the project is submitted to assess avoidance and minimization of impacts. ALDOT has a general idea of the footprint for the remainder of the Beltline, but final engineering is not complete and on the ground waters of the US determinations have not been conducted. This is because the funding is not available to get this far along in the planning stages. They have a general idea of the direct impacts, but until they get to the stage where they have the funding for in-depth studies, this type of project planning cannot be conducted at this time. The Corps will work with ALDOT when the appropriate time comes.").  Thus, Plaintiff has not demonstrated that COE failed in any of its responsibilities as "cooperating agency" in the 2012 Re-evaluation to ensure that the 1997 FEIS was still valid.

EIS of a lead agency,[54] and, in the EA/FONSI, COE stated that, as a cooperating agency in the 1997 FIES, it was "adopting" the FEIS.  (USACOE004804.)

A Re-evaluation, however, is not an EIS, and, in the EA/FONSI, COE did not purport to "tier" to that document, and it did not purport to "adopt" the Re-evaluation on the same grounds or under the same legal authority that it adopted the EIS.

---

[54] 40 C.F.R. § 1502.20 ("Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."); 23 U.S.C. § 101(b)(4) ("Congress declares that it is in the national interest to expedite the delivery of surface transportation projects by substantially reducing the average length of the environmental review process. . . . Accordingly, it is the policy of the United States that . . . the [Department of Transportation] Secretary shall have the lead role among Federal agencies in carrying out the environmental review process for surface transportation projects."); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1215, 1223 (11th Cir. 2002) ("Agencies are not required to duplicate the work done by another federal agency which also has jurisdiction over a project. NEPA regulations encourage agencies to coordinate on such efforts.  As early as possible, a lead agency should be designated. Other involved agencies are designated 'cooperating agencies.' 40 C.F.R. § 1501.6. A lead agency, who ultimately signs the EIS, is responsible for ensuring the involvement of all other agencies involved and supervising the EIS preparation. 40 C.F.R. §§ 1501.5(a), 1501.6(a). . . . Cooperating agencies are permitted to adopt an EIS signed by the lead agency, provided they undertake 'an independent review of the statement' and determine that their 'comments and suggestions have been satisfied.' 40 C.F.R. § 1506.3(c). . . . . The Corps acted as a cooperating agency in the development of the 1994 EIS . . . . In such a situation, the Corps' regulations require the district engineer to coordinate with a lead agency to 'insure that agency's resulting EIS may be adopted by the Corps for purposes of exercising its regulatory authority.' 33 C.F.R. Pt. 325, App. B ¶ 8(c). . . . In addition, NEPA regulations require an agency to undertake an independent review of a lead agency's EIS before adopting it. 40 C.F.R. § 1506.3(c). If the Corps undertook no independent consideration of the [EIS], it would be in violation of both NEPA and its own regulations. *See* 40 C.F.R. § 1506.3; 33 C.F.R. Pt. 325, App. B ¶ 8(c). However, it is apparent from the administrative record that the Corps amply fulfilled its independent review duty. Moreover, we presume that the Corps complied with all regulatory requirements; Sierra Club has adduced no evidence to the contrary.").

In addition to specifically providing for "tiering" an EA to a previous EIS, CEQ regulations also more generally provide for the adoption of "appropriate environmental documents" (which, by definition, include EISs, EAs, FONSIs, and notices of intent) that have been prepared by other agencies.  *See D'Agnillo v. U.S. Dep't of Hous. & Urban Dev.*, 965 F. Supp. 535 (S.D.N.Y. 1997) (discussing relevant regulations); *see also* 40 C.F.R. § 1506.4 ("Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.").

(USACOE004804; USACOE004818; USACOE4860-62.)   Instead, COE "made [the 2012 Re-evaluation] a part of [its] administrative record and [the Re-evaluation] serve[d] as a source of some data related to" the Northern Beltline."   (USACOE004804; USACOE004818; USACOE4860-62.)  In the EA/FONSI, COE considered the data from the Re-evaluation along with other data and its own independent analysis and conducted an independent NEPA evaluation that focused on whether an EIS was needed for the 1.86-mile section.  (USACOE004804; USACOE4860-72; USACOE004876.)  COE also "assessed additional items not considered during the EIS and Re-evaluation process to satisfy Corps regulations."  (USACOE004804; USACOE004862-72.)   The regulations do not prohibit COE from relying on data from the Re-evaluation so long as COE conducted its own independent assessment of the data,[55] and Plaintiff does not argue that

---

[55] 33 C.F.R. Pt. 325, App. B ¶ 3 ("The district engineer may require the applicant to furnish appropriate information that the district engineer considers necessary for the preparation of an Environmental Assessment (EA) or Environmental Impact Statement (EIS)."); *Hoosier Envtl. Council v. U.S. Army Corps of Eng'rs*, 722 F.3d 1053, 1061 (7th Cir. 2013) ("Although the Corps has an independent responsibility to enforce the Clean Water Act and so cannot just rubberstamp another agency's assurances concerning practicability and environmental harm, it isn't required to reinvent the wheel. If another agency has conducted a responsible analysis the Corps can rely on it in making its own decision. After all, it is permitted to rely (though not uncritically) on submissions by private permit applicants and on consultants . . . and it necessarily relies heavily on them—so why not on federal agencies that have relevant responsibilities and experience?"); *see also Friends of the Earth v. Hintz*, 800 F.2d 822, 834 (9th Cir. 1986) ("The Corps' regulations do not require the Corps to undertake an independent investigation or to gather its own information upon which to base an EA."); *Save the Bay, Inc. v. U.S. Corps of Eng'rs*, 610 F.2d 322, 325 (5th Cir. 1980) ("[I]t is clear that the Corps had testimony, evidence and comments from individuals and governmental agencies which could lead it to reasonably conclude that an EIS would not be necessary. The Corps received and reviewed comments from several governmental agencies as well as from quasi-governmental and business organizations. . . . We cannot agree . . . that consulting with these agencies was improper. [NEPA] requires that federal agencies consult with other agencies whose area of expertise is superior to their own." (footnote omitted)). *Cf.* 40 C.F.R. § 1506.5(a) ("If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by

they do.

In addition to relying on the Re-evaluation as a source of data, COE also stated repeatedly throughout the EA that it deferred to FHWA's decision, as the lead agency for the Northern Beltline Project, that no SEIS was needed.    (USACOE004804; USACOE004818-20; USACOE004821; USACOE004829-30; USACOE004834.)  Taken in context, however, these statements clearly refer to COE's deference to FHWA's administrative decision regarding whether a SEIS was needed *for the entire Northern Beltline.*  More specifically, COE deferred to FHWA's decision that no SEIS was needed for the entire eastern portion of the Beltline and also deferred to FHWA's decision to reserve for future consideration whether a SEIS will be issued "on just the western section and not the entire route."  (*See* USACOE004819-20.)

However, COE did not defer to or adopt the 2012 Re-evaluation with respect to whether an EIS (or SEIS) was needed for the 1.86-mile section that was the subject of the permit.    (*See, e.g.*, USACOE004818; USACOE004821; USACOE004876 ("Having reviewed the information provided by the applicant and all interested parties and an assessment of the environmental impacts, [COE finds] that this permit action will not have a significant impact on the quality of the human environment. Therefore, an Environmental Impact Statement will not be required.").  COE explained in the EA that it

---

outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. . . . It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.")

was not responsible for determining whether a SEIS was needed for the entire route, but COE maintained that its obligation was to determine whether the significance of the impacts of the 1.86-mile section required an EIS. (*See, e.g.*, USACOE004817-21; USACOE004876.)  As explained in Section VI.C., Plaintiff has not demonstrated that COE's decision to focus its NEPA analysis on the necessity of an EIS for the 1.86-mile section was arbitrary or capricious.

Accordingly, regardless of COE's status or actual participation as a "cooperating agency" in the 2012 Re-evaluation, Plaintiff has failed to demonstrate that COE acted arbitrarily or capriciously in declining to second-guess FHWA's lead-agency determination regarding whether a SEIS was needed for the entire Northern Beltline.  *Cf. Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1222 (11th Cir. 2002) ("[Plaintiff] makes three additional claims which are essentially challenges to decisions by other agencies. [Plaintiff] bears a difficult burden in proving the Corps was arbitrary and capricious in relying on these decisions, which were entirely within those agencies' areas of expertise.").

For the reasons stated in this memorandum opinion, the January 17, 2014 Order, and Defendants' briefs, Plaintiff has not demonstrated that COE[56] failed to follow proper procedures or acted arbitrarily and capriciously in declining to consider whether a SEIS

---

[56] Plaintiff asserts in the last paragraph of Count III that "Defendants" in the § 404 action violated NEPA.  Defendants in the § 404 action include not only COE and COE's District Commander, but also ALDOT and ALDOT's Director.  However, all factual allegations in Count III pertain to the alleged conduct of COE.  Therefore, it does not appear that Count III is directed at ALDOT or its Director.  Moreover, for the reasons stated in this Section and in Section V., Plaintiff has not demonstrated that ALDOT violated NEPA by not preparing a SEIS for the entire Northern Beltline.

was required for the entire Northern Beltline.   Defendants are entitled to summary judgment on Count III of the complaint in the § 404 action.

**E.      The § 404 Action: Conclusion**

Accordingly, Defendants are entitled to summary judgment on all claims asserted in the complaint in the § 404 action, and Plaintiff's motion for summary judgment on the claims in that complaint is due to be denied.

## VII.  CONCLUSION

Finally, for the reasons stated in this Memorandum Opinion and Order, in the January 17, 2014 Memorandum Opinion and Order (Doc. # 157), and in Defendants' summary judgment briefs, it is ORDERED:

1.      that Plaintiff's motion for summary judgment (Doc. # 163) is DENIED;

2.      that the motion for summary judgment (Doc. # 165) filed by ALDOT and ALDOT Director, John R. Cooper, is GRANTED;

3.      that the motion for summary judgment (Doc. # 167) filed by FHWA, Mark Bartlett, COE, and Col. Jon J. Chytka is GRANTED;

4.      that judgment is granted in favor of Defendants on all claims; and

5.      that these consolidated cases are DISMISSED with prejudice.

A separate final judgment will be entered.

DONE this 19th day of January, 2016.

/s/ W. Keith Watkins
CHIEF UNITED STATES DISTRICT JUDGE